# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE APPRAISAL OF REGAL
ENTERTAINMENT GROUP

)
)
)

Cons. C.A. No. 2018-0266-JTL

## MEMORANDUM OPINION

Date Submitted: April 1, 2021
Date Decided: May 13, 2021

Samuel T. Hirzel, II, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; David J. Margules, Elizabeth A. Sloan, BALLARD SPAHR LLP, Wilmington Delaware; Thomas E. Redburn, Jr., Maya Ginsburg, LOWENSTEIN SANDLER LLP, New York, New York; *Attorneys for Petitioners*.

Robert S. Saunders, Jenness E. Parker, Lauren N. Rosenello, Kaitlin E. Maloney, Justin C. Barrett, Andrew D. Kinsey, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Respondents*.

**LASTER, V.C.**

The petitioners owned shares of Class A common stock in Regal Entertainment Group ("Regal" or the "Company"). On February 28, 2018, Cineworld Group plc ("Cineworld") acquired the Company through a reverse triangular merger (the "Merger"). Under the agreement and plan of merger that governed the transaction (the "Merger Agreement"), each share of Regal common stock was converted into the right to receive $23.00 per share in cash.

The petitioners sought appraisal and litigated the case through trial. The parties presented three valuation indicators for the court's consideration. The petitioners argued in favor of a discounted cash flow ("DCF") methodology, which they maintained supports a fair value of $33.83 per share. Cineworld[1] responded that the court should not consider a DCF model and argued instead for relying on Regal's unaffected trading price and the deal price minus synergies. Cineworld proposed to give equal weight to those valuation indicators, resulting in a fair value of $18.02 per share.

Each of the three methodologies could be used to generate a sufficiently reliable valuation to use in an appraisal proceeding. Applying recent Delaware precedent to the facts of the case, this decision looks to the deal price as the most reliable evidence of

---

[1] Technically, an appraisal proceeding pits the petitioners who have opted for appraisal against the corporation that survived the merger. After an acquisition, however, the buyer is the real party in interest on the respondent's side of the case. *See In re Appraisal of Columbia Pipeline Gp., Inc.*, 2019 WL 3778370, at *17 (Del. Ch. Aug. 12, 2019). Reflecting this reality, this decision refers to the respondent's arguments as Cineworld's.

Regal's value at the time of signing. To adjust the deal price to eliminate value arising from the accomplishment or expectation of the Merger, this decision then subtracts $3.77 per share, representing the portion of Cineworld's anticipated synergies that the deal price allocated to Regal's stockholders.

The resulting value of $19.23 per share reflects the fair value of Regal when the Merger Agreement was signed. The appraisal statute obligates the court to determine the fair value of Regal when the Merger closed. The parties agreed that some adjustment was necessary because after signing but before closing, Regal's value increased when the Tax Cuts and Jobs Act (the "Tax Act") reduced the corporate tax rate from 35% to 21%. To reflect that valuation increase, this decision adds $4.37 per share to the value of the deal price minus synergies.

Consequently, based on the evidence presented at trial, the fair value of the Company's common stock at the effective time of the Merger was $23.60 per share. The petitioners are entitled to this amount, plus pre- and post-judgment interest.

## I. FACTUAL BACKGROUND

Trial took place over four days. The parties introduced 1,675 exhibits, including twenty-two deposition transcripts. Six fact witnesses and four experts testified live. In the pre-trial order, the parties agreed to 243 stipulations of fact. The following factual findings represent the court's effort to distill this record.[2]

---

[2] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 223. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript.

## A.  The Company

Regal is a Delaware corporation headquartered in Knoxville, Tennessee. Regal exhibits theatrical films (colloquially called "movies") in hundreds of cinemas in the United States.

The Anschutz Corporation ("Anschutz") created Regal through a series of transactions in 2001 and 2002. Anschutz is a private Delaware corporation headquartered in Denver, Colorado. Philip F. Anschutz has controlled Anschutz since 1962.[3]

In 2002, Regal completed an initial public offering of Class A shares, which carried one vote per share. From that point until the closing of the Merger, Regal's Class A shares traded on the New York Stock Exchange. Anschutz owned all of the Company's Class B shares, which carried ten votes per share.

After the IPO, Anschutz continued to hold a controlling interest in the Company. At the time of the Merger, Anschutz held 12,440,000 Class A shares and 23,708,639 Class B

---

Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX —— at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

The parties deposed some witnesses multiple times. For those witnesses, the citation includes the JX number of the pertinent deposition in parentheses.

[3] My usual practice is to identify individuals by their last names without honorifics. In this case, the risk of confusion between Mr. Anschutz, the biological person, and Anschutz, the corporate person, warrants an exception. The same risk does not exist for others, who are identified without honorifics. No disrespect is intended.

shares. *See* JX 304 at 19; JX 1444 at 96. In total, Anschutz controlled approximately 67% of the Company's outstanding voting power while owning shares reflecting 23% of the Company's economic value. PTO ¶ 4; JX 1363 at 12; JX 1461 at 5.

Despite Anschutz's voting power, Mr. Anschutz did not serve on the Company's board of directors (the "Board"). The members of the Board comprised eight independent, outside directors plus Amy Miles, who served as CEO and Chair of the Board. David Ownby was Regal's CFO. Peter Brandow was Regal's General Counsel. Gregory Dunn was Regal's President and Chief Operating Officer.

## B.    The Company's Business

At the time of the Merger, Regal was the second largest theatrical film exhibitor in the world, operating 7,321 screens in 560 theaters across the United States.[4] Regal's two largest competitors were AMC Theatres ("AMC") and Cinemark USA, Inc. ("Cinemark"). Together, the three firms accounted for roughly 50% of U.S. cinema screens and 65% of U.S. box office revenues. Financial analysts viewed Regal as "an industry leader." JX 790 at '198.

---

[4] The American spelling of the English word *theatre* likely resulted from Noah Webster's efforts after the Revolutionary War to establish a "national language" for the newly formed United States of America, distinct from the orthographic predilections of its imperial forebear. *See* Conrad T. Logan, *Noah Webster's Influence on American Spelling*, 14 Elementary Eng. Rev. 18, 18–20 (1937) ("'My lad,' [Webster] said to the printer, 'when you use these words, please oblige me by spelling them as here: *theater*, *enter*, etc.'" (quoting Horace E. Scudder, *Noah Webster* 214 (1890)). Contemporary exhibitors deploy both spellings. Out of a mild sense of patriotism, this decision follows Webster.

The key drivers of Regal's business were ticket sales, concessions, and "film rent," which is the portion of ticket revenue that a theater pays the studio that produces a film in return for the right to show the film in its theaters. Studios historically licensed their films exclusively to theater owners during the "theatrical release window." JX 1630 ("Hollis Report") ¶ 72. After the theatrical release window, studios distributed the films to consumers through other channels. *Id.* The duration of the theatrical release window had shortened steadily over time, from approximately six months in 1997 to approximately 100 days when the Merger Agreement was signed in 2017. *See* JX 1575 at 1.

Ticket sales, also known as box office receipts, constituted Regal's primary source of revenue. Ticket sales were a function of attendance and ticket prices. Both variables fluctuated from year to year.

Attendance peaked in 2002, then declined at a compound annual growth rate ("CAGR") of 1.6% through the announcement of the Merger. Hollis Report ¶ 20. In the six years before the Merger, attendance declined at a lower CAGR of 0.5%. Calkins Tr. 131–32. Prices moved in the other direction, increasing at a CAGR of 2.1% during the six years before the Merger. JX 1629 ("Calkins Report") ¶ 80, Fig. 4, Fig. 12; Calkins Tr. 42–43.

Regal also derived significant revenue from concessions sales. During the five years before the Merger, concession spending per ticket increased at a CAGR of 5%. Calkins Report ¶ 82, Fig. 5.

In addition to tickets and concessions, Regal generated revenue from in-theater advertisements and from transaction fees on ticket sales through its online portal. *See*

5

Calkins Tr. 90; Ownby Tr. 228, 259; JX 564 at 14. At the time of the Merger, in-theater advertisements and online ticketing fees were miniscule but rapidly growing components of the Company's revenue. *See, e.g.*, JX 647 at 3 (online and mobile ticketing fees "contributed to double-digit growth in [Regal's] other revenue streams in first quarter of 2017"); *id.* at 5 (in 2017 online ticketing was "a relatively small part . . . of our overall other revenue line" and increased "just a little less than 50% . . . versus the first quarter of last year"); JX 1084 at '101 ("Other Operating Revenues," which include in-theater advertisements and online ticketing fees, comprised approximately 6% of year-to-date revenues in September 2017).

Beginning in 2011, exhibitors began investing in the theater experience to counteract declining attendance.[5] Regal enhanced its concessions offerings, added new screen formats such as 3D and IMAX, and began offering mobile ticketing and reserved

---

[5] Calkins Tr. 37–38 (describing increase in exhibitors' "experience investments," including enhanced viewing formats such as 3D and IMAX, reclining seats, alcohol sales, and enhanced concessions offerings, beginning in 2011); Calkins Report ¶ 61 ("[B]y 2011 studios and exhibitors were working together to put in place a series of initiatives that have ultimately helped their attendance in recent years."); Hollis Report ¶ 26 & n.22 (exhibitors have invested in "a premium theater experience" in "reaction to falling or stagnating ticket sales, offering consumers a differentiated experience from watching films at home"); *see* JX 790 at '196 (financial analyst report stating that "the movie going experience has improved considerably in recent years due to several amenities (primarily recliner seating, but also expanded food/beverage/alcohol offerings) and greater technologies (sound and picture)").

seating.[6] Regal also invested in reclining seats.[7] Regal observed that after adding reclining seats, a theater generally experienced increased attendance for twelve to eighteen months. Ownby Tr. 227; *see* Miles Tr. 429. On the concessions side, Regal invested in an expanded food menu and began selling alcoholic beverages in some locations. JX 165 at 3; JX 189 at 5; *see* JX 166 at 18. Regal also developed an industry-leading loyalty program with over twelve million members. JX 1222 at '041; Dunn Tr. 188–89; JX 149 at 5.

At the time of the Merger, there were six major studios in the United States: Warner Brothers, 20th Century Fox, Paramount Pictures, Universal Pictures, Sony Pictures Entertainment, and Walt Disney. PTO ¶ 112; Calkins Tr. 19; Hollis Report ¶ 22. The studios' biggest and most popular films, called "tentpole releases," produced an outsize portion of theater revenues. Examples include movies in the *Star Wars* and *Harry Potter* franchises. Tentpole releases typically arrived in theaters during the summer months and winter holidays. The intervening months were referred to as "shoulder" periods, when

---

[6] Dunn Tr. 175–76, 183–84; JX 155 at 3 (April 30, 2013, Regal earnings call transcript stating that Regal is "well-positioned to capitalize on the numerous premium-format films scheduled for release in the rapidly approaching summer movie season" and describing other investments in "premium" theater experience); JX 157 at 3 (October 24, 2013, Regal earnings call transcript describing the "returns generated to date by our investments in the premium experience"); JX 165 at 3 (February 13, 2014, Regal earnings call transcript stating that Regal "expanded [its] rollout of existing amenities" and "began installing new concepts" such as "luxury seating").

[7] JX 165 at 3 (Regal began installing luxury seating in 2013); *see also* Calkins Report ¶ 90 ("[T]he most important viewing experience innovation over the past several years has been the shift . . . to recliner-seated auditoriums.").

studios generally released smaller films supported by smaller marketing campaigns. Beginning around 2011, studios shifted their production and marketing efforts toward tentpole releases.

From Regal's IPO until the Merger, film rent remained relatively constant at just over fifty percent of box office revenue. As a practical matter, the studios and theaters had relatively equal bargaining power. If a studio demanded excessive film rent, then a large exhibitor like Regal could refuse to show the film, and theater revenue and visibility were important to the studios. But the exhibitors also needed the studios, because they could not sell tickets without films.

During the years leading up to the Merger, studios began exploring the possibility of offering premium video on demand ("PVOD"). Under this model, a studio would make a film available for viewing at home over an online streaming service, during the theatrical release window, to customers who paid a premium price. If widely adopted, PVOD would shorten the theatrical release window and disrupt the exhibitors' business model.

Exhibitors also faced competitive threats from widely available streaming services such as Netflix, Hulu, and Amazon. By 2013, Netflix and Amazon had started producing their own content, which enabled them to bypass studios and cinemas. And exhibitors faced competitive threats from other forms of entertainment, such as video games, social media, and free video alternatives such as YouTube. Yet despite these threats, movies remained among the most popular and affordable leisure activities in North America.

## C.    2014: The Failed Sale Process

In October 2014, the Board evaluated Regal's strategic alternatives. For assistance, Regal engaged Morgan Stanley & Co. LLC as its financial advisor. David Ownby, Regal's CFO, prepared a set of five-year financial projections (the "2014 Projections") to "provide the Board with meaningful context in which to evaluate [Regal]'s strategic alternatives." JX 189 at 1; *see* PTO ¶ 119; JX 187 at '874. Regal's management prepared annual budget forecasts, but they did not regularly prepare multi-year projections. Ownby Tr. 211–12; Miles Dep. (JX 1589) 197–98. Although management prepared the annual budget using a detailed, "bottoms up" process, the 2014 Projections relied on "high-level assumptions" and did not include "detailed theater-by-theater assumptions." Ownby Tr. 215–16.

At a meeting in October 2014, Morgan Stanley provided the Board with valuation analyses based on the 2014 Projections. JX 189 at 2. Morgan Stanley reported that before the meeting, it had discussed a possible sale with Anschutz, and that Anschutz "would be supportive." *Id.* Morgan Stanley then summarized several potential strategic alternatives available to the Company. *Id.* at 3. When reviewing the prospects for a sale, Morgan Stanley identified AMC and Cinemark as possible strategic buyers. *Id.* Later that month, Regal announced that the Board had "authorized the exploration of strategic alternatives to enhance shareholder value, which may include a potential sale of the Company." PTO ¶ 121; JX 198; Miles Tr. 273–75.

Financial analysts reacted positively. They described Regal as "an extremely attractive business" and characterized the timing of a possible sale as "perfect." JX 202 at

9

'024–25. They also speculated that the idea for a sale might have originated with Anschutz.[8]

In December 2014, Morgan Stanley reported that it had contacted seventy-one potential buyers. Six potential financial sponsors and one strategic acquirer—Cineplex—had executed non-disclosure agreements. Nine other firms had expressed interest. JX 219 at '468. But no one had bid. The Board decided to continue its process through year-end 2014. JX 221. The Board also discussed "other monetization alternatives for Anschutz, including secondary offerings and block trades." *Id.*; *see* JX 245.

In January 2015, Morgan Stanley reported on the sale process. Morgan Stanley explained that potential buyers viewed the cinema sector as fully valued, thought Regal was well-run without obvious room for improvements, and saw long-term risks to Regal's business model. *See* JX 219 at '469; JX 245 at 3; JX 247 at 2; Miles Tr. 275–77. Morgan Stanley devoted roughly half of its presentation to the possibility that Anschutz might try to exit from its position in Regal. *See* JX 245. On the positive side, Morgan Stanley noted that an Anschutz exit could enable Regal "to broaden [its] shareholder base with longer term investors" and could "[r]educe [or] eliminate" any "overhang" from the presence a

---

[8] *See id.* at '025 ("In our opinion, this news most likely reflects a decision made by 50 percent owner Phil Anschutz rather than management to unlock greater value for the shares." (internal quotation marks omitted)); *id.* at '041 ("We believe Anschutz could . . . be exploring a sale of Regal without previous inbound interest and with a relatively high bar for the value he may be seeking."); *see also id.* (describing lack of information about "controlling shareholder Anschutz's motivations").

10

controlling stockholder. *Id.* at 9. But Morgan Stanley cautioned that an exit would be viewed as a "[s]mart investor seen exiting [Regal's] stock," suggesting that Regal's prospects were trending downward. *Id.* at 12. Morgan Stanley also observed that if Anschutz sold a portion of its position, then its remaining stake would create a "temporary overhang" for Regal's stock price. *Id.*

**D.      2015 and 2016: Growing The Business**

After ending the sale process, Regal returned to business as usual. Regal continued to modernize its theaters and improve the customer experience. Regal experienced positive results from its investments in reclining seats and improved concessions.[9]

In July 2015, Paramount proposed shortening the theatrical release window in return for providing exhibitors with a share of its revenue from other distribution channels. *See* JX 272. Paramount ultimately did not pursue its plan, but the proposal signaled that changes to the theatrical release window might be coming. In November, the Board

---

[9] *See, e.g.*, JX 250 at 3 ("[O]ur installation of luxury reclining seats gained significant momentum in the fourth quarter of 2014 and is already generating significant returns in the New Year, with converted screens producing average box office revenue growth of over 40% for the first six weeks of 2015. . . . [O]ur low-cost, low-risk investment in . . . [providing] an enhanced menu and alcohol beverages to our customers is beginning to have a more meaningful impact on our concession revenue . . . ."); JX 263 at 3 ("[O]ur installation of luxury reclining seats is continuing at a steady pace with an additional 63 screens converted so far this year and another 92 currently under construction. . . . [O]ur low-cost, low-risk investment in the equipment necessary to provide an enhanced menu and alcoholic beverages to our customers continues to have a more meaningful impact on concession revenues . . . .").

authorized management to hire Bain & Company, Inc. to analyze various "windowing strategies." JX 278 at 2; Miles Tr. 278–80.

Bain presented its analysis in April 2016. Bain reported that the length of the theatrical release window had decreased "slowly over time," with the pace increasing in the last five years. JX 310 at 2. Bain warned that the window could "meaningfully compress in the near-term" due to financial pressures on the studios. *Id.* at 5; *see also id.* at 8. Bain and the Board discussed possible ways to create a "win-win" by reaching an agreement with studios about the theatrical release window. JX 309; JX 310 at 33–34. The Board instructed management to "develop a strategy that best positions [Regal] for the possibility that [the] exhibition industry would have a shortened theatrical release window." JX 309.

During the same meeting, the Board "discussed a potential acquisition of Cinemark and determined that exploring such a transaction was in the best interest of [Regal] and its stockholders." *Id.* After the meeting, management engaged with Cinemark. In June 2016, representatives of Anschutz, Cinemark, and Regal met to discuss a potential transaction. PTO ¶ 147; JX 342. In July, representatives of Cinemark and Regal met again to discuss a potential combination. PTO ¶ 149. The talks did not bear fruit, and Regal refocused on operating its business. *See* JX 380.

E.      **Anschutz Sells Two Large Blocks.**

While Regal was in discussions with Cinemark, Anschutz began considering "monetization alternatives" for its investment in Regal. JX 382. Regal's stock price had increased 24.3% in the previous twelve months, significantly outperforming its peers. *Id.* at '483. In late July 2016, Anschutz considered five possible monetization strategies,

12

including a block sale. *Id.* at '490. Of those possibilities, a block sale created the "[g]reatest likelihood of after-market selling pressure" on Regal's stock. *Id.*

On July 30, 2016, representatives of Anschutz informed Regal that Anschutz wanted "to be in a position to sell some shares as soon as possible." JX 385 at 1. To facilitate the sale, Regal's management accelerated the filing of Regal's Form 10-Q. Ownby testified that there was a "sense of urgency" from Anschutz "to execute this trade quickly so that they could lock in the price." Ownby Tr. 241.

Over the next few days, Regal's management and Morgan Stanley prepared "talking points" to address the market's reaction to the block sale. JX 387; JX 391; JX 392; JX 393; JX 394; JX 395. The talking points described the sale as "completely understandable – given that the shares are trading above $23 for only the second time in the last 5 years and at a multiple that is near the high end of the historical range." JX 393. During discussions about the talking points, an Anschutz executive suggested attributing the sale to estate planning. *See* JX 393; JX 395. Regal rejected the suggestion because it could invite unwanted speculation about additional block sales. *See* Ownby Tr. 243–44. Mr. Anschutz testified that estate planning was "not the reason for the block sale." Anschutz Dep. 47–48. He averred that he simply wanted to "lighten up" on his investment at an attractive price because of concern about the business. Anschutz Tr. 519; *see* Anschutz Dep. 31–32.

On August 2, 2016, Anschutz sold a block of 13,000,000 Class A shares at $21.60 per share, a 7% discount to that day's closing price. PTO ¶ 151; JX 397; JX 408. During a meeting on August 31, the Board discussed the impact of the sale on Regal's stock. JX 434 at 1–2. The "total shareholder return" of Regal's stock over the past six months had

13

declined from 42% the day before Regal announced Anschutz's block sale to 31% on August 31. JX 433 at '472. During the same meeting, Miles reported that Regal continued to negotiate with the studios regarding potential changes to the theatrical release window. JX 434 at 2. Miles also reported that talks with Cinemark had ended. *Id.* Miles stated that Regal's "current strategy of investing in its existing theatres would provide [Regal] with significant returns over the next several years, but that management should review the landscape of potential acquisition targets." *Id.*

On November 17, 2016, Anschutz sold a second block of 13,000,000 Class A shares at a price of $22.95 per share, reflecting a 6% discount to the closing price on that day. PTO ¶ 155; JX 492. During the following month, Anschutz transferred another 5,560,000 Class A shares to a charitable foundation. PTO ¶ 156; JX 578 at 4. Through the two block sales and the charitable contribution, Anschutz reduced its ownership of Class A shares by 63.1%. *See* JX 578 at 4. Anschutz continued to control a majority of Regal's voting power through its ownership of Class B shares. Jack Tyrrell, an independent board member of Regal, emailed Ownby expressing his concern that Anschutz's block sales might have established "an effective ceiling on the stock price given [Anschutz's] remaining ownership." JX 491.

**F.    Cineworld Contacts Anschutz About A Potential Deal.**

In March 2017, Cineworld contacted Anschutz about a potential deal. Founded in 1995, Cineworld is the creation of Moshe ("Mooky") Greidinger, its CEO, and his deputy

CEO and younger brother, Israel Greidinger.[10] The Greidingers built their business by expanding from a theater their family owned in Haifa, Israel. They first added theaters in Israel, then built theater circuits in Central and Eastern Europe. In 2014, they created Cineworld by merging with the largest cinema operator in the United Kingdom. For the Greidingers, the next stage was to expand to the United States.

Mooky became interested in Regal while attending an industry conference hosted by Rich Gelfond, the CEO of IMAX. Gelfond and Mooky had a close working relationship, and Gelfond suggested to Mooky that there could be "an opportunity" to acquire Regal. Greidinger Tr. 311; Gelfond Dep. 16–19. After the conference, Cineworld began analyzing a potential acquisition. After looking at the market prices of the U.S. cinema exhibitors, Cineworld concluded that their valuations were attractive. Greidinger Tr. 312.

Mooky contacted Gelfond and asked him for advice on acquiring Regal. Gelfond introduced Mooky to David Posnick, a Blackstone employee and a "good connection into the Anschutz organization." *Id.* at 313; Gelfond Dep. 27–29, 42. Mooky and Israel met with Posnick in April 2017. PTO ¶ 161; *see* JX 644. Afterward, Israel wrote to Posnick that "[t]he transaction we are thinking about should facilitate a full exit for [Mr. Anschutz]." JX 644. Posnick proceeded to arrange a meeting between the Greidingers and Anschutz. Greidinger Tr. 314.

---

[10] To avoid confusion, this decision refers to Mooky and Israel Greidinger by their first names.

Meanwhile, on April 26, 2017, Regal held its earnings call for the first quarter of 2017. Regal reported better-than-expected revenues and its highest-ever quarterly EBITDA. JX 647 at 5; JX 652; JX 658. During the call, Miles attributed Regal's strong performance in part to the studios' successful efforts to release tentpole films during shoulder periods. JX 647 at 3. She also credited "the industry's efforts to improve the customer experience." *Id.* During the first quarter of 2017, over 25% of industry box office revenue came from theaters with reclining seats and similar amenities, and box office revenue in markets with the highest concentration of recliner-equipped theaters grew at more than double the overall industry growth rate. *Id.* Regal increased ticket prices at a rate of 5.5% in recliner locations during the first quarter of 2017, compared to 3.2% growth overall. *Id.* at 3–4. Concessions per capita at those locations increased at nearly 6% compared to 4% growth overall. *Id.* at 4–5.

By the time of the earnings call, Regal had introduced an improved food menu at theaters representing 55% of Regal's attendance base and alcohol at theaters representing 31% of Regal's attendance base. *Id.* at 3. Regal's first quarter revenue also received a boost from its online booking and mobile ticketing platforms, which generated sales representing "over 23% of [Regal's] first quarter box office revenue and contributed to double-digit growth in [Regal's] other revenue streams." *Id.*

During a meeting of the Board on May 3, 2017, Miles reported on Regal's discussions with the studios about the theatrical release window. Fox had been advocating for a PVOD model that would allow consumers to rent films thirty days after their initial

theatrical release for $30. JX 673 at 2. Universal and Warner Brothers preferred a higher-priced model that would shorten the theatrical release window even more. *Id.*

## G. Israel Meets With Anschutz.

At a meeting in Denver on July 18, 2017, Israel engaged in discussion about Regal with Anschutz representatives. Greidinger Tr. 314; *see* JX 697; JX 709. The Anschutz representatives said that Regal was not for sale and that the timing was not optimal. Greidinger Tr. 314. The Anschutz representatives also expressed comfort with Regal's performance and said that they were "not very eager to sell." *Id.* In response to Israel's description of possible deal structures, the Anschutz representatives stated that Anschutz would consider a sale only if all stockholders received the same cash consideration. The Anschutz team expressed doubt that Cineworld could finance the deal. *Id.* at 315.

After the meeting, Israel met with his contacts at HSBC and Barclays about financing a transaction. Cineworld also hired Ernst & Young ("E&Y") and PricewaterhouseCoopers ("PwC"). PTO ¶¶ 98–99. Cineworld tasked E&Y with evaluating tax-efficient ownership structures for the post-merger company. *See* JX 971 at '862. Cineworld tasked PwC with analyzing merger synergies. Greidinger Tr. 337–38. Cineworld believed it needed to point to significant synergies to be able to finance the deal. In addition, because Cineworld traded on an exchange in the United Kingdom, it would be required to report its synergy estimates when announcing a deal and to document realized synergies two years after the transaction. *Id.* at 329; Cohen Tr. 601.

On July 26, 2017, Regal reported its earnings for the second quarter of 2017. PTO ¶ 167; JX 734. The results were disappointing, with box office revenue down 4.9%. JX 730

17

at 4; *see* JX 711. On the bright side, Regal reported record per capita concessions sales and had deployed luxury seating to nearly one fourth of its locations. JX 730 at 3; JX 737.

AMC's results were worse. On August 1, 2017, AMC pre-announced a net loss of over $174 million for the second quarter of 2017, prompting a broad selloff in cinema stocks. *See* JX 752; JX 753. AMC's shares declined by 27% on the following day, and Regal and Cinemark shares each dropped by 5%. JX 752. One news article asked, "Is Netflix killing the multiplex?" *Id.* Another highlighted the rapid rise in popularity of streaming services like Netflix, Hulu, and Amazon. JX 749. A few days later, Disney announced that it would launch its own streaming service. JX 761; JX 762; JX 763. A *Business Insider* article noted that short interest in the largest North American cinema chains had increased "to the highest in years," with Regal as the "biggest target." JX 768 at '341–43.

## H.  Regal Ends Discussions With Cinemark.

Throughout 2017, Regal had continued its on-again, off-again talks with Cinemark. While the management teams interacted with each other, Mr. Anschutz engaged with Lee Roy Mitchell, Cinemark's founder and chairman. A deal with Cinemark would have been a stock-for-stock merger. *See* JX 779; JX 786. Mr. Anschutz thought the transaction would be difficult and would involve many "social issues, like who would run the company [and] where would its headquarters be." Anschutz Dep. 94–95.

In late August 2017, Regal terminated discussions, citing antitrust risk and "the parameters that have been placed by you on any potential transaction." JX 1332. Regal management testified that Regal terminated discussions because Cinemark refused to

18

provide diligence information that Regal requested. Miles Dep. (JX 1589) 274–75; Ownby Dep. (JX 1599) 224. There also are indications that Mr. Anschutz balked at a deal that would leave Anschutz with a significant equity stake in the combined company but without control. *See* Ownby Dep. (JX 1599) 82; JX 756.

During a Board meeting on August 30, 2017, Miles reported that industry box office revenues for the third quarter were down because of a weak film slate. She predicted that industry box office would finish the quarter down at least 14%. JX 818 at 1. Regal's box office and concessions revenues were down 18.8% and 17.1%, respectively. JX 817 at '878. Miles added that since May, Regal had had "no meaningful discussions" with the studios about PVOD and the theatrical release window. JX 818 at 2. At the meeting, the Board authorized management to initiate a $50 million share repurchase program. *Id.*

## I.    Cineworld Returns.

On September 18, 2017, Israel met again with the Anschutz team. HSBC and Barclays attended the meeting and expressed their willingness to consider financing an acquisition of Regal by Cineworld. Greidinger Tr. 316–17; JX 812. The Anschutz representatives were encouraged and directed Israel to contact Regal. Greidinger Tr. 317.

On September 27, 2017, Anschutz's representative told Miles that Cineworld would be contacting her about a possible deal. PTO ¶ 174. The Anschutz representative did not specify an acceptable price or provide any instructions on how to run the deal process. Miles Tr. 282. On the same day, Mooky scheduled a meeting with Miles for October 4. *See* JX 859.

To prepare for Miles' meeting with Mooky, Ownby prepared a new set of five-year projections. JX 874 (the "2017 Projections"). He used the same process that he followed for the 2014 Projections: He started with Regal's annual forecast, then projected forward for the next five years. JX 864; JX 874. His numbers assumed that Regal's 2017 attendance would be "very similar to Q4 of 2015 – roughly 56M attendees." JX 864 at '635. If that estimate was correct, then attendance would have declined 4% year-over-year by the end of 2017. *See* JX 1632 ("Yilmaz Rebuttal Report") ¶ 113, Fig. 11; JX 874. The other key assumption in the 2017 Projections was that attendance would increase by 3.5% in 2018 and by 0.9% in 2019. *See* JX 864 at '635; JX 874 at '800–01. After that, attendance would increase modestly in a range between 0.1% and 0.3% annually through the end of 2022. JX 874 at '801. Ownby explained that roughly a third of the projected 2018 attendance growth would occur naturally because in 2018 Regal would have the benefit of owning theaters it had acquired mid-2017 for the full year. JX 864 at '635. The 2017 Projections also assumed that Regal could increase ticket and concessions prices by "between 2.0% and 3.5%" annually. *Id.* at '637.

Ownby testified that the 2017 Projections were "optimistic but achievable." Ownby Tr. 216, 265. He added that they were "reasonably prepared on bases reflecting the best currently available estimates and judgments of Regal management . . . concerning the future performance of the business." *Id.* at 230. The 2017 Projections did not make any assumptions or include sensitivities based on possible disruptions to Regal's business model from PVOD, a shortened theatrical release window, or streaming services. *Id.* at 220.

**J.      Cineworld Increases Its Bid.**

During the meeting on October 4, 2017, Cineworld offered to purchase Regal for $20.50 per share. The price represented a 21.2% premium to the closing price of Regal's Class A shares on October 4. During the meeting, Cineworld indicated that the transaction would generate $50 million of synergies. *See* JX 908 at '182. Regal rejected the offer as inadequate, but agreed to facilitate due diligence so that Cineworld could determine whether to improve its offer. JX 1665 at 23.

After the meeting, Greidinger contacted Mr. Anschutz, who declined to discuss the transaction and instructed Cineworld to communicate with Regal. Follow-up meetings between Regal and Cineworld took place on October 11 and 12. JX 965. On October 15, Cineworld offered to acquire Regal for $21 per share. PTO ¶ 184; JX 946. The price represented a 30% premium to the closing price of Regal's Class A shares on October 13. JX 946 at 2.

On October 19, 2017, the Board met to discuss Cineworld's offer. Morgan Stanley presented valuation analyses based on the 2017 Projections and a consensus set of analyst projections. JX 971 at '867–77; JX 965 at 3; *see* JX 971 at '875 (DCF "Based on Street Estimates"); *id.* at '876 (DCF "Based on [Regal] Management Projections"). By this point, the White House and Republican leaders in Congress had released a "unified framework" for reducing taxes that contemplated slashing the corporate tax rate from 35% to 20%. *See* JX 857. Morgan Stanley's DCF analyses included sensitivity analyses that showed the effects of the U.S. corporate tax rate decreasing to 30% or 20%. JX 971 at '875–76.

Morgan Stanley's presentation included a slide titled "Potential Interlopers," which identified other potential buyers. *Id.* at '888; *see also* Kim Tr. 121–22. The slide highlighted Cinemark and Vue, "one of Europe's leading Cinema groups," as the most likely contenders. JX 971 at '888. Morgan Stanley did not think that either company was likely to engage. Morgan Stanley noted that Cinemark had not made an offer during Regal's prior sale process, that Cinemark had a conservative culture, and that the company had limited "leverage capacity and cash on [its] balance sheet." *Id.* Vue was also "[h]ighly levered" and suffered from a "potentially conflicting strategic focus among [its] ownership group." *Id.* Morgan Stanley listed four other "Potential Buyers" that Morgan Stanley had excluded "due to size/ strategic priorities": Cinemex, Cineplex, Cinepolis, and AMC. *Id.* In other words, other strategic bidders were not likely to bid, but due to reasons other than the price of the transaction.

The Board decided to reject Cineworld's offer. Although receptive to a deal, the Board wanted to "play hard to get." Bell Dep. (JX 1591) 86; *see* Miles Tr. 285–86.

On October 20, 2017, Miles and Bell told Cineworld that Regal was not for sale and that Cineworld's offer was too low for Regal to consider. Miles and Bell also cited uncertainty over Cineworld's ability to finance the transaction.

After Regal rejected Cineworld's second offer, the Greidingers were pessimistic about a deal. They decided to "put the deal on hold for the time being." JX 985 at '683.

Having declined Cineworld's overtures, Miles continued working on a response to the threats posed by PVOD and the possible shortening of the theatrical release window.

22

Miles felt that Regal was in a "very compelling and durable position," with theater exhibitions continuing to be an "extremely important driver" of studios' revenues. JX 986.

On October 24, 2017, Regal reported its earnings results for the third quarter. Revenue and EBITDA exceeded analysts' expectations by 1% and 6%, respectively. JX 1022 at '899. Regal highlighted that it had rolled out its new food and alcohol menus across 59% and 36% of its attendance base, respectively. JX 988 at 3. Ownby expected a return to 2015 and 2016 industry attendance levels in 2018. *See id.* at 12. The positive earnings did not have an immediate effect on Regal's stock price. *See* JX 1021 at 1.

### K.    Cineworld Increases Its Offer Again.

After Regal's second rejection, Cineworld and its advisors quickly resumed work on a transaction. Barclays sent Israel analyses of prices ranging from $20 to $25 per share using the 2017 Projections and an analyst consensus set of projections. JX 990. If the 2017 Projections were accurate, then a transaction would be accretive to Cineworld immediately at prices up to $25 per share. *Id.* at '726. Under the analyst consensus case, a transaction at a price up to $24 per share would become accretive in 2019. *Id.* at '727. Barclays drew a red line at $22.95, labeled "[o]n 23rd Nov 2016 Anschutz sold 13m [Regal] shares at $22.95 per share." *Id.* at '726–27.

On October 25, 2017, Cineworld made its third offer, this time at $22.50 per share. PTO ¶ 190; JX 1003. The offer represented a 37.1% premium over the closing price of Regal's stock on that date.

On October 27, 2017, the Board met to consider Cineworld's revised offer. Morgan Stanley advised that the lack of any stock price reaction to Regal's excellent third quarter

earnings likely was due to weak performance across the cinema sector generally. JX 1021 at 1. The median analyst forecast anticipated that Regal's 2018 revenue would increase year-over-year by 1%, EBITDA would increase by 4.1%, and Regal's stock price would appreciate by 2.7%. JX 1022 at '901. The analyst community generally remained positive, with some analysts increasing their price target for Regal's stock. *Id.* But multiple analysts cited concerns about competition from PVOD and streaming services. *Id.*

After Morgan Stanley's presentation, the Board considered whether to pursue a sale. JX 1021 at 2. The Board determined that the value of Regal to Cineworld was higher than its value to a domestic theater company and that it was unlikely that other strategic buyers or financial sponsors could complete a transaction at the price level under consideration. *Id.* The Board also concluded that the risk of antitrust review was lower for a deal with Cineworld than for a deal with a domestic competitor. *Id.* The Board considered reaching out to other bidders, but concluded that the risk of a leak outweighed the benefits. *Id.* at 3. Miles explained that Regal did not want to lose the "bird in the hand" by pursuing an open sale process. Miles Dep. (JX 1589) 214–15. Regal's unsuccessful sale process in 2014 and 2015 weighed heavily in the decision. *Id.* at 214; Bell Tr. 511.

The Board directed management make a counteroffer at $23.50 per share and to insist on retaining the ability to evaluate competing offers. Miles Tr. 289–90; JX 1021 at 3. Miles communicated the Board's position to Cineworld on October 30. PTO ¶ 193; *see* JX 1032.

24

## L. Cineworld Looks For More Synergies.

While engaging with Regal, the Cineworld management team also was refining its views on synergies. After a meeting with Cineworld's banks, Israel informed Mooky by email that "[t]he banks expect us to reach a level of Non Capex Synergies . . . of 100 million dollars." JX 1052 at '946. PwC's initial report on synergies only showed $70 million of synergies, meaning that Cineworld needed to "improve [its] position." *Id.*

Israel then described line-by-line changes to Cineworld's financial model that resulted in greater synergies. *Id.* PwC had weighted the various synergies by their probability of success, and Israel increased those percentages. *Id.* After Israel's changes, the synergy estimates added up to $100 million. *Id.*

## M. The Parties Reach A Deal.

On November 1, 2017, Cineworld made its "final" offer of $23.00 per share. PTO ¶ 195; JX 1045. Cineworld's final offer represented a 46.1% premium to the closing price of Regal's stock of $15.74 on that date.

The Board convened to consider Cineworld's offer on the following day. Bell reported that Anschutz supported accepting the offer. JX 1048. The Board decided to accept the offer on the conditions that Regal would not negotiate exclusively with Cineworld and that the Merger Agreement would have to include a go-shop provision and a reverse break-up fee. *Id.*

The Board met again on November 8, 2017. Morgan Stanley recapped the sale process and outlined next steps. JX 1085 at 2, 6. Morgan Stanley again described the potential for "interlopers" and outlined the risks and benefits of a pre-signing market check,

noting that it would create "[f]avorable optics for the record" but increase the probability of a leak. *Id.* at 7. The Board continued to regard a post-signing go-shop as the better option. JX 1084 at '119.

Miles reported that "industry box office revenues for the first nine months of 2017 decreased by about 5% over the same period in 2016, primarily due to poor performance of the film product release in August." *Id.* at '117. The primary culprit was August 2017, when industry box office revenue underperformed by almost $400 million. *Id.* at '070; *see* JX 988 at '497. Box office revenue for October also was down by approximately $100 million. JX 1084 at '070. As a result, Regal reported significant year-over-year declines in revenue (-11.8%), adjusted EBITDA (-33%), and earnings per share (-75.9%) in the third quarter of 2017. *Id.* at '077.

Despite the underperformance in August and October 2016, Regal's management continued to expect a rebound. *Id.* at '070. Miles predicted that November and December, which traditionally accounted for 75% of fourth quarter box office, would compare favorably with the remainder of 2017, due in part to the anticipated success of *Justice League* and *Star Wars: The Last Jedi*. *Id.* Regal also was experiencing success in its revenue stream from online bookings, which had increased 66% year-to-date in 2017. *Id.* at '075.

During the same time period, Cineworld's board of directors convened to discuss the Merger. *See* JX 1115. Cineworld's financial advisors highlighted a "Window of Opportunity" caused by "[d]islocation in [the] market value of US cinemas compared to [their] long term average." *Id.* at '777. The advisors cited investors' concerns about AMC's

recent financial struggles, the weak film slate in 2017, and "noise" in the press about the theatrical release window and PVOD. *Id.* Cineworld's financial advisors presented a DCF analysis that valued Regal at $25.70 per share using the analyst consensus case. *Id.* at '813. A DCF analysis based on the 2017 Projections generated a value of $36.40. *Id.* at '814. The presentation concluded that the Merger was "[c]ompelling" from a financial perspective "[b]ased on [the] broker consensus case." *Id.* at '807 & n.1.

Cineworld's financial advisors also identified three categories of merger-related synergies that increased Regal's per-share value.

- "Cost Reduction Opportunities," which consisted of "[p]ublic to private savings," "[g]roup savings," "[s]trategy and operations re-design," and "[c]ommercial economies of scale." These categories were expected to generate $46 million in annual benefits by 2019.

- "Leverage of Know-How & Industry Best Practice," which consisted of "[l]oyalty programs," "[o]nline booking," "[a]dvertising," and "[c]oncession spend increase." These categories were expected to generate $62 million in annual benefits by 2019.

- "Tax Benefits," which consisted of "[f]inancial structuring benefits" and "[o]ptimization of transfer pricing." These categories were expected to generate $72 million in annual benefits by 2019.

*Id.* at '781. Using analyst consensus projections, Cineworld's bankers valued the business initiatives at $6.40 per share and the tax benefits at $7.10 per share. *Id.* at '787. Using the 2017 Projections, Cineworld's bankers valued the business initiatives at $8.10 per share and the tax benefits at $7.10 per share. *Id.* at '788.

While the parties were negotiating, news of the deal leaked. On November 20, 2017, Regal's stock closed at $16.01 per share. The trading price increased steadily and, a week later, it closed on November 27 at $18.25 per share, 14% higher. JX 1200. The next day,

27

November 28, multiple news outlets published rumors about a potential transaction. PTO ¶ 211. Cineworld and Regal issued public statements confirming that they were in discussions about a potential transaction. JX 1180; JX 1182 at '196–98. Cineworld's press release reported a price of $23.00 per share in cash and stated that Cineworld would fund the acquisition "through a mixture of incremental debt and a material equity raise." JX 1182 at '196.

Regal's stock closed at $19.63 on November 28, up 7.6% from the previous day's closing price of $18.25. *See* PTO ¶¶ 209, 213; JX 1200. Cineworld's stock declined by 17%. Kim Tr. 823; JX 1190.

Morgan Stanley reported to Regal that investors viewed the strategic rationale of the deal as "sound" given the "consensus . . . that cinema businesses need to roll-out into new geographies to grow" and the threat from streaming services like Netflix. JX 1190. But investors questioned whether the transaction would produce "meaningful synergies . . . given the lack in geographical overlap" between Cineworld and Regal, and they were skeptical about Cineworld's ability to finance the transaction. *Id.* Morgan Stanley subsequently relayed more investor feedback, including a "[g]eneral sentiment" that "[Anschutz] wants out and that [Regal] is operating in a tricky landscape." JX 1215.

Morgan Stanley also reported that it had "not heard much in the form of interlopers" because the "[i]mplied multiple of this transaction is full." *Id.*; *see* Kim Tr. 824–25. Morgan Stanley believed that the "[m]ost likely interlopers [are] likely to not have interest" because "(i) AMC would struggle to make a transaction like this work and (ii) Cinemark is doing their own thing." JX 1215 at 1; *see* Kim Tr. 826.

28

**N.  The Board Approves The Merger Agreement.**

On December 4, 2017, the Board met to consider the Merger Agreement. Morgan Stanley noted that the deal price exceeded the valuation estimates of nine equity research analysts. *See* JX 1256 at 11. Morgan Stanley also noted that the 2017 Projections were more optimistic than the analysts' expectations. As a result, a discounted equity value analysis using the 2017 Projections produced a value of $25.15, while the same analysis using consensus projections generated a value of $19.53. *See id.* at 14. Morgan Stanley's DCF valuation based on the 2017 Projections estimated Regal's value at between $20.99 and $28.12 per share. *Id.* at 15. Morgan Stanley did not include a DCF analysis using analysts' projections. Cineworld's offer price fell in the high end of the valuation matrix that Morgan Stanley prepared. *See* JX 1267 at '332–33.

While the parties were negotiating the Merger, legislation amending the tax code continued moving through Congress:

- On October 19, 2017, the Senate passed a resolution that would allow the Senate to amend the tax code through the budget reconciliation process.

- On November 2, 2017, the Tax Act was introduced in the House. It called for reducing the corporate tax rate to 20%.

- On November 16, 2017, the House passed its version of the Tax Act.

- On December 2, 2017, the Senate passed its version of the Tax Act, which called for reducing the corporate tax rate to 21%.

Morgan Stanley's analyses, however, did not address the possibility of a lower corporate tax rate, because Morgan Stanley believed it was "still too uncertain" to incorporate in a valuation of Regal. JX 1257 at 3; Kim Tr. 844. The only nod to a lower corporate tax rate

was a sensitivity analysis for the DCF valuation that estimated Regal's value based on a range of tax rates and EBITDA multiples. JX 1256 at 15. It showed that reducing Regal's tax rate from 39.5% to 20% would increase Regal's value by 6.5%. *See id.* Morgan Stanley also "noted that the prospect of certain changes to corporate income tax rates could enhance Morgan Stanley's selling efforts." JX 1257 at 3. Miles testified that the Board believed any reduction in the corporate tax rate was uncertain and that in any event, "other buyers would have that information as well." Miles Tr. 296; *see* Kim Tr. 848.

At the conclusion of the meeting, the Board unanimously approved the Merger Agreement. Its terms provided for (i) a termination fee, (ii) a go-shop provision that would last until January 22, 2018, and (iii) a fiduciary out that the Board could exercise after the expiration of the go-shop period if Regal received a superior proposal.[11] The termination fee provisions in the Merger Agreement established a two-tiered structure depending on whether a superior proposal emerged before the end of the go-shop period. If Regal terminated the Merger Agreement to accept a superior proposal made before the end of the go-shop period, then Regal could terminate the Merger Agreement and pay a termination fee equal to $36,270,000, or twenty-three cents per share, reflecting 0.63% of Regal's implied enterprise value and 1% of its implied equity value. *See* MA §§ 8.3(b)(i)–(ii). If Regal terminated the Merger Agreement to accept a superior proposal that was not made

---

[11] PTO ¶ 221; JX 1293 ("MA") §§ 6.1(a) (go-shop), 6.1(c) (fiduciary out), 8.1–8.3 (termination provisions).

before the end of the go-shop period, then Regal could terminate the Merger Agreement and pay a termination fee equal to $95,150,963, or sixty cents per share, reflecting 1.64% of Regal's implied enterprise value and 2.62% of its implied equity value.

Later on December 4, 2017, Ownby learned that Cineworld's press release announcing the Merger would claim "$100M (EBITDA) of combination benefits" and "an additional $50M in tax structuring benefit." JX 1258 at '387. Ownby responded, "Those are some bullshit numbers – glad I don't have to deliver them!" *Id.* Miles responded, "Ditto[.]" *Id.* She later added, "Beauty of an all cash deal. Not our responsibility[.]" *Id.*

## O. The Go-Shop Process

After the Merger was announced, Morgan Stanley began soliciting other bidders as part of the go-shop process. Morgan Stanley contacted a total of forty-seven parties, including Adam Aron, the CEO of AMC. Aron stated that "AMC would like to take a look at Regal" and requested a non-disclosure agreement. JX 1312; Aron Dep. 9–10. Morgan Stanley sent Aron the non-disclosure agreement the next day. JX 1317. On December 12, Regal's outside counsel sent AMC a different and more restrictive non-disclosure agreement along with a lengthy list of requests for detailed information from AMC, including the "name, address, remaining lease term . . . , amenities, and box office for the past two years of each theatre in the AMC circuit," a "spreadsheet containing the name, address, and amenities of any theatres that AMC intends to open or reopen within the next two years," and any analyses AMC had made of the antitrust implications of a transaction with Regal. JX 1334 at '814–16.

Aron balked at the request. He responded to Regal that "acquirers need to be courted not insulted." *Id.* at '813. Continuing, he stated:

> Your demands for information from AMC are sufficient to convince us NOT to participate in your Go Shop process.
>
> As a result of your unreasonable demands, AMC is hereby official pencils down.
>
> And unfortunately your action gives enormous fodder to plaintiffs attorneys [sic] that you did not adequately canvas [sic] potential buyers in the sale of Regal.

*Id.* at '813–14.

Referencing a popular credit card commercial, Miles described Aron's response as follows:

> Earlier bids. $0
>
> Cineworld bid. $6.0 billion
>
> AMC response  Priceless

*Id.* at '813. At trial, she testified that her message responded to Aron's characteristic use of "hyperbole," and she expressed her belief that if AMC had "wanted to move forward . . . [then] they would have moved forward." Miles Tr. 297–98. AMC never executed a non-disclosure agreement with Regal and never received any confidential information. Aron Dep. 16–17, 43–46.

On December 15, 2017, Morgan Stanley reported to Miles that most of the parties contacted had declined to engage. The financial sponsors thought it would be "[d]ifficult to compete against a strategic with meaningful synergies." JX 1336. Cinemark had passed, "referencing prior conversations around governance, [Anschutz], etc." *Id.*

During a meeting with the Board on January 10, 2018, Morgan Stanley reported that the forty-seven parties contacted had shown "little interest" in Regal. JX 1392 at 2. Morgan Stanley also reported that the Federal Trade Commission had granted early termination of the Hart-Scott-Rodino waiting period, indicating that antitrust scrutiny was unlikely and the Merger could proceed on an expedited schedule. *Id.*

On January 22, 2018, the go-shop period ended. No one had expressed interest. On the same day, Regal's stock closed at $22.94 per share, reflecting the market's assessment that the Merger would close at the agreed-upon price of $23 per share.

## P. Cineworld Refines Its Synergies.

While the go-shop process was unfolding, Cineworld continued to refine its synergy estimates and pursue financing. On December 19, 2017, PwC presented Cineworld with its final synergies report. JX 1340. The report did not identify "tax synergies" or "[t]ax benefits." *Id.* at '725, '728. It rather focused on "Cost Reduction and contract renegotiation" and "Leverage of know-how and industry best practice." *Id.* The report identified "stretched" estimates for each category, then applied an achievability factor to those estimates. *Id.* PwC estimated $140.8 million in total run-rate synergies achievable by 2022, comprising $50.6 million in cost reduction and contract renegotiation benefits and $90.2 million in benefits from leverage of know-how and industry best practice. *Id.*

On January 17, 2018, Cineworld sent its stockholders a letter announcing a stockholder meeting to vote on the Merger. Cineworld represented that by implementing its best practices in the U.S. market, it could create significant value. As examples of best practices, Cineworld cited "enhancing the customer's experience through venue

33

refurbishments and better seating, diversifying multiplex offering[s] using latest technology, loyalty programmes, accretive bolt-on acquisitions and adopting a highly disciplined approach to costs." JX 1416 at 9.

Cineworld also anticipated the following annual "combination benefits" from the Merger:

- $60 million in cost reductions "including the elimination of duplicated corporate costs, public company expenses and functional overheads, the optimisation of functions and economies of scale"

- $40 million in "benefits from business initiatives and implementing best practices across sales and marketing, customer experience and other income"

- $10 million in "group structuring benefits . . . through the adoption of an efficient financial structure"

*Id.* at 9–10. Cineworld stressed these synergies to reassure investors who believed Cineworld had overpaid. *See, e.g.*, Greidinger Tr. 357–59. Cineworld's directors, however, were skeptical about the "the '[$]100 million combination benefits' story." JX 1186.

In a lender presentation, Cineworld presented the same synergy figures. JX 1420 at 27. The presentation explained that Cineworld previously had expected the Merger to create $50 million in group structuring benefits because of Cineworld's status as a foreign company and its ability to lower Regal's effective tax rate once it was part of the Cineworld enterprise. The Tax Act had rendered a substantial portion of those savings redundant. After the Tax Act, Cineworld anticipated achieving $50 million in tax savings plus $10 million in group structuring benefits. *Id.*

On January 22, 2018, Institutional Shareholder Services Inc. ("ISS") recommended that Cineworld's stockholders vote against the Merger. ISS cited the "significant

34

operational risk" involved in the transaction and the size of the acquisition. JX 1434 at 1. ISS also doubted whether Cineworld could "deliver on the planned synergies," which were "critical for the success of the deal." *Id.* at 9. On the bright side, ISS noted the "previously unexpected" $50 million in estimated annual tax savings resulting from the Tax Act. *Id.* at 4.

**Q.     The Merger Closes.**

On February 1, 2018, Anschutz delivered a written consent that voted its shares in favor of the Merger Agreement. Because Anschutz controlled approximately 67% of the Regal's outstanding voting power, the written consent resulted in the transaction being approved. The next day, Regal filed a definitive information statement, which notified Regal's Class A stockholders of their right to seek appraisal. Holders of 8,809,239 shares of Regal Class A common stock eschewed the consideration offered in the Merger and pursued appraisal.

The Merger closed on February 28, 2018. Regal's executives submitted their resignations on the following day.

## II.     LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988). The appraisal statute states that "the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation." 8 *Del. C.*

35

§ 262(h). The statute instructs that "[i]n determining such fair value, the Court shall take into account all relevant factors." *Id.* "The time for determining the value of a dissenter's shares is the date on which the merger closes." *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 17 (Del. 2020).

In its seminal decision on the meaning of fair value, the Delaware Supreme Court provided the following explanation:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered . . . .

*Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950). The Delaware Supreme Court has adhered to this definition ever since.[12]

---

[12] *Stillwater*, 240 A.3d at 10 (explaining that a stockholder should be awarded "'his proportionate interest in [the] going concern'" (alteration in original) (quoting *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 21 (Del. 2017))); *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 132–33 (Del. 2019) (per curiam) ("[f]air value is . . . the value of the company to the stockholder as a going concern," defined as the stockholder's "proportionate interest in a going concern." (internal quotation marks omitted)); *accord Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del.

To determine the fair value of a stockholder's proportionate interest in the corporation, the court must "envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such." *Dell*, 177 A.3d at 20. When doing so, the court must value the corporation based on its "operative reality" at the time of the merger. *Id.* "The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred." *Cede & Co. v. Technicolor, Inc.* (*Technicolor IV*), 684 A.2d 289, 298 (Del. 1996). Consequently, the trial court must assess "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition."[13]

## A. Burdens Of Proof And Valuation Indicators

By stating that "the Court shall determine the fair value of the shares," the appraisal statute places the obligation to determine the fair value of the shares squarely on the court. *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 361 (Del. 1997). Because of this

---

1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975). *But see DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 371 (Del. 2017) (describing fair value inquiry as examining whether stockholders "receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction").

[13] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999); *accord Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 217 (Del. 2010) ("fair value" means "the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction"). *But see DFC*, 172 A.3d at 346 (describing fair value inquiry as evaluating whether stockholders "receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction").

37

statutory mandate, the allocation of the burden of proof in an appraisal proceeding differs from a traditional liability proceeding. In an appraisal proceeding, "both sides have the burden of proving their respective valuation positions by a preponderance of [the] evidence." *Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 322 (Del. 2020) (alteration in original) (internal quotation marks omitted). "No presumption, favorable or unfavorable, attaches to either side's valuation." *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989). "Each party also bears the burden of proving the constituent elements of its valuation position . . . , including the propriety of a particular method, modification, discount, or premium." *In re Appraisal of Stillwater Mining Co.* (*Stillwater Trial*), 2019 WL 3943851, at *18 (Del. Ch. Aug. 21, 2019) (internal quotation marks omitted), *aff'd sub nom. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3 (Del. 2020).

A party may seek to prove fair value using "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983). "In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999). The Court of Chancery may "adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." *Id.* at 526. Or the court "may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to

the resulting valuation." Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, Corp. Prac. Series (BNA) No. 38-5th, at A-31 (2010 & 2017 Supp.) (collecting cases). "If neither party satisfies its burden, however, the court must then use its own independent judgment to determine fair value." *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004).

Although the appraisal inquiry might seem to involve neutral principles of valuation, "corporate finance is not law." *In re Appraisal of Jarden Corp.* (*Jarden Trial*), 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019), *aff'd sub nom. Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 322 (Del. 2020).

> The appraisal exercise is, at bottom, a fact finding exercise, and . . . by functional imperative, the evidence, including expert evidence, in one appraisal case will be different from the evidence presented in any other appraisal case. Different evidence, of course, can lead to different decision paths and different outcomes.

*Id.*; *accord Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016) (noting that an argument which succeeds in one case "may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively"). "What is necessary in any particular appraisal case is for the Court of Chancery to explain its fair value calculus in a manner that is grounded in the record before it." *Jarden*, 236 A.3d at 325 (alterations and internal quotation marks omitted); *accord Stillwater*, 240 A.3d at 16.

The parties presented three valuation methodologies for the court's consideration. The petitioners argued in favor of a DCF methodology, which they maintained supports a fair value of $33.83 per share. Cineworld responded that the court should not rely on a

DCF analysis and argued instead for relying on Regal's unaffected market price and the deal price minus synergies. Cineworld proposed to give equal weight to its valuation indicators, resulting in a fair value of $18.02 per share.

## B.     The DCF Methodology

The petitioners contend that the court should rely on a DCF model prepared by their expert, Bilge Yilmaz. Cineworld did not submit its own DCF analysis. Instead, Cineworld's valuation expert, G. William Kennedy, critiqued Yilmaz's model. As the proponent of valuing Regal using this method, the petitioners bore the burden of proving the reliability of the valuation.

The DCF method is a technique that is generally accepted in the financial community. "While the particular assumptions underlying its application may always be challenged in any particular case, the validity of [the DCF] technique *qua* valuation methodology is no longer open to question." *Campbell-Taggart*, 1989 WL 17438, at *8 n.11. It is a "standard" method that "gives life to the finance principle that firms should be valued based on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk." *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005).

During the four decades after *Weinberger*, Delaware courts frequently used the DCF methodology to derive fair value. *See, e.g., ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 916 (Del. Ch. 1999) ("[S]ince the abolishment of the Delaware Block method . . . this Court frequently has employed the discounted cash flow as at least one method of valuation." (footnote omitted)). Chancellor Allen endorsed the approach, observing that "[i]n many

40

situations, the discounted cash flow technique is in theory the single best technique to estimate the value of an economic asset." *Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at *7 (Del. Ch. Oct. 19, 1990), *aff'd in part*, *rev'd in part on other grounds*, 636 A.2d 956 (Del. 1994). By the late 1990s, the DCF methodology had become "the model of choice for valuations in this Court." *Grimes v. Vitalink Commc'ns Corp.*, 1997 WL 538676, at *1 (Del. Ch. Aug. 26, 1997); *accord Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at *10 (Del. Ch. Feb. 10, 2004) ("In recent years, the DCF valuation methodology has featured prominently in this Court . . . ."); *Crescent/Mach I P'ship, L.P. v. Turner*, 2007 WL 1342263, at *10 (Del. Ch. May 2, 2007) ("[T]he Court tends to favor the discounted cash flow method . . . .").

In *Dell* and *DFC*, the Delaware Supreme Court cautioned against using the DCF methodology when a reliable market-based indicator is available. In *Dell*, the high court explained that "[a]lthough widely considered the best tool for valuing companies when there is no credible market information and no market check, DCF valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large valuation gaps." *Dell*, 177 A.3d at 37–38. The senior tribunal warned that when a reliable market-based indicator is available, "the Court of Chancery should be chary about imposing the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony." *Id.* at 35. Making the same point conversely in *DFC*, the Delaware Supreme Court advised that a DCF model *should* be used

41

in appraisal proceedings "when the respondent company was not public or was not sold in an open market check." 172 A.3d at 369 n.118.

This court has heeded the admonition to favor market-based valuation indicators. In the aftermath of *Dell* and *DFC*, this court has explained that the fair value analysis should "begin with the market evidence." *Jarden Trial*, 2019 WL 3244085, at *2. And this court has observed that a more subjective valuation technique, like a DCF methodology or a comparable company analysis, "is necessarily a second-best method" when "market-based indicators are available."[14]

This appraisal proceeding involves a company and a merger where a DCF model is unlikely to provide more reliable evidence of fair value than a market-based indicator. Regal was a well-known, publicly traded company whose shares were widely held. Regal's business was straightforward, and its business model was mature. The Merger resulted from an arm's-length process that included an open and active post-signing market check, and all stockholders received the same cash consideration for their shares.

In addition to factors favoring market-based indicators, there are reasons to question the result that Yilmaz generated using his DCF methodology. The principal grounds are

---

[14] *In re Appraisal of Panera Bread Co.*, 2020 WL 506684, at *40 (Del. Ch. Jan. 31, 2020) (quoting *Stillwater Trial*, 2019 WL 3943851, at *60–61); *accord Columbia Pipeline*, 2019 WL 3778370, at *52; *see also In re Appraisal of Solera Hldgs., Inc.*, 2018 WL 3625644, at *32 (Del. Ch. July 30, 2018) (agreeing with expert's conclusion that merger price minus synergies was more reliable fair value measure "given the uncertainties . . . surrounding several inputs to the DCF valuation" (omission in original) (internal quotation marks omitted)).

42

the divergence between his valuation conclusion and market-based indicators and his reliance on optimistic management projections.

## 1. The Divergence Between Yilmaz's DCF Valuation And Market-Based Indicators

One reason to question Yilmaz's DCF valuation is its divergence from market-based indicators. Deploying a customary tactic, Cineworld portrayed Yilmaz's valuation conclusion of $33.83 per share as an outlier by comparing it with Regal's trading price at various points in time and with the deal price. *See* JX 1631 ("Kennedy Report") ¶ 129. Cineworld noted that Yilmaz's DCF valuation represents a premium of 47.1% over the deal price and observed that if that valuation were accurate, then Cineworld received a windfall of $1.7 billion. Dkt. 259 at 5, 41. Cineworld argues that it is implausible bordering on impossible to think that ardent capitalists on the sell-side would sacrifice that amount, or that no competing bidder would have intervened if such a pricing discrepancy existed.

Cineworld's comparisons undermine Yilmaz's analysis, but the argument has less force than in prior cases.[15] Most of the delta between Yilmaz's valuation and the deal price results from the Tax Act's lowering of the corporate tax rate. JX 1632 ("Yilmaz Report")

---

[15] *See Panera*, 2020 WL 506684, at *17, *40–43 (rejecting petitioners' 60% DCF-weighted valuation (the remaining 40% attributable to comparable analyses also rejected by the Court) that was 12% higher than the deal price); *Columbia Pipeline*, 2019 WL 3778370, at *50 (rejecting petitioners' DCF-derived valuation that was 27% higher than the deal price); *Solera*, 2018 WL 3625644, at *16, *29–32 (rejecting petitioners' DCF-derived valuation that was 51.6% higher than the deal price); *In re Appraisal of PetSmart, Inc.*, 2017 WL 2303599, at *22–23, *31–40 (Del. Ch. May 26, 2017) (rejecting petitioners' DCF-derived valuation that was 55% higher than the deal price).

¶ 14. The parties agree that Regal's value increased after signing and before closing because of the Tax Act. In preparing his DCF valuation as of closing, Yilmaz used the lower corporate tax rate that the Tax Act adopted. When Yilmaz modified his DCF model to use Regal's pre-Tax Act rate, his methodology generated a value of $26.51 per share. That output remains 15.3% higher than the deal price, but the divergence is obviously less extreme.

Once adjusted to exclude the post-signing change in Regal's value, Yilmaz's DCF model generates results comparable to the DCF model prepared by Cineworld's financial advisors. Using analyst consensus projections and varying assumptions for the weighted average cost of capital ("WACC") and terminal growth rate, Cineworld's financial advisors generated a valuation range for Regal of $21 to $32.30 per share, with a midpoint of $25.70 per share. JX 1115 at '813. Without the effects of the Tax Act, Yilmaz's valuation is only 3.15% higher. Using a WACC of 7%, nearly identical to Yilmaz's WACC of 6.99%, Cineworld's financial advisors valued Regal at between $26.80 and $32.30 per share, slightly higher than Yilmaz. *Id.*; *see* Yilmaz Report Ex. 12. Using the 2017 Projections and a similar range of assumptions for the WACC and terminal growth rate, Cineworld's financial advisors generated a valuation range for Regal of $30.30 to $44.80 per share, with a midpoint of $36.40 per share, well above Yilmaz. JX 1115 at '814.

The Delaware Supreme Court has stated that "a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller." *Aruba*, 210 A.3d at 137. Describing an acquirer's superior insight into the value of the target, the high court posited that "HP's access to nonpublic

44

information . . . improved [its] ability to estimate Aruba's going-concern value over that of the market as a whole. In particular, HP had better insight into Aruba's future prospects than the market because it was aware that Aruba expected its quarterly results to exceed analysts' expectations." *Id.* at 139 (footnote omitted). These observations suggest that a buyer's internal valuations carry an extra imprimatur of reliability and are likely to provide more persuasive evidence of value than the buyer's actual bids, which are tempered by the buyer's desire to acquire the target for the lowest possible price. *See In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *9 (Del. Ch. Nov. 27, 1990) ("A bidder's objective is to identify an underpriced corporation and . . . acquire it at the lowest price possible.").[16] In this case, Cineworld's internal valuations corroborate Yilmaz's valuation conclusion.

The fact that Cineworld's financial advisors reached valuation conclusions that are similar to Yilmaz's when using the same DCF methodology does not change the fact that

---

[16] Recent precedent creates some uncertainty about the extent to which a trial court should consider the buyer's internal valuations. The *Aruba* decision suggests that the buyer's internal valuations are highly probative. In *DFC*, however, the Delaware Supreme Court cast doubt on the propriety of a trial court relying on a buyer's internal valuations. There, the trial court had noted that the buyer "thought it was taking an opportunity to buy DFC at trough pricing and that it could reap the upside of this risk." 172 A.3d at 374 n.145. Observing that "[o]ne would expect a buyer to think it made a wise decision with an upside," the high court suggested that "it is in tension with the [appraisal] statute itself to argue that the subjective view of post-merger value of the acquirer can be used to value the respondent company in an appraisal," because rigid adherence to that approach would risk discouraging buyers from pursuing transactions that otherwise would be "valuable to selling stockholders." *Id.* The high court thus indicated that the buyer's higher internal valuation of the target and its belief that the target was undervalued should not be given significant weight.

those valuation conclusions are inconsistent with market-based indicators. The Delaware Supreme Court's decisions in *DFC* and *Dell* teach that a trial court should be skeptical of valuation conclusions reached using a judgment-laden methodology when that method diverges from market indicators. Yilmaz's DCF valuation was not so extreme as to strain credulity, but the degree of divergence weighs against using it to value Regal.

## 2. Yilmaz's Reliance On The 2017 Projections

A second reason to view Yilmaz's DCF valuation as less reliable than market-based indicators is his reliance on the 2017 Projections, which have a mixture of positive and negative characteristics. Ultimately, however, the 2017 Projections contain a sufficient dose of optimism to warrant harboring doubt about a valuation that relies on them.

When evaluating the suitability of projections, Delaware cases express a strong preference for management projections prepared in the ordinary course of business and available as of the date of the merger.[17]

---

[17] *See, e.g., JRC Acq. Corp.*, 2004 WL 286963, at *2 ("[T]his Court prefers valuations based on management projections available as of the date of the merger . . . ."); *In re Appraisal of SWS Gp., Inc.*, 2017 WL 2334852, at *11 (Del. Ch. May 30, 2017) ("This Court has long expressed its strong preference for management projections."); *PetSmart*, 2017 WL 2303599, at *32 ("[T]his court has deemed projections unreliable where . . . the projections were created for the purpose of obtaining benefits outside the company's ordinary course of business . . . ." (internal quotation marks omitted)); *LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *17 (Del. Ch. June 30, 2015) ("[T]he final nail in the coffin for the Management Projections is that Ramtron did not rely on them in the ordinary course of its business."); *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *4 (Del. Ch. Apr. 30, 2012) ("[T]he Court generally relies on management projections made in the ordinary course of business . . . ."); *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2003) ("When management projections are made in the ordinary course of business, they are generally deemed reliable."), *aff'd in part, rev'd in*

By corollary, projections prepared outside of the ordinary course do not enjoy the same deference. In fact, management projections can be, and have been, rejected entirely when they lack sufficient indicia of reliability, such as when they were prepared: (1) outside of the ordinary course of business; (2) by a management team that never before had created long-term projections; (3) by a management team with a motive to alter the projections, such as to protect their jobs; and (4) when the possibility of litigation, including an appraisal action, was likely and probably affected the neutrality of the projections.

*Ramtron*, 2015 WL 4540443, at *10.

Another issue that arises regularly with projections is the distinction between so-called "bottom-up" and "top-down" processes. Projections prepared using a "bottom-up" process start with detailed information drawn from business units, then aggregate it to create a company-wide forecast. *See, e.g.*, *Merion Cap. LP v. BMC Software, Inc.*, 2015 WL 6164771, at *4 (Del. Ch. Oct. 21, 2015). A "top-down" process, by contrast, relies on broad assumptions about the company's performance and industry trends. *See* Yilmaz Report ¶ 61. Projections prepared using a "bottom-up" process generally are more reliable than projections prepared using a "top down" process. *See PetSmart*, 2017 WL 2303599, at *34 n.386 ("[M]anagement's projections were 'top down' rather than 'bottom up' projections, which is contrary to best practices."); *see also In re Dole Food Co., Inc.*

---

*part on other grounds*, 884 A.2d 26 (Del. 2005); *see also Gray v. Cytokine Pharmasciences, Inc.*, 2002 WL 853549, at *8 (Del. Ch. Apr. 25, 2002) (rejecting respondent's "litigation-driven projections" as less reliable than contemporaneous management projections).

47

*S'holder Litig.*, 2015 WL 5052214, at \*30–31 (rejecting "top down" projections as unreliable).

When evaluated in light of Delaware precedent, the record surrounding the 2017 Projections is mixed. On the positive side, they were prepared by Regal's "gold standard" management team and were available at the time of the Merger. They were not created for purposes of litigation. Ownby repeatedly testified that they were "optimistic but achievable." Ownby Tr. 216, 265. No one from the management team disavowed the 2017 Projections, and they reflected the team's best judgment concerning Regal's future performance. *See* Ownby Tr. 229–30; Miles Tr. 438. The Board reviewed and discussed them with management during a meeting on October 19, 2017, and the minutes do not reflect any disapproval or concern about their reliability. *See* JX 965 at 2. Regal included the 2017 Projections in the definitive information statement it filed in connection with the Merger. JX 1444 at 37. Although Regal included appropriate caveats regarding the projections, management clearly believed in their reliability.

On the negative side, the 2017 Projections were not prepared in the ordinary course of business. They were created for Regal's negotiations with Cineworld. Ownby Tr. 211, 214–15; Ownby Dep. (JX 1599) 229. Given this context, there is reason to think that management erred on the bullish side. As noted, Ownby described the projections as "optimistic but achievable." Ownby Tr. 216, 265.

Also on the negative side, Regal management did not have experience preparing five-year projections. In the ordinary course of business, Regal management only prepared an annual operating budget. The one previous time that management prepared five-year

48

projections was for the 2014 sale process, when Ownby prepared the 2014 Projections using the same method. Ownby Tr. 216. Regal failed to meet the 2014 Projections, with the degree of underperformance increasing over time.[18] Kennedy calculated that if the 2017 Projections were adjusted downward to reflect the degree by which Regal underperformed the 2014 Projections, then the value generated by Yilmaz's DCF model would fall to $20.93 per share. Kennedy Report ¶ 112.

As a further negative consideration, Regal management prepared the 2017 Projections using a "top-down" process, which differed from the "bottom-up" process that management used for the annual budget. In the annual budgeting process, management "gathered information from the various departments" and estimated revenues and expenses "theater by theater, month by month, and line by line." Ownby Dep. (JX 1599) 141. Management then adjusted the budget based the anticipated performance of "key metrics," such as "attendance, average ticket price, concession sales per patron, . . . and film rent." *Id.*

This process enabled management to create forecasts based on "detailed theater-by-theater assumptions." Ownby Tr. 215. By contrast, for the 2017 Projections,

---

[18] *Compare* JX 874 (projecting $3.4 billion in revenue for 2015, $3.5 billion in revenue for 2016, and $3.6 billion in revenue of 2017), *with* JX 1509 at 16 (reporting $2.9 billion in revenue for 2015, $3.2 billion in revenue for 2016, and $3.2 billion in revenue for 2017). *See* Kennedy Report ¶ 169 (depicting increasing levels of underperformance versus 2014 Projections across attendance, attendance per screen, revenue, and adjusted EBITDA); Yilmaz Tr. 684 (conceding that Regal did not meet the 2014 Projections).

management made "high-level assumptions." *Id.* As a result, the 2017 Projections were less rigorous, and therefore less reliable, than the annual budget. *See* Yilmaz Report ¶ 61.

Yet another negative factor is that the 2017 Projections were highly sensitive to theater attendance. The 2017 Projections assumed that attendance would rebound in 2018 after a weak 2017, then continue to increase in 2019 at a rate of 0.9%. *See* JX 864 at '635; JX 874 at '800–01. By projecting year-over-year growth in attendance going forward, the 2017 Projections diverged from the historical trend. Looking backward, Regal's attendance had declined at a CAGR of -1.8% from 2010 until 2017, and there had been a 20% aggregate decline in attendance since 2002.[19] Those declines were consistent with attendance falling industry-wide at a CAGR of -0.5% from 2011 until 2017. Calkins Tr. 40. Regal management did not have a persuasive explanation for reversing the long-term decline in cinema attendance. The 2017 Projections also did not account for potential disruptions to Regal's business model from PVOD, a shortened theatrical release window, or streaming services. Ownby Tr. 217, 220.

---

[19] *See* Hollis Report ¶¶ 77–80, Fig. 12, Fig. 13; Miles Tr. 300. Of the two assumptions—a rebound in 2018 and projected growth thereafter—the former was more reasonable. In forecasting the rebound, the 2017 Projections took into account a mid-year theater acquisitions that Regal completed in mid-2017, which would increase total attendance in 2018. *See* JX 864 at '635 ("[S]ome of that growth . . . comes simply from having the Warren and Santikos acquisitions for a full year."); JX 874 at '800 ("Attendance rebounds in 2018 . . . partially due to screens acquired in 2017[.]"). But the rebound also anticipated real growth in attendance during 2018, and the 2017 Projections contemplated further growth in subsequent years. Hollis Report ¶ 77, Fig. 12.

Finally, the 2017 Projections deviated from the analyst consensus to a significant degree. As noted, Cineworld's financial advisors prepared DCF valuations using analyst consensus projections and the 2017 Projections. Using the former, the model generated a midpoint valuation for Regal of $25.70 per share; using the latter, the same model produced a midpoint valuation of $36.40 per share. JX 1115 at '813–14. For many companies, there could be good reasons why management would be better positioned than analysts to project long-term financial results. For Regal, that was unlikely to be the case. The business was stable and easy to understand. The key driver was attendance, which generally depended on the quality of the film slate. Regal's management team did not have any unique insight into the pipeline of future films that was not available to industry analysts. Ownby Tr. 264; Miles Tr. 272.

The 2017 Projections were not unreliable. They represented management's best estimates of the future performance of the business, and Regal had a "gold standard" management team. Dunn Tr. 171; *see* Ownby Tr. 257; Miles Tr. 301; Anschutz Tr. 516; Kim Tr. 859. If a reliable market-based indicator were not available, then the court could value Regal using the 2017 Projections and a DCF methodology. But that does not mean that the court *should* do so.

"It's difficult to make predictions, especially about the future." *In re Altaba, Inc.*, 241 A.3d 768, 776 (Del. Ch. 2020) (noting that this observation has been attributed variously to Mark Twain, Yogi Berra, and Niels Bohr, among others). That truism applies to the 2017 Projections. Sufficient doubt surrounds the 2017 Projections that Yilmaz's DCF valuation is a less desirable approach than a market indicator.

51

### 3.    Other Aspects Of Yilmaz's DCF Valuation

Once the analysis moves beyond the preceding points, there is relatively little to criticize in Yilmaz's valuation. By and large, Yilmaz grounded his valuation on conservative assumptions.

For example, Yilmaz modified the cash flows in his DCF valuation to reflect Regal's actual results for the fourth quarter of 2017. Yilmaz Report ¶ 65. Regal's actual results were lower than the 2017 Projections, so this change lowered Yilmaz's valuation conclusion. Yilmaz Tr. 567.

Another example involved Regal's projected capital expenditures during the terminal period. Using one method, Yilmaz calculated the average reinvestment rate during the projection period and applied the same rate during the terminal period. Yilmaz Report ¶ 78, Ex. 7-1. Using another method, Yilmaz estimated "the average useful life of Regal's asset base" and the "annual cost and overall duration of significant capital projects like the recliner conversion," then used those variables to derive a rate for the terminal period. *Id.* The first method generated a higher figure, resulting in a lower valuation estimate. Yilmaz nevertheless selected that method to make his valuation more conservative. *Id.*

### 4.    The Conclusion Regarding The DCF Methodology

On balance, the court declines to use Yilmaz's DCF methodology as a valuation indicator. In many respects, Yilmaz's analysis is conservative. Nevertheless, there are sufficient questions raised by the divergence between Yilmaz's valuation conclusion and the market-based indicators, and there is sufficient uncertainty surrounding the 2017

Projections, to make the DCF methodology a less desirable methodology than a market-based approach.

## C. The Unaffected Trading Price

Cineworld contends that the trading price of Regal's stock provides reliable evidence of fair value. The petitioners respond that the court should not rely on Regal's trading price. As the proponent of using the trading price, Cineworld bore the burden of proving its reliability.

> Reliance on the trading price of a widely held stock is generally accepted in the financial community, and the trading price or metrics derived from it are regularly used to estimate the value of a publicly held firm based on its operative reality in that configuration.

*Stillwater Trial*, 2019 WL 3943851, at *51; *accord* Kennedy Tr. 1014 (testifying that reliance on the unaffected market price is a "widely accepted methodolog[y]"). "[T]here is extensive case law on [the use of the trading price] because of its role as one of the three elements of the Delaware Block Method." Finkelstein & Hendershot, *supra,* at A-57. Recent Delaware Supreme Court decisions have endorsed the use of trading prices as a valuation indicator. *See Dell*, 177 A.3d at 35–38; *DFC*, 172 A.3d at 369–70 & n.118. Although the Delaware Supreme Court reversed a decision that relied exclusively on the unaffected trading price, *see Aruba*, 210 A.3d at 140, the high court subsequently rejected the notion that "a corporation's unaffected stock price cannot equate to fair value." *Jarden*, 236 A.3d at 316. The high court confirmed the "traditional Delaware view that in some cases the price a stock trades at in an efficient market is an important indicator of its economic value and should be given weight." *Id.* at 325 (internal quotation marks omitted).

Whether the trading price should be used as a valuation indicator turns on whether the market exhibits sufficient evidence of informational efficiency. The concept of informational efficiency describes how rapidly security prices reflect or impound new information that arrives to the market. *See* Alex Frino et al., *Introduction to Corporate Finance* 305 (5th ed. 2013). Informational efficiency differs from fundamental-value efficiency, which concerns the extent to which the market price reflects intrinsic value. It is impossible to determine whether a stock trades in a market that is fundamental-value efficient, but that does not render trading prices useless for purposes of appraisal.

> Whether called fundamental value, true value, intrinsic value, or fair value, the really-real value of something is always an unobservable concept. No valuation methodology provides direct access to it. Fundamental value is like a Platonic form, and the various valuation methodologies only cutouts casting shadows on the wall of the cave. The real issue is not whether a particular method generates a shadow (they all do), but rather whether the shadow is more or less distinct than what other methods produce.

*Stillwater Trial*, 2019 WL 3943851, at *51. For purposes of determining fair value in an appraisal proceeding, the trading price has a lot going for it.[20]

---

[20] *See, e.g.*, Richard A. Booth, *Minority Discounts and Control Premiums in Appraisal Proceedings*, 57 Bus. Law. 127, 151 n.130 (2001) ("[M]arket price should ordinarily equal going concern value if the market is efficient."); William J. Carney & Mark Heimendinger, *Appraising the Nonexistent: The Delaware Court's Struggle with Control Premiums*, 152 U. Pa. L. Rev. 845, 847–48, 857–58 (2003) ("The basic conclusion of the Efficient Capital Markets Hypothesis . . . is that market values of companies' shares traded in competitive and open markets are unbiased estimates of the value of the equity of such firms."); *id.* at 879 (noting that the appraisal statute requires consideration of all relevant factors and stating that "in an efficient market, absent information about some market failure, market price is the only relevant factor" (internal quotation marks omitted)); Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. Pa. L. Rev. 1, 54 (2007)

The question in an appraisal proceeding is whether the trading market for the security to be valued is "informationally efficient enough, and fundamental-value efficient enough, to warrant considering the trading price as a valuation indicator when determining fair value." *Stillwater Trial*, 2019 WL 3943851, at *52. As an initial cut at this question, the Delaware Supreme Court has looked to an array of factors, many of which are associated with public company status. *See Dell*, 177 A.3d at 25–28; *DFC*, 172 A.3d at 369–70.

Regal was a public company that traded on a major exchange, and the factors associated with a company of that type are present in this case.

- **Public Information:** The Delaware Supreme Court has cited the existence of "robust public information" about a company as supporting reliance on its trading price. *DFC*, 172 A.3d at 349. Regal had been a public company since 2002 and had generated an extensive body of public information by making the filings required by the federal securities laws.

- **Stock Exchange Listing:** The Delaware Supreme Court has cited the fact that a company is "listed on a major U.S. exchange" as making it "unlikely that the market would somehow miss out" on information about the company's value. *Id.* at 372. Regal was listed on a major stock exchange.

_____

("Take the case of a publicly traded company that has no controller. Efficient market theory states that the shares of this company trade at the pro rata value of the corporation as a going concern."); *id.* at 60 ("As a matter of generally accepted financial theory . . . , share prices in liquid and informed markets do generally represent . . . going concern value . . . ."); *see also* Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. Rev. 1021, 1033–34 (2009) (positing trading prices should not be used to determine fair value if there is either no public market price at all, if the shares are illiquid or thinly traded, or if there is a controlling stockholder, implying that outside of these scenarios, "because financial markets are efficient, one can simply use the market value of the shares").

- **Active Trading:** The Delaware Supreme Court has held that when a company's stock is subject to "highly active trading," it is more likely that "the price at which its shares trade is informative of fair value, as that value reflects the judgments of many stockholders about the company's future prospects." *Id.* at 373. The average daily and weekly trading volumes for Regal's stock were significantly higher than the average company in indices of similarly sized companies. Kennedy Report ¶ 132, Fig. 12.

- **Followed by Equity and Credit Analysts:** The Delaware Supreme Court has stated that "the pre-transaction trading price of a public company's shares" is more informative when the company's performance and competitive position are covered by debt and credit analysts. *DFC*, 172 A.3d at 373; *see Dell*, 177 A.3d at 7 (citing equity analyst coverage as "suggest[ing] the market for Dell stock was semi-strong efficient"). Regal was followed by more equity analysts than the average company in the S&P 600, S&P 500, and S&P 400 indexes. *See* Kennedy Report ¶ 132, Fig. 12. Regal also was covered by credit analysts. *See* JX 735 (Regal credit report prepared by Standard and Poor's). The existence of equity and credit specialists who covered Regal strengthens the inference that the market's "digestion and assessment of all publicly available information" about Regal "was quickly impounded" into its trading price. *Dell*, 177 A.3d at 7.

- **Bid-Ask Spread:** The Delaware Supreme Court has cited the fact that a company's stock had a narrow bid-ask spread as supporting the inference that the market for the company's stock is efficient. *Dell*, 177 A.3d at 7. Regal's stock exhibited a bid-ask spread of 0.05% of the price of its shares, which is narrower than the bid-ask spread of 0.08% that was cited with approval in *Dell*. Kennedy Report ¶ 130, Fig. 12; *see Dell*, 177 A.3d at 7.

- **Market Capitalization.** The Delaware Supreme Court has cited a company's large market capitalization as supporting the inference that the market for the company's stock is efficient. *Dell*, 177 A.3d at 7. Regal's market capitalization was approximately $2.85 billion, more than double the market capitalization of the company in in *Stillwater*, a case in which this court found that the company's market capitalization provided evidence that its stock traded in an efficient market. Kennedy Report ¶ 132, Fig. 12; *see Stillwater Trial*, 2019 WL 3943851, at *53.

These attributes suggest as an initial matter that Regal's common stock had sufficient attributes of market efficiency to warrant considering it as an indicator of fair value. But despite these high-level indicators, Cineworld failed to carry its burden to prove

the trading price for Regal's stock was a sufficiently reliable to use in this case. Three reasons collectively contribute to this conclusion.

First, Regal had a controlling stockholder—Anschutz. The Delaware Supreme Court has expressed support for relying on the trading price when a company is widely traded and has "no controlling stockholder." *Dell*, 177 A.3d at 25. This court also has cited the lack of a controlling stockholder as support for relying on the trading price. *See Jarden Trial*, 2019 WL 3244085, at *27; *see also Stillwater Trial*, 2019 WL 3943851, at *51 n.22 (collecting research supporting reliability of unaffected trading price in absence of controlling stockholder). Cineworld attempted to respond to this concern by arguing that there was no evidence that Anschutz "obtained any 'private benefits of control.'" Kennedy Report ¶¶ 138–39. That observation does not carry the day, because in an efficient market, participants will perceive the *possibility* that the controller will act in its own interests and discount the minority shares accordingly. Moreover, as Kennedy himself acknowledged, Regal's annual reports included as a risk factor "that the interests of Anschutz could conflict with the interests of other shareholders." Kennedy Report ¶ 136.

Second, Anschutz engaged in block sales that created an overhang that capped the price of Regal's stock. The Board, management, and Morgan Stanley contemporaneously identified this issue.[21] After Anschutz's first block sale, Regal and Anschutz worked on

---

[21] *See* JX 245 at '060, '063; JX 247; JX 382 at '490; JX 433 at '472; JX 434 at 1–2; *see also* Ownby Tr. 235–36.

talking points to mitigate the downward pressure on Regal's stock.[22] Market participants took note of the sale, and investment banks sent Anschutz unsolicited offers to execute any future block sales. JX 560; JX 579; JX 585. The Board continued to worry about the overhang through the approval of the Merger Agreement.[23] Cineworld responds that Anschutz's block sales could have signaled that a whole-company sale was in the offing, causing traders to anticipate a merger premium and bid up the stock. That is theoretically possible, but there is no persuasive evidence that Anschutz's block sales had that effect. The contemporaneous evidence indicates that Anschutz's block sales capped the value of the stock.

Finally, the petitioners introduced evidence that Regal's stock was in a "trough" due to the disastrous film slate in summer 2017. Dkt. 255 at 35–36. Between May and mid-August 2017, Regal's stock dropped precipitously, erasing over $830 million in market capitalization. *See* JX 781. AMC contributed to an industry-wide selloff by issuing a disastrous pre-earnings release that disclosed a large net loss for the second quarter of 2017. *See* JX 752; JX 753. Market participants also became more concerned about competition from streaming services such as Netflix, Hulu, and Amazon. JX 743; JX 752; *see* JX 749.

---

[22] *See* JX 387; JX 391; JX 392; JX 393; JX 394; JX 395.

[23] *See* JX 1257 at 3 (December 4, 2017, Board minutes discussing overhang); *see also* Ownby Tr. 250–51 (the Board worried about the overhang until as late as 2017). Ownby believed that Regal's stock price was not "indicative of anything." JX 1220 at 1; *see* Ownby Tr. 252–53.

Short sellers targeted the cinema sector, with Regal as their "biggest target." JX 768 at '341–43. During this period, Regal's insiders concluded that Regal's stock had become disconnected from its fundamental value. *See* JX 1220 at 1; Ownby Tr. 252–53; Bell Tr. 490–91; *see also* PTO ¶¶ 179–180. Standing alone, this evidence would not be sufficient to undermine the reliability of the unaffected market price. *See DFC*, 172 A.3d at 374 n.145 (rejecting trial court's reliance on acquirer's belief that deal took place at "trough pricing" that enabled buyer to "reap the upside"); *Dell*, 177 A.3d at 30 (rejecting trial court's reliance on contemporaneous evidence that the company's management and financial advisors believed the company was worth up to more than double its trading price because market did not perceive success of corporate transformation and reorganization). In conjunction with the Anschutz-related factors, it contributes to the questions surrounding the market price.

Because of these factors, the court declines to rely on the trading price as an indicator of fair value. This decision has not held that the trading market for Regal's common stock was inefficient, nor that the trading price of Regal's common stock was wholly unreliable. To reiterate, the question of efficiency is a matter of degree. *See* Bradford Cornell & John Haut, *How Efficient Is Sufficient: Applying the Concept of Market Efficiency in Litigation*, 74 Bus. Law. 417, 422 (2019). In this case, Cineworld failed to carry its burden to show that the market for Regal's common stock was sufficiently

efficient to be used as an indicator of fair value when another market-based indicator is available.[24]

**D.    The Deal Price Minus Synergies Adjusted For Any Changes In Value Between Signing And Closing**

Finally, Cineworld contends that the deal price minus synergies provides reliable evidence of the fair value of Regal. The petitioners contend that the court should not use the deal price minus synergies. As the proponent of this valuation methodology, Cineworld bore the burden of proving its reliability.

The Delaware Supreme Court has endorsed using the deal price in an arm's-length transaction as an indicator of fair value.[25] The high court has stressed that although a deal price that results from a reliable sale process often will provide the best evidence of fair value, "there is no presumption in favor of the deal price." *DFC*, 172 A.3d at 349. Nevertheless, the Delaware Supreme Court has instructed this court to give "considerable weight" to the deal price "absent deficiencies in the deal process." *Aruba*, 210 A.3d at 137.

---

[24] Assuming for the sake of argument that the court used the trading price as a valuation indicator, then the trading price would provide an indication of Regal's value on the trading date. Adjustments would be necessary to derive Regal's fair value at closing.

[25] *See, e.g., Aruba*, 210 A.3d at 135 & n.41 (describing the "long history of giving important weight to market-tested deal prices in the Court of Chancery and [the Delaware Supreme Court]"); *Dell*, 177 A.3d at 23 ("[T]he record as distilled by the trial court suggests that the deal price deserved heavy, if not dispositive, weight."); *DFC*; 172 A.3d at 349 ("[U]nder the conditions found by the Court of Chancery, economic principles suggest that the best evidence of fair value was the deal price . . . ."); *Gilbert*, 731 A.2d at 796 ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value.").

### 1. Step One: The Reliability Of The Sale Process

The first step in using the deal-price metric is to determine whether the process that led to the deal is sufficiently reliable that the deal price can be regarded as a reliable ceiling on fair value. *See id.* at 142. If that process is sufficiently reliable, then the deal price establishes an upper bound for fair value because "it is widely assumed that the sales price in many M & A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control." *DFC*, 172 A.3d at 371. But under the appraisal statute, fair value must be determined "irrespective of the synergies involved in a merger." *Gilbert*, 731 A.2d at 796–97 (emphasis omitted). Consequently, fair value under the appraisal statute typically will be less than the deal price that results from a reliable transaction process.

When evaluating the reliability of a transaction process, the Delaware Supreme Court has identified certain "objective indicia" which suggest that the process was sufficiently reliable. *Stillwater*, 240 A.3d at 11–12. In accordance with precedent, this decision considers the extent to which the sale process exhibits the objective indicia.[26] If sufficient indicia are present, then the court "must determine whether they outweigh weaknesses in the sale process, or whether those weaknesses undermine the persuasiveness of the deal price." *Panera*, 2020 WL 506684, at *19.

---

[26] *Panera*, 2020 WL 506684, at *19–24; *Stillwater Trial*, 2019 WL 3943851, at *22–24; *Columbia Pipeline*, 2019 WL 3778370, at *24–25.

The first objective indicator is whether the buyer was an unaffiliated third party.[27] Cineworld was an unaffiliated acquirer with no prior ownership interest in Regal.

The second objective indicator is whether the seller's board labored under any conflicts of interest.[28] Eight of the Board's nine members were disinterested, outside directors. As a super-majority of the Board, those directors had the statutory authority under the Delaware General Corporation Law to say "no" to any merger. *See* 8 *Del. C.* § 251(b). None of the members of the Board joined the post-merger entity. In cases involving claims for breach of fiduciary duty, Delaware decisions generally discount the implications of board service with the surviving company.[29] Here, even that possible influence was absent.

_____

[27] *See DFC*, 172 A.3d at 349; *Panera*, 2020 WL 506684, at *19; *Stillwater Trial*, 2019 WL 3943851, at *22; *Columbia Pipeline*, 2019 WL 3778370, at *25.

[28] *See Dell*, 177 A.3d at 28; *Panera*, 2020 WL 506684, at *19; *Stillwater Trial*, 2019 WL 3943851, at *22; *Columbia Pipeline*, 2019 WL 3778370, at *25.

[29] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 45 (Del. Ch. 2013) (holding that director's post-merger "board membership [in post-merger entity], standing alone, would not be sufficient to create a disqualifying interest"); *Orman v. Cullman*, 794 A.2d 5, 28–29 (Del. Ch. 2002) ("The *only* fact alleged in support of Orman's allegation of director Barnet's interest is that he 'has an interest in the transaction since he will become a director of the surviving company.' No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he will be a director in the surviving corporation. To the contrary, our case law has held that such an interest is not a disqualifying interest." (footnote omitted)); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("[T]he fact that several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest."). Academic studies indicate that there may be good reason to think that losing or gaining a board seat is material. *See* Lucian Bebchuk & Jesse Fried, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation* 25 (2004) (describing benefits of board service and

The one director who faced a conflict was Miles, Regal's CEO. She was not

disinterested or independent with respect to the Merger because, like other senior

executives of Regal, she received a generous change-in-control package.[30] But she was

only one of nine directors, and the Board knew about her change-in-control package and

the interests it created. Moreover, none of the members of Regal's senior management

stayed on as employees of the Company after the Merger, making it unlikely that divided

loyalties tainted the sale process. *See DFC*, 172 A.3d at 376 (crediting trial court's finding

---

concluding that "[i]n most cases, these benefits are likely to be economically significant to the director."); David I. Walker, *The Manager's Share*, 47 Wm. & Mary L. Rev. 587, 633 (2005) (arguing that from an economic perspective, "[t]he incentive to retain a board position generally outweighs the incentive to maximize shareholder value"); David Yermack, *Remuneration, Retention, and Reputation Incentives for Outside Directors*, 59 J. Fin. 2281, 2282, 2307 (2004) (finding "statistically significant evidence that outside directors receive positive performance incentives from compensation, turnover, and opportunities to obtain new board seats" that have a direct impact on the accumulation of wealth by that director and "considering that an outside director may serve on several boards, these incentives appear non-trivial, albeit much smaller than those offered to top managers"); Jarrad Harford, *Takeover Bids and Target Directors' Incentives*: *The Impact of a Bid on Directors' Wealth and Board Seats*, 69 J. Fin. Econ. 51, 68 (2003) (finding statistical evidence that a board seat is difficult to replace, because directors who lose a seat as a result of a takeover can expect to hold one fewer directorship than peers for two years following a completed merger; finding that directors suffer a net financial penalty from the loss of the directorship "between zero and -$65,443"); *see also* Renée B. Adams & Daniel Ferreira, *Do Directors Perform for Pay?*, 46 J. Acct. & Econ. 154, 168–69 (2008) (finding statistically significant correlation between director attendance and per meeting fees, indicating that per-meeting payments of approximately $1000 have a material influence on directors).

[30] *See* Miles Tr. 475 (Miles' total severance, cash and equity compensation following the Merger was "north of $16 million"); JX 1499, "Amy" tab (Miles received $10,533,734 in change-in-control payments as a result of the Merger).

that "[t]he deal did not involve the potential conflicts of interest inherent in a management buyout or negotiations to retain existing management—indeed, Lone Star took the opposite approach, replacing most key executives" as supporting reliability of deal price (emphasis and internal quotation marks omitted)).

A third objective indicator is the existence of "robust public information" about the value of the company. *Id.* at 349; *see Panera*, 2020 WL 506684, at *20. Regal had been a public company since 2002 and was followed by more equity analysts than the average company in the S&P 600, S&P 400, and S&P 500 indexes. Kennedy Report ¶ 132, Fig. 12. Robust public information about Regal was available.

A fourth objective indicator is whether the bidder conducted diligence to obtain non-public information about the company's value. *See Panera*, 2020 WL 506684, at *20; *Stillwater Trial*, 2019 WL 3943851, at *23; *Columbia Pipeline*, 2019 WL 3778370, at *25. The Delaware Supreme Court has stated that a buyer armed with "material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller." *Aruba*, 210 A.3d at 137. This factor is satisfied if the buyer has "signed a confidentiality agreement, done exclusive due diligence, [and] gotten access to material nonpublic information." *Id.* at 140. Cineworld did each of these things.

64

A fifth objective indicator is whether the parties engaged in negotiations over the price.[31] Regal rejected Cineworld's initial offer of $20.50 per share, which represented a 21.2% premium over Regal's stock price at the time. Regal did not counter, forcing Cineworld to increase its bid. Regal next rejected Cineworld's second offer of $21 per share, a 30% premium over Regal's stock price at the time, and told Cineworld that Regal was not for sale. Regal only expressed interest in a potential transaction after Cineworld increased its bid to $22.50 per share, a 37.1% premium over Regal's stock price at the time. Regal then countered at $23.50 and demanded the ability to evaluate competing offers. The parties ultimately reached agreement at a price of $23.00 per share, representing a 46.1% premium over Regal's stock price and a 12.2% increase over Cineworld's original offer. *See* JX 1045; JX 1200.

A sixth objective indicator is whether the merger agreement was sufficiently open to permit bidders to emerge during the post-signing phase.[32] The Merger Agreement

---

[31] *See id.* at 139; *Dell*, 177 A.3d at 28; *Panera*, 2020 WL 506684, at *20; *Stillwater Trial*, 2019 WL 3943851, at *23; *Columbia Pipeline*, 2019 WL 3778370, at *25.

[32] *See Panera*, 2020 WL 506684, at *21–24; *Columbia Pipeline*, 2019 WL 3778370, at *25; *see also Aruba*, 210 A.3d at 136 ("It cannot be that an open chance for buyers to bid signals a market failure simply because buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other."); *Dell*, 177 A.3d at 29 ("Fair value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay."); *id.* at 33 (finding that absence of higher bid meant "that the deal market was already robust and that a topping bid involved a serious risk of overpayment," which "suggests the price is already at a level that is fair"); *DFC*, 172 A.3d at 376 (citing "the failure of other buyers to pursue the

permitted Regal to conduct an active post-signing market check during which Morgan Stanley contacted forty-seven potential buyers. The Merger Agreement did not contain any exceptional deal protection measures. If a competing bidder had emerged during the go-shop phase, then the Company could have engaged with the bidder and terminated the Merger as long as the Company paid Cineworld the termination fee of $36,270,000, equal to 1% of the Merger's equity value. If a competing bidder had emerged after the go-shop phase, then the Company could have engaged with the bidder and terminated the Merger as long as the Company paid Cineworld the termination fee of $95,150,963, equal to 2.62% of the Merger's equity value.[33]

The sale process that led to the Merger thus exhibited sufficient objective indicia of an arm's-length transaction to warrant a finding that the deal price operates as a ceiling on fair value. Consequently, the court must determine whether these objective factors "outweigh weaknesses in the sale process, or whether those weaknesses undermine the persuasiveness of the deal price." *Panera*, 2020 WL 506684, at *19.

---

company when they had a free chance to do so" as factor supporting fairness of merger price).

[33] Concern about the reliability of a sale process may arise if other acquirers perceive an incumbent bidder possesses an informational advantage. *See Lender Processing*, 2016 WL 7324170, at *19 (explaining that a company "can create informational inadequacies by providing disparate information to bidders," which reduces competition from other bidders). Cineworld's expert opined that Regal was a mature public company in a mature industry, making it unlikely that a topping bidder would be deterred by Cineworld's informational advantage. *See* Kennedy Report ¶ 123; *see also* Miles Tr. 273 ("[W]e were . . . a company in a mature industry.").

66

### a.     The Petitioners' Arguments About A "Single Bidder" Process

The petitioners contend that the sale process did not generate reliable evidence of fair value because the "Board decided to pursue a single bidder strategy by engaging in secret negotiations solely with Cineworld" and "[t]here was no auction or pre-signing market check." Dkt. 255 at 36–37. The argument that additional pre-signing competition generally leads to a higher deal price is theoretically sound.[34] Whether the company might have obtained a higher price, however, is not the issue in an appraisal proceeding.[35] The court in an appraisal proceeding is charged with determining fair value, not the highest price that the seller reasonably could have obtained.[36] The key question during the first step

---

[34] *See, e.g.*, Nihat Aktas et al., *Negotiations Under the Threat of an Auction*, 98 J. Fin. Econ. 241, 242 (2010) ("It is well known that competition increases the expected revenue of the seller. . . . Our empirical results confirm the existence of latent competition on acquirers' bidding in one-on-one negotiations: More potential competitors are associated with higher bids." (citations and footnote omitted)); *see also* Jeremy Bulow & Paul Klemperer, *Auctions Versus Negotiations*, 86 Am. Econ. Rev. 180, 180 (1996) ("Since the informational demands for computing optimal mechanisms are substantial, and the computations involved are complex, . . . it will often be more worthwhile for a seller to devote resources to expanding the market than to collecting the information and making the calculations required to figure out the best mechanism.").

[35] *See Jarden*, 236 A.3d at 322 ("[T]he trial judge must determine fair value, and 'fair value is just that, "fair." It does not mean the highest possible price that a company might have sold for.'") (footnote omitted) (quoting *DFC*, 172 A.3d at 370)); *DFC*, 172 A.3d at 370 (noting that "the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way"); *Dell*, 177 A.3d at 33 ("The issue in an appraisal is not whether a negotiator has extracted the highest possible bid. Rather, the key inquiry is whether the dissenters got fair value and were not exploited.").

[36] *See Aruba*, 210 A.3d at 142 (holding sale process that exhibited objective indicia of reliability meant that "the deal price . . . operates as a ceiling for fair value" (omission in original) (internal quotation marks omitted)); *Lender Processing*, 2016 WL 7324170, at

of evaluating the deal price as a valuation indicator is whether the sale process exhibited sufficient indications of reliability to establish by a preponderance of the evidence that the deal price likely exceeded the company's standalone value, even if the sale process might not have generated the last nickel for the seller's stockholders. *See Dell*, 177 A.3d at 33 ("The issue in an appraisal is not whether a negotiator has extracted the highest possible bid.").

Delaware law recognizes that a deal price that results from a single-bidder process can provide reliable evidence of fair value.[37] In addition to the other objective indicia of reliability, a court evaluating a single-bidder process will examine whether the merger agreement allowed for a sufficiently open post-signing market check. If the post-signing process was sufficiently open and there are no other factors that would call the sale process into question, then the deal price resulting from a single-bidder process generally will operate as a ceiling on fair value.

---

*26 ("The existence of combinatorial synergies provides an additional reason to think that the Final Merger Consideration exceeded the fair value of the Company."); *see also Dell*, 177 A.3d at 30–31 (holding that "deal price has heavy, if not overriding, probative value . . . . [g]iven the objective indicia of the deal price's reliability"); *Stillwater Trial*, 2019 WL 3943851, at *44 ("[G]iven the arm's-length nature of the Merger, the premium over market, and the substance of what took place during the sale process, it is not possible to say that an award at the deal price would result in the petitioners being exploited.").

[37] *See Stillwater Trial*, 2019 WL 3943851, at *24–30; *Columbia Pipeline*, 2019 WL 3778370, at *25; *Ramtron*, 2015 WL 4540443, at *21; *see also Blueblade Cap. Opportunities LLC v. Norcraft Cos., Inc.*, 2018 WL 3602940, at *24 & n.265 (Del. Ch. July 27, 2018) (finding "no basis in law or fact" for proposition that a single bidder process followed by a go-shop "will *never* produce fair value for the target" (citation omitted)).

As discussed above, the Merger Agreement provided for a post-signing market check that was sufficiently open to serve as an objective indicator of the reliability of the sale process. Delaware law will afford evidentiary weight to a single-bidder process combined with a *passive* post-signing market check.[38] The sale process in this case included an *active* post-signing market check. Because of the objective indicia of reliability present in this case, the petitioners must point to flaws that undermined the efficacy of the sale process in generating a deal price that would act as a ceiling on fair value.

### i. Regal's Treatment Of AMC

As the only meaningful flaw in the post-signing phase, the petitioners contend that Regal subjected AMC to "an intrusive information request to which Regal did not make any other potential bidder respond." Dkt. 263 at 13. The petitioners contend that as a result, Regal squandered the opportunity to engage with "a major strategic buyer with the financial wherewithal and appetite to challenge Cineworld's bid." *Id.*

As a threshold matter, AMC's expression of interest demonstrates that the Merger Agreement was sufficiently open to permit third-parties to engage. AMC's participation in

---

[38] *See Panera*, 2020 WL 506684, at *24; *Stillwater Trial*, 2019 WL 3943851, at *24–30; *Columbia Pipeline*, 2019 WL 3778370, at *26; *see also Aruba*, 210 A.3d at 136 ("[A]fter signing and the announcement of the deal, still no other buyer emerged even though the merger agreement allowed for superior bids."); *DFC*, 172 A.3d at 359 (citing the absence of bidding during a passive post-signing market check as supporting the fairness of the deal price).

the post-signing process thus supports the reliability of the deal price as an indication of fair value.

The petitioners are correct that Regal's discussions with AMC fell apart after Regal asked for information from AMC that Regal did not request from any other bidder. The fact that Regal requested additional information from AMC, however, does not establish that Regal undermined the sale process. The evidence at trial demonstrated that a deal with AMC presented unique antitrust concerns, and Regal asked for information that the Board believed was necessary to assess antitrust risk. *See* Miles Tr. 472–74; Kim Tr. 831–32; *see also* Aron Dep. at 12–13. The Board also asked for additional information because it was concerned about AMC's ability to finance a transaction. Kim Tr. 825 (AMC was "not performing well operationally" at the time and its ability to "finance[] a $6 billion transaction . . . was a key issue or question that was raised"); Miles Tr. 472–73 ("AMC had significant leverage, [and] would have had very much difficulty getting this transaction done."). The evidence also demonstrated that Regal had good reason not to want to provide confidential information to AMC unless AMC could consummate a transaction. This court has recognized that a company can be validly concerned about providing confidential information to its largest competitor. *See PetSmart, Inc.*, 2017 WL 2303599, at \*28.

The evidence indicates that AMC decided to withdraw from the post-signing process because AMC was not genuinely interested in an acquisition, not because Regal drove off AMC. Regal's management team knew AMC's executives well. Miles testified credibly that if AMC wanted to pursue a deal, then it would have. Miles Tr. 474–75 ("We asked for reasonable information. They refused to provide it. That indicated to me that they

70

were not serious. And through knowing [AMC's CEO], I'm confident that if he was really serious, . . . . [h]e would have picked up the phone and called me.").

Regal's interactions with AMC did not undermine the reliability of the sale process. At best for the petitioners, AMC might have paid more than Cineworld and forced the deal price to a level that exceeded fair value to a greater degree. AMC's withdrawal from the sale process does not indicate that the deal price left part of Regal's fundamental value on the negotiating table.

### ii.       The Lack Of Outreach During The Pre-Signing Phase

Having failed to identify any meaningful flaws in the post-signing market check, the petitioners return to the pre-signing phase in their effort to undermine the reliability of the sale process. Because the post-signing phase involved an effective market check, the petitioners must do more than simply identify arguable flaws in the pre-signing process. The petitioners must identify flaws that "sufficiently impaired the sale process as a whole, including the post-signing phase, so as to prevent the deal price from serving as a persuasive indicator of fair value." *Stillwater Trial*, 2019 WL 3943851, at \*30. The petitioners have not pointed to anything about the pre-signing phase that would have tainted the overall reliability of the sale process.

The petitioners are correct that Regal did not engage in any active outreach during the pre-signing phase after Cineworld made its initial offer. That fact, however, did not undermine the sale process. What matters is that Regal did not do anything during the pre-signing phase that would have dissuaded other bidders from participating in the post-signing phase.

71

The Board's decision not to contact other bidders during the pre-signing phase also does not suggest any motive to suppress value. To the contrary, the Board had good reasons for that decision. Regal had canvassed the market in 2014 and failed to generate any interest. When announcing the termination of the 2014 sale process in January 2015, the Board stated its continued willingness to evaluate strategic alternatives. The Company had engaged with Cinemark, a natural candidate for a merger, and those discussions had not borne fruit. When Cineworld appeared, Regal did not want to lose the "bird in the hand" by engaging in pre-signing outreach. Miles Dep. (JX 1589) 214–15; *see* Bell Tr. 511. This court has recognized the validity of that concern. *See Panera*, 2020 WL 506684, at *23 (crediting board's conclusion that buyer was "the only remaining logical bidder" when board had "already exhausted" the option of engaging with "the only other potential buyer that could afford Panera" (footnote omitted)).

Moreover, although the Board did not contact other bidders before signing, news of the Merger leaked on November 28, 2017, nearly a week before the parties executed the Merger Agreement. After the leak, both parties publicly confirmed that they were in discussions about a potential transaction, and Cineworld disclosed that the anticipated deal price was $23 per share. The leak gave any potentially interested bidder an opportunity to contact Regal and engage before Regal became subject to the Merger Agreement. No one came forward, providing additional evidence that Regal's lack of affirmative outreach during the pre-signing phase did not have any meaningful effect.

72

### b. The Petitioners' Arguments About Anschutz

In a separate line of attack on the sale process, the petitioners contend that the Board "effectively delegat[ed] to [Anschutz] the determination of a fair sale price for Regal." Dkt. 255 at 39. Noting that the deal price was close to the prices at which Anschutz executed its block trades in 2016, the petitioners argue that those sales anchored the parties' negotiations, preventing the Board from obtaining fair value.

The petitioners accurately observe that Cineworld knew about Anschutz's block trades and focused on those prices when developing its bidding strategy. Barclays presented illustrative transaction scenarios to Cineworld in October 2017 that depicted a red line at $22.95, reflecting the price of Anschutz's second block trade in November 2016. JX 990 at '726–27. The petitioners also correctly point out that once Cineworld offered $22.50 per share, Anschutz representatives told Bell that the bidding was "nearing levels that Anschutz would support." JX 1021 at 3. The petitioners then attack the Board's decision to counter at $23.50, claiming that by doing so, the Board "effectively established [Anschutz]'s $23 trigger as the mid-point, locking in the minimum price it knew Regal's controlling stockholder would accept." Dkt. 255 at 40. According to the petitioners, the Board's deference to Anschutz was problematic because Anschutz "was motivated to sell for reasons unrelated to maximizing fair value, having demonstrated over the years that it wanted to monetize its investment in Regal for reasons related to [Mr. Anschutz's] health and estate planning needs." *Id.* at 40–41.

As a preliminary matter, the evidence does not support the contention that $23 was a magic number for Anschutz. In August 2016, Anschutz sold its first block at $21.60 per

share, a 7% discount to that day's closing price of $23.29 per share. PTO ¶ 151; JX 397. In November 2016, Anschutz sold its second block at $22.95 per share, a 6% discount to that day's closing price of $24.45 per share. PTO ¶ 155; JX 492. These transactions evidence Anschutz's decisions in 2016. They do not suggest any particular price at which Anschutz wanted to sell all of its shares almost a year later, when Regal's stock traded at much lower levels. *See* JX 1200 (Regal stock trading in mid-teens prior to deal leak on November 28, 2017).

The record contains weak evidence suggesting that Mr. Anschutz had idiosyncratic reasons to favor a near-term cash deal. When reviewing a press release about the first block sale, an Anschutz representative suggested that Regal include a reference to "estate planning" as having prompted the sale. *See* JX 393; JX 395. All else equal, a desire to engage in estate planning could have led Mr. Anschutz to favor a near-term cash sale that would have facilitated his estate planning and diversification. Consistent with this interest, there is evidence that representatives of Anschutz told Cineworld that Anschutz wanted an all-cash deal. *See* JX 804. A desire for a cash deal also could explain the abrupt end to Regal's talks with Cinemark in August 2017, after Mr. Anschutz learned that the discussions contemplated a stock deal in which Anschutz would hold a substantial block in the post-transaction entity. *See* JX 786.

Credible trial testimony put to rest those possible inferences. Mr. Anschutz testified explicitly that estate planning was "not the reason for the block sale," Anschutz Dep. 47–48, and that his company had "no need for liquidity." Anschutz Dep. 97–98. Bell and Miles testified that Anschutz never pressured the Board to pursue a transaction or to seek a

74

particular price. *See* Bell Tr. 507–08; Miles Dep. (JX 1664) 83; Bell Dep. (JX 1591) 88–89, 134. Miles conceded that "we had indications that we were getting close to a price that [Anschutz] would support," but she stressed that "the objective of the board throughout the process was to try to get the highest price and a price at which we thought the deal could actually be consummated." Miles Dep. (JX 1664) 84.

Assuming for the sake of argument that Mr. Anschutz had a desire to obtain liquidity for estate planning purposes or otherwise, then that interest was not strong enough to undermine the sale process for purposes of an appraisal proceeding. Any interest that Mr. Anschutz might have had was far weaker and less problematic the Michael Dell's buy-side interest in *Dell*. There, Mr. Dell held 15.4% of the stock of Dell Inc., served as the company's CEO, and teamed up with Silver Lake, a private equity firm, to take Dell private. *In re Appraisal of Dell Inc.* (*Dell Trial*), 2016 WL 3186548, at *5, *12 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 21 (Del. 2017). Under the terms of the transaction, Mr. Dell "rolled over his entire 16% equity stake into the new company and contributed $750 million in cash," increasing his ownership in Dell to 74.9% and making him "a net purchaser in the transaction." *Id.* at *43. As a result, "any increase in the deal price would cost him money." *Id.* At the trial level, the court found that Mr. Dell's role with the company and his involvement with the buyout group were factors contributing to the deal price being an unreliable indicator of fair value. *Dell Trial*, 2016 WL 3186548, at *44, *51. On appeal, the Delaware Supreme Court reversed, explaining that the sale process bore many "objective indicia of reliability." *Dell*, 177 A.3d at 28. The high court did not regard

Mr. Dell's role as problematic, holding instead that "sound economic and policy reasons support[] the use of the deal price as the fair value award on remand." *Id.* at 44.

Any interest that Mr. Anschutz might have had in this case also was weaker and less problematic than the interests of the CEO and financial advisor in *Aruba*. There, "the petitioners proved that Aruba's bankers catered to HP," the buyer, in an effort to convince HP to use their services in the future. *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.* (*Aruba Trial*), 2018 WL 922139, at *42 (Del. Ch. Feb. 15, 2018), *rev'd*, 210 A.3d 128 (Del. 2019) (per curiam). The trial court also found that the bankers' eagerness to complete a transaction undermined their roles as Aruba's sell-side advisors. *Id.* at *43. And the trial court found that Aruba's CEO "had divergent interests" in the form of "a combination of personal and professional goals that included hastening his return to a personally fulfilling retirement." *Id.* Despite acknowledging that different negotiators might have obtained a better price, the court found that the deal price had not "left a portion of Aruba's fundamental value on the table." *Id.* at *44. For other reasons, however, the trial court rejected the deal price as a valuation indicator and relied on the unaffected market price of Aruba's stock. *Id.* at *54–55. On appeal, the Delaware Supreme Court cited the reliability of the sale process and held that it provided "compelling evidence of fair value on this record." *Aruba*, 210 A.3d at 141.

The evidence in this case does not establish that Mr. Anschutz had a divergent and idiosyncratic interest that undermined the sale process. To the contrary, as a large stockholder, Anschutz's incentives generally were aligned with the interests of the stockholders as a whole, and Anschutz received the same consideration as the other

stockholders. Yet assuming for the sake of argument that Mr. Anschutz had some divergent interest, it was far weaker than the interests in *Dell* and *Aruba*, which the Delaware Supreme Court regarded as insufficient to overcome the objective indicia of reliability exhibited by the sale processes in those cases. Likewise in this case, the objective indicia of reliability are sufficient to overcome any potentially divergent interest that Mr. Anschutz might have had. The limited involvement that Anschutz had in the sale process does not undermine its reliability.

### 2. Step Two: The Deduction For Synergies

Based on the foregoing analysis, the sale process that led to the Merger Agreement was sufficiently reliable to make it probable that the deal price establishes a ceiling for the determination of fair value. *See id.* at 142. The analysis of the deal price metric next moves to the second step, which is to determine whether any synergies were allocated to the seller that should be deducted to arrive at fair value.

The court must exclude synergies when using the deal price as a valuation indicator because the appraisal statute mandates that the court determine the fair value of the corporation "exclusive of any element of value arising from the accomplishment or expectation of the merger." 8 *Del. C.* § 262(h). Fair value thus is "more properly described as the value of the company to the stockholder as a going concern, rather than its value to a third party as an acquisition," meaning that the court must "exclude from any appraisal award the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern,

77

but as part of a larger enterprise, from which synergistic gains can be extracted." *Aruba*, 210 A.3d at 133 (internal quotation marks omitted).

When deriving a synergy deduction, the court engages in two tasks. *BMC Software*, 2015 WL 6164771, at *17. Initially, the court determines which categories of value arise from the accomplishment or expectation of the merger, and it strives to reach a "reasonable estimate" of those sources of value. *Aruba*, 210 A.3d at 133. Some sources of value may not qualify for exclusion under the Delaware appraisal statute, because those sources of value may already have been available to the seller. Other sources of value may qualify for exclusion.

Next, the court estimates the extent to which those sources of value were "captured by the sellers in the deal price." *BMC Software*, 2015 WL 6164771, at *17. "[N]o bidder will rationally pay more than a 100% of the expected synergy value to a seller," because then the deal price would exceed the buyer's estimate of value. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995). Moreover, a buyer has no reason to bestow value gratuitously on a seller; "[a] bidder's objective is to identify an underpriced corporation and . . . acquire it at the lowest price possible." *Dunkin' Donuts*, 1990 WL 189120, at *9. Rather, the seller must bargain for a price that extracts a share of the value that the buyer expects to create. Some sellers will have greater success than others.

When identifying synergies, quantifying them, and determining the amount that was allocated to the seller, the court "may rely upon its expertise and upon whatever evidence is presented to determine fair value," using "whatever methodology [is] supportable by the

record to reach a valuation result that exclude[s], to the extent reasonably possible, the synergies implicit in the . . . transaction being considered." *Montgomery Cellular*, 880 A.2d at 222. As part of its determinations, the court may consider evidence of the buyer's synergy expectations.[39] That evidence is relevant and potentially persuasive because the buyer logically incorporates some amount of its expected synergies into its offer, recognizing the sharing of synergies as part of the price that the buyer must pay to obtain control.[40] Under the appraisal statute, the amount that the buyer agrees to pay thus reflects

---

[39] *See Panera*, 2020 WL 506684, at *36–40 (excluding value of buyer's expected cost savings and tax benefits); *Solera*, 2018 WL 3625644, at *29 (excluding value of buyer's expected "portfolio company revenue synergies, private company cost savings, and the tax benefits of incremental leverage"); *Ng v. Heng Sang Realty Corp.*, 2004 WL 1151980, at *5 (Del. Ch. May 18, 2004) (excluding buyers' expected cost savings from post-merger tax status conversion); *see also Highfields Cap., Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 60–61 (Del. Ch. 2007) (finding it "appropriate to rely on" buyer's internal synergies estimate "after certain adjustments"); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 353 & n.26 (Del. Ch. 2004) (finding buyer's synergy estimate "reasonable"). *But see DFC*, 172 A.3d at 374 n.145 (asserting that "it is in tension with the statute itself to argue that the subjective view of post-merger value of the acquirer can be used to value the respondent company in an appraisal").

[40] *See DFC*, 172 A.3d at 371 ("[I]t is widely assumed that the sale price in many M&A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control."); *Dunmire v. Farmers & Merchs. Bancorp of W. Pa., Inc.*, 2016 WL 6651411, at *8 & n.95 (Del. Ch. Nov. 10, 2016 (recognizing that target corporations generally extract a portion of synergy value and citing academic research in support of that proposition); *Olson v. ev3, Inc.*, 2011 WL 704409, at *10 (Del. Ch. Feb. 21, 2011) ("In an arm's-length, synergistic transaction, the deal price generally will exceed fair value because target fiduciaries bargain for a premium that includes . . . a share of the anticipated synergies . . . ."); *Union Ill.*, 847 A.2d at 356 ("[A]cquirers typically share a portion of synergies with sellers in sales transactions and that portion is value that would be left wholly in the hands of the selling company's

value "arising from the accomplishment *or expectation* of the merger." 8 *Del. C.* § 262(h) (emphasis added). If a buyer overpays for a company based on the buyer's subjective yet unrealistic synergy expectations, then the deal price nevertheless reflects those synergy expectations. The price is based on the buyer's synergy expectations and the seller's success in extracting a portion of the anticipated value, not whether the synergy expectations ultimately are achieved.

Cineworld identified two types of synergies: operational synergies and financial savings. Cineworld analyzed the two categories of synergies separately. This decision does so as well.

### a. Operational Synergies

Cineworld asserts that it anticipated $8.10 per share in operational synergies. Cineworld's expert, Kennedy, did not calculate this figure himself; he reviewed and deemed reasonable a valuation of the operational synergies prepared by Cineworld's financial advisors for a meeting of Cineworld's board of directors on November 16, 2017. Kennedy Report ¶¶ 18, 90, 103; *see* JX 1115 (the "Banker Presentation") at '788. The Banker Presentation estimated $8.10 per share of operational synergies by calculating the present value of cost savings and revenue enhancements. JX 1115 at '788, '812. As the source of the cost savings and revenue enhancements, the Banker Presentation relied on

stockholders, as a price that the buyer was willing to pay to capture the selling company and the rest of the synergies.").

work conducted by PwC. *See id.* at '797; JX 1094 (the "PwC Synergy Report"). The clearest evidence of the composition of the operational synergies appears in the PwC Synergy Report, and both sides analyzed the PwC Synergy Report when addressing the categories of operational synergies.[41]

The petitioners did not dispute that Cineworld anticipated $8.10 per share in operational synergies. They instead questioned the reliability of the synergy estimates, and they argued that Regal already was pursuing many of the initiatives, meaning that they were not sources of value that arose from the accomplishment or expectation of the Merger.

### i.     The Qualifying Operational Synergies

For a category of synergies to be excluded under the appraisal statute, it must "aris[e] from the accomplishment or expectation of the merger." 8 *Del. C.* § 262(h). This valuation principle "rul[es] out consideration of not just the gains that the particular merger will produce, but also the gains that might be produced from any other merger." *Aruba*, 210 A.3d at 133. The principle most obviously excludes value "resulting from economies of scale or increased market share," but it also excludes value that "derive[s] from the acquirer's plans to operate the post-merger enterprise more efficiently." Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal*

---

[41] *See* Dkt. 255 at 51–57 (criticizing PwC Synergy Report); Dkt. 259 at 21–22 (citing later draft PwC Synergy Report). The petitioners objected to the PwC Synergy Report as hearsay, but it is admissible both as a business record and as the type of information on which an expert typically would rely. *See Aruba Trial*, 2018 WL 922139, at *37 n.346.

*Law*, 31 J. Corp. L. 119, 148 (2005) [hereinafter *Cornfields*]. Stated conversely, the corporation's operative reality at the time of the merger "does not include the capitalized value of possible changes which may be made by new management."[42] Consequently, "the benefits of an alternative method of operation that is neither proposed before the merger nor implemented thereafter should not be taken into account in determining 'fair value.'" Hamermesh & Wachter, *Cornfields*, *supra*, at 161. By contrast, if the corporation was pursuing an initiative at the time of closing, then it is part of the corporation's operative reality and should not be excluded from the fair value calculation, even if the initiative was not fully implemented.[43]

The PwC Synergy Report divided the potential operational synergies into the following categories:

- Cost Reduction Opportunities

---

[42] *Gonsalves*, 701 A.2d at 362–63; *see Panera*, 2020 WL 506684, at *37 (excluding value that serial acquirer that planned by create through financial optimization, including by extending the days payable in the company's cash collection cycle, because although incumbent management could have made that change, "Panera's management culture and priorities did not support the changes that JAB intended to make").

[43] *See, e.g.*, *Technicolor IV*, 684 A.2d at 299 (holding that because management implemented the "Perelman Plan" after a first-step tender offer and before a second-step merger, the trial court was obligated to value the company's operative reality at the time of the merger based on the Perelman Plan); *In re Emerging Commc'ns, Inc. S'holders' Litig.*, 2004 WL 1305745, at *13 (Del. Ch. June 4, 2004) (including costs savings that the defendants attributed to the merger when calculating fair value "because they were contemplated well before the going private merger and could have been achieved without it"); *ONTI*, 751 A.2d at 906–07, 911 (including value of acquisition that had been planned and could have been effectuated without the merger).

- o Public To Private

- o Group Services

- o Strategy and Operations Re-Design

- o Economy Of Scale (Commercial)

- Leverage Of Know-How And Industry Best Practice

  - o Loyalty Programs

  - o Online Booking – Increase Traffic

  - o Advertising

  - o Concession Spend Increase

JX 1094 at '025 (formatting added). Most of these categories of value must be excluded as arising from the accomplishment or expectation of the merger.

Under the heading "Public to Private," Cineworld anticipated achieving cost savings by "[d]e-listing Regal and transitioning it to an operational subsidiary." *Id.* at '027. The savings included the expenses associated with listing Regal's stock on the New York Stock Exchange, professional services costs associated with running a U.S. public company, and the compensation paid to Regal's directors and senior executives. Cohen Tr. 605–06. Off-setting costs included the lower compensation for a new senior management team and the expense to upgrade Cineworld's accounting team so it could oversee Regal's operations. JX 1094 at '027. Regal obviously could not achieve the net savings under its operative reality as a public company. The net savings therefore arose from the accomplishment or expectation of the Merger and must be excluded from the fair value determination.

Under the heading "Group Services," Cineworld anticipated achieving savings by eliminating redundant finance, information technology, and construction functions and relocating functions to jurisdictions with lower labor costs. *Id.* The savings associated with Group Services are a straightforward example of economies of scale that Regal could not achieve on its own, independent of the Merger. They arose from the accomplishment or expectation of the Merger and must be excluded from the fair value determination.

Under the heading "Strategy and Operations Re-Design," Cineworld anticipated achieving savings by implementing layoffs in areas such as marketing, film booking, retail, maintenance, human resources, risk management, security, and sales. *Id.* at '028; Cohen Tr. 607–08. This category also included Cineworld's plan to negotiate an increase in the fees that Regal received from online ticket sales. JX 1094 at '028; *see* Cohen Tr. 610. These cost savings reflect economies of scale arising from the combination of the two entities' operations, and Regal could not have achieved them on its own. Regal might have tried to renegotiate its fee-sharing arrangement, but management had no plan to do so, and Regal would not have had the bargaining power associated with the combined company's larger operations. The benefits associated with Strategy Operations and Re-Design arose from the accomplishment or expectation of the Merger and must be excluded from the fair value determination.

Under the heading "Economy of Scale (Commercial)," Cineworld expected to achieve cost savings on concessions and other consumables and on a large commercial

84

insurance contract. JX 1094 at '025; *see* Cohen Tr. 608, 610.[44] The PwC Synergy Report estimated that the combined entity's purchasing power could improve Regal's gross margin on concessions by two percent. JX 1094 at '028; *see* Greidinger Tr. 347–48. Regal had not renegotiated its commercial insurance contract in ten years and did not have any plan to address it. Cohen Tr. 608. The savings in this category arose from the accomplishment or expectation of the Merger and must be excluded from the fair value determination.

Under the heading "Loyalty Programs," Cineworld expected it could increase revenue by bringing its own specialized loyalty programs to Regal. JX 1094 at '029; Greidinger Tr. 349–50. Cineworld offered its customers both a points-based program where users could generate "points" from purchases at Cineworld locations, as well as an "all-you-can-watch" subscription program that allowed moviegoers to pay a monthly fee for unlimited access to theaters. Greidinger Tr. 349–51; Cohen Tr. 612–14. Regal had the industry-leading loyalty program in the United States, but it was only a points-based program. Dunn Tr. 188–89; Greidinger Tr. 349–51. Cineworld's plan for a subscription program was novel and carried risk, because it depended on negotiating arrangements with the studios so that the film rents did not exceed the subscription fees. Greidinger Tr. 351.

---

[44] When testifying, Cohen mistakenly described the renegotiation of the commercial insurance contract as falling into the "Strategy Operations and Redesign" category, but the PwC Synergy Report listed it as a component of the "Economy of Scale (Commercial)" category. *Compare* Cohen Tr. 607–08 *with* JX 1094 at '028. This decision follows the PwC Synergy Report. Because this decision finds that both categories comprised value arising from the accomplishment or expectation of the Merger, the distinction is immaterial.

No studio had agreed to a similar program in the United States, but Cineworld had experience developing and operating the program in Europe and believed it was feasible. *Id.* at 350–51, 411–12. Regal management had no plan to implement a subscription-based loyalty program, making this source of value one that arose from the accomplishment or expectation of the Merger.

Cineworld also believed that it could increase the volume of online ticket sales, and the PwC Synergy Report identified these benefits under the heading "Online Booking – Increase Traffic." JX 1094 at '029. The PwC Synergy Report observed that Regal's "current online ticket purchasing [percentage] out of total admission is low." *Id.* Cineworld planned to increase online bookings by expanding the availability of reserved seating from recliner seats to all available seats. Greidinger Tr. 351–53; Cohen Tr. 614. Cineworld also envisioned driving online booking traffic to Regal's website, avoiding the need to share online booking fees with a third-party provider. JX 1094 at '029. Regal management, however, already had implemented a program to promote online booking, which by November 2017 had increased by 66% year-to-date. JX 1084 at '075; *see* Miles Tr. 428; Ownby Tr. 259. Regal also already offered its own mobile application for online sales. *See* JX 1089 at 29–30. The evidence thus shows that the pursuit of these initiatives was part of Regal's operative reality at the time of the Merger, so value associated with this category will not be deducted from the appraisal award.

Under the heading "Advertising," Cineworld expected to increase Regal's average advertising revenue per patron by gradually shifting the timing of advertisements to play after the movie's scheduled showtime to maximize revenue from so-called "gold-spot"

advertising slots. Cohen Tr. 618–9; Greidinger Tr. 353–54. Regal management was not pursuing this strategy, making this source of value one that arose from the accomplishment or expectation of the Merger.

Under the heading "Concession Spend Increase," Cineworld planned to increase average concession spend per patron through the expansion of reserved seating. JX 1094 at '030. Cineworld believed that expanding reserved seating would mean that "people will have more patience to queue in the snack bar . . . because you don't need to run into the auditorium to grab the best seats because you know your seat is reserved." Greidinger Tr. 354–55. Regal already offered reserved seating via online and mobile ticketing, and Cineworld did not demonstrate that demand existed for more reserved seating in Regal's theaters. Regal already was pursuing initiatives to increase concessions spending per patron, which had resulted in high growth in that metric in the five years preceding the Merger.[45] The evidence thus shows that the pursuit of these initiatives was part of Regal's operative reality at the time of the Merger, so value associated with this category will not be deducted from the appraisal award.

### ii. The Value Of The Qualifying Operational Synergies

Having determined which categories of operational synergies qualify for exclusion under the appraisal statute, the next step is to value those synergies. Because this decision

---

[45] *See* Calkins Report ¶¶ 82–83, Fig. 5; Bell Tr. 501; JX 197 at 3; JX 250 at 3–4; JX 263 at 3–4; JX 296 at 2–3; JX 647 at 4–5; JX 730 at 3–4; JX 988 at 3–4, 9.

has found that two categories of operational synergies did not qualify as value arising from the accomplishment or expectation of the Merger, the value associated with those categories will not be deducted from the deal price. A second issue presented by the evidence in this case is Cineworld's degree of confidence in its synergy expectations.

The total value of run-rate operational synergies in the PwC Synergy Report was $141.3 million. JX 1094 at '025. Revenue from online booking and concessions accounted for $18.2 million and $16.9 million, respectively. Together, these categories comprised 24.84% of the total value of operational synergies. This means that excludable, merger-specific synergies comprised 75.16% of the total value of operational synergies. Multiplying the $8.10 per share estimate of operational synergies in the Banker Presentation by 75.16% yields a per-share value of $6.09.

Although the court could use the value of $6.09 per share as the value of the operational synergies, the evidence suggests that Cineworld was not fully confident in its ability to achieve that figure. Instead, Israel increased Cineworld's synergy expectations to satisfy the banks' demands for $100 million in operational synergies. As discussed previously, PwC's original synergy model generated benefits of $70 million. *See* JX 1052. After a meeting with Cineworld's bankers, Israel told Mooky that the bankers "expect us to reach a level of Non Capex Synergies . . . in 2019 of 100 million dollars." JX 1052. Israel then described "[t]he recommended changes after sitting with PWC," which consisted of line-by-line changes to PwC's model to bridge the $30 million gap. JX 1052. PwC adjusted the inputs to its model to arrive at an estimate of 2019 operational synergies of $99.9 million. JX 1039. Cineworld disclosed the $100 million figure to the market, but

Cineworld's directors remained skeptical about "the '[$]100 million combination benefits' story." JX 1186.

This decision credits that Israel subjectively believed that Cineworld had the potential to achieve $100 million in synergy benefits, but the evidence also suggests that Israel regarded the incremental $30 million in benefits as more difficult to achieve. Those synergies appear to have been necessary to convince the lenders to finance the deal. Later, Cineworld stressed these synergies to reassure investors who believed Cineworld had overpaid. *See, e.g.*, Greidinger Tr. 357–59; JX 1298. Given the higher risk associated with the incremental synergies and the need for Cineworld to retain their value, it is unlikely that Cineworld would have shared those synergies with Regal. This decision therefore does not include the $30 million in incremental synergies as part of the value that was available for inclusion in the purchase price. Instead, this decision uses the original, more conservative estimate of operational synergies that PwC prepared.

PwC originally estimated total synergies of $70 million in 2019. *See* JX 1052. That amount is 70% of the $100 million in synergies that Cineworld presented to its lenders and to the market. To derive the value of synergies that potentially will be deducted from the deal price, this decision uses 70% of the value of the operational synergies. Multiplying the $6.09 per share estimate of qualifying operational synergies by 70% yields a per-share value for operational synergies of $4.26 per share. Put differently, when negotiating the Merger, Cineworld expected to achieve operational synergies of $4.26 per share that both qualified for potential exclusion from the deal price under the appraisal statute and which Cineworld was prepared to allocate to Regal as part of the price negotiations.

89

### b. The Financial Savings

Cineworld also contends that the deal price included $4.93 per share of financial savings. Dkt. 259 at 44–45. Both experts assumed the existence of financial savings. Neither provided a reliable valuation. This decision values the financial savings at $2.73 per share.

As with the operational synergies, the process of quantifying the financial savings involves two steps. First, the court must determine which elements of the financial savings qualify as synergies under the appraisal statute. Second, the court must value the qualifying synergies. For the financial savings, the two elements are interrelated, because the passage of the Tax Act caused a portion of the financial savings that otherwise would have qualified as synergies to qualify no longer.

While the parties were negotiating the deal price, before the Tax Act became law, Cineworld anticipated being able to achieve significant financial savings by moving revenue out of the United States and into lower-tax jurisdictions. The quantum of savings that Cineworld could achieve depended in large part on the delta between Regal's higher tax rate in the United States and the lower rates in other jurisdictions. The passage of the Tax Act lowered Regal's tax rate in the United States, which reduced the quantum of financial savings that Cineworld could achieve.[46] For appraisal purposes, the reduced tax

---

[46] *See* Greidinger Tr. 415–17 (agreeing that Cineworld reduced its estimate of financial savings it could achieve after the Tax Act was passed); JX 1163 at '294–96 (E&Y noting that the Tax Act would "substantially limit" the benefits from shifting income to other jurisdictions and could eliminate the benefits of transfer pricing entirely); *see also*

rate also meant that the portion of financial savings attributable to those expectations no longer was a synergy arising from the accomplishment or expectation of the Merger. After the Tax Act, those financial savings were a component of value available to Regal in its operative reality as a stand-alone entity. The overall value of the financial savings achievable from the lowered corporate tax rate did not change. What changed was whether Regal could achieve them on its own.

Notably, the Tax Act also contained provisions that limited Cineworld's ability to reduce Regal's U.S.-based revenue using transfer pricing, and Cineworld reduced its expectations regarding financial savings in light of those provisions. The Tax Act's effect on transfer pricing did not transform any portion of that category of synergies into benefits that Regal could achieve on its own. The effect of that aspect of the Tax Act was to impair Cineworld's ability to achieve its expectations. When the parties were negotiating over the deal price, however, Cineworld expected to be able to achieve those benefits. Those expected benefits were attributable to the accomplishment or expectation of the Merger and therefore qualify for exclusion from the deal price.

Kennedy valued the financial savings by starting with the figure of $7.10 per share that appeared in the Banker Presentation. JX 1115 at '788. The Banker Presentation reached that figure by estimating that the combined company could save $54 million

Kennedy Tr. 1055 (noting that after the passage of the Tax Act, Cineworld "didn't need to go through some of the restructuring that might have shifted income from a high tax rate country like the U.S. to lower tax rate countries").

91

annually through "[f]inancial structuring benefits" and $18 million through the "[o]ptimization of transfer pricing," for a total of $72 million in annual savings. *Id.* at '781. Those estimates seem to have been derived from analyses conducted by E&Y. Greidinger Dep. 185–86 (financial savings estimate in Banker Presentation was "copied from an E&Y analysis that . . . calculat[ed] this complicated structure"); *see* JX 1163 (E&Y analysis).

Kennedy next adjusted the calculation in the Banker Presentation to account for the Tax Act. He recognized that the figure of $7.10 per share reflected value that Cineworld could have achieved by generating tax savings based on Regal's effective tax rate before the adoption of the Tax Act, and he acknowledged that Regal could achieve some of those benefits as a standalone company. He concluded correctly that those benefits no longer qualified as synergies under the appraisal statute.

To identify the value that no longer qualified for exclusion as a merger-related synergy, Kennedy consulted Cineworld's press release that announced the Merger on December 5, 2017. That press release stated that Cineworld anticipated "US$50 million of group structuring benefits . . . through the adoption of an efficient financial structure." JX 1296 at '994. Because the Banker Presentation had estimated $72 million in savings before the Tax Act, and because Cineworld still anticipated $50 million in savings when the passage of the Tax Act was imminent, Kennedy concluded that the difference of $22 million reflected savings that Regal could achieve on its own after the passage of the Tax

92

Act. Kennedy Report ¶ 101. Kennedy excluded a proportionate amount from the per-share synergies figure, resulting in an adjusted savings of $4.93 per share.[47]

Kennedy's approach was logical, but Cineworld provided a more credible estimate of the benefits it could achieve after the passage of the Tax Act. In January 2018, Cineworld reduced its estimate of the value of the financial structuring benefits to $10 million annually in a letter to its stockholders and in two presentations to potential lenders. *See* JX 1416 (the "January Stockholder Letter") at 9–10; JX 1420 (the "January Lender Presentation") at 8, 27; JX 1425 at '435–36. Put differently, rather than still being able to achieve $50 million in financial savings after the passage of the Tax Act, as Kennedy assumed, Cineworld thought it could achieve only $10 million annually. Cineworld made no reference to benefits from transfer pricing in either document, suggesting that Cineworld no longer thought that it could achieve benefits through transfer pricing.

This decision uses Kennedy's method to calculate the per-share value of the financial savings, but it relies on the January Stockholder Letter and the January Lender Presentation to estimate the financial savings Cineworld could generate after the Tax Act. In other words, because the Banker Presentation had estimated $71.5 million[48] in savings

---

[47] To make the adjustment, Kennedy divided $50 million, representing the amount of financial savings after the passage of the Tax Act, by the $72 million estimate in the Banker Presentation. He then multiplied the resulting percentage (69.4%) times the estimate of financial savings in the Banker Presentation ($7.10 per share). That calculation produced his figure of $4.93 per share. Kennedy Report ¶ 101.

[48] The spreadsheet that supported the Banker Presentation valued financial savings at $71.5 million annually. *See* JX 1116, "Merger" tab, cells BM53:BQ53. The Banker

before the Tax Act, of which $17.5 million was due to transfer pricing, and because Cineworld still anticipated $10 million in savings after the passage of the Tax Act, the difference of $44 million reflected savings that Regal could achieve on its own after the passage of the Tax Act.

Yilmaz attempted to value the financial savings that no longer could be claimed as synergies by recreating Kennedy's calculation while using $10 million for the value of the financial structuring benefits that Cineworld could achieve after the enactment of the Tax Act. His calculation resulted in financial savings of $2.65 per share,[49] but it contained an error. He assumed that Kennedy valued annual financial structuring benefits of $54 million at $4.93 per share, when Kennedy actually valued annual financial structuring benefits of

---

Presentation appears to have rounded up to $72 million for simplicity. To be more precise, this decision uses $71.5 million as Cineworld's estimate of the financial savings.

[49] To make the adjustment, Yilmaz broke the calculation into two components. For the first component, he divided $10 million, representing his estimate of the amount of financial savings after the passage of the Tax Act, by the $54 million that he believed Kennedy estimated. He then multiplied the resulting percentage (18.52%) times Kennedy's estimate of the financial savings attributable to that component ($4.93 per share). That calculation produced a figure of $0.91 per share for the first component. For the second component, Yilmaz divided $17.5 million in transfer pricing benefits by the $71.5 million of total financial savings that originally appeared in the Banker Presentation, then multiplied the resulting percentage (24.48%) times Kennedy's total estimate of financial savings ($7.10 per share). That calculation produced a figure of $1.74 per share for the second component. The sum the two components generated a value of $2.65 per share. Yilmaz Rebuttal Report ¶ 39 & nn.45–46.

$50 million at $4.93 per share.[50] Corrected for this error, Yilmaz's calculation shows that Cineworld expected to achieve financial savings of $2.73 per share that Regal could not achieve as a standalone entity.[51] Put differently, Cineworld expected to achieve $7.10 per share in financial savings when it negotiated the Merger, but $4.37 of this amount reflected value that Regal could have achieved on its own under its operative reality at closing and which therefore cannot be deducted from a fair value determination under the appraisal statute. The calculation continues to include value attributable to Cineworld's expectation that it could achieve financial savings through transfer pricing. When Cineworld bargained with Regal over the deal price, Cineworld believed it could achieve those benefits, and they could not be achieved absent the Merger. The subsequent passage of the Tax Act interfered with Cineworld's ability to achieve those benefits, but it did not alter either Cineworld's expectations about them at the time Cineworld negotiated the deal price, or the fact that Regal never had the ability to achieve those benefits as a standalone entity.

This decision adopts the corrected version of Yilmaz's calculation. When negotiating the Merger, Cineworld anticipated financial savings of $2.73 per share that

---

[50] *Compare* Yilmaz Rebuttal Report ¶ 39 & n. 45 (valuing financial structuring benefits of "$54 million annually"), *with* Kennedy Report ¶ 101 (valuing financial structuring benefits of $50 million annually).

[51] To calculate the value of $10 million of financial structuring benefits and $17.5 million of benefits from transfer pricing, Yilmaz should have divided the sum of both values ($27.5) by $71.5 million and multiplied the result (38.46%) by $7.10 per share, for a total financial savings value of $2.73 per share.

both qualified for potential exclusion from the deal price under the appraisal statute and a portion of which Cineworld was prepared to allocate to Regal as part of the price negotiations.

### c. The Sharing Of Synergies

"[T]he proper way of applying a merger-price-less-synergies approach is to determine the value paid for a company and then subtract that portion of the purchase price representing synergies." *Ramtron*, 2015 WL 4540443, at *25. This decision has concluded that the Merger generated operational synergies of $4.26 per share and financial savings of $2.73 per share that potentially were available for allocation to Regal's stockholders. The court's next task is to estimate how much of the $6.99 in total synergies was in fact allocated to Regal's stockholders in the purchase price.

As noted previously, Delaware law recognizes that sell-side stockholders typically receive a share of synergies as part of the deal premium, and there is academic support for that proposition.[52] There also is evidence that sell-side stockholders receive, on average, a

---

[52] *See, e.g.*, Lawrence A. Hamermesh & Michael L. Wachter, *Finding the Right Balance in Appraisal Litigation: Deal Price, Deal Process, and Synergies*, 73 Bus. Law. 961, 1003 (2018) [hereinafter *Finding the Right Balance*] ("The question in any given appraisal proceeding . . . is to determine the extent to which estimated synergies were allocated in the deal to target stockholders and how much of that value was retained by the acquirer."); Kenneth R. Ahern, *Bargaining Power and Industry Dependence in Mergers*, 103 J. Fin. Econ. 530, 531, 547 (2012) (demonstrating that targets capture on average "modestly more" of the merger gains than buyers); Jens Kengelbach et al., *Divide and Conquer: How Successful M&A Deals Split the Synergies* 4, 9 (2013) [hereinafter *2013 M&A Report*] (explaining that a buyer may "demand a share of [synergies] in the form of a takeover price higher than the [company]'s standalone valuation" and that "[t]o arrive at a transaction price acceptable to the seller, in most cases, the acquirer must agree to share

majority of the synergies.[53] That observation, however, reflects a generalization across deals; the outcome in any individual deal may be different.[54]

To date, Delaware law has not recognized a presumption that the seller's stockholders capture synergies. Instead, the court must make a fair value determination "that is grounded in the record before it."[55] To obtain a synergy deduction, the seller "bears

---

expected synergies"); Richard A. Brealey et al., *Principles of Corporate Finance* 813–14 (10th ed. 2011) (explaining that "in mergers sellers generally do better than buyers"); Robert F. Bruner, *Applied Mergers and Acquisitions* 936 (2004) ("In efficient markets for securities, the stand-alone value of the firm should equal its market capitalization. If this assumption is reasonable . . . , then the test for value creation for the buyer reduces to: $V_{Synergies} > \Pi_{Bid}$."). *See generally* William J. Carney & Keith Sharfman, *The Death of Appraisal Arbitrage: Ending Windfalls for Deal Dissenters*, 43 Del. J. Corp. L. 61, 94–96 (2018) (summarizing research).

[53] *DFC*, 172 A.3d at 371 (collecting authorities); *see, e.g.*, Tim Koller et al., *Value* 169 (2011) ("[D]espite the fact that acquisitions overall create value, the distribution of any value they create tends to be lopsided, with the selling companies' shareholders capturing the bulk."); Gregor Andrade et al., *New Evidence and Perspectives on Mergers*, 15 J. Econ. Persp. 103, 110 (2001) ("Target firm shareholders are clearly winners in merger transactions."); Bruner, *supra*, at 775 ("Buyers give more (and targets take more) of the middle ground.").

[54] *See* Kengelbach et al., *2013 M&A Report*, *supra*, at 9 (explaining that the allocation of synergies "varies . . . according to factors such as the relative negotiating strengths of the buyer and seller and the amount of competition to acquire the target"); Hamermesh & Wachter, *Finding the Right Balance*, *supra*, at 1005–06 ("[A] perception that bargaining was relatively weak may imply that the target's stockholders received a relatively smaller share of overall synergies, and vice versa."); Carney & Sharfman, *supra*, at 104 ("The more competitive the market for the target, the greater its bargaining power, and the higher the acquisition price will rise, leaving fewer benefits from the bargain for the buyer . . . .").

[55] *Jarden*, 236 A.3d at 325 (internal quotation marks omitted); *see also Panera*, 2020 WL 2020 WL 506684, at *18 ("Because the Court determines fair value based on an

the burden of demonstrating what, if any, portion of [the synergies] value was included in the price-per-share." *Jarden Trial*, 2019 WL 3244085, at \*26 (alteration in original) (internal quotations omitted).

The parties agree on these general principles, but they disagree about the evidentiary showing necessary to carry the burden. The petitioners argue that Cineworld must point to deal-specific evidence in the factual record that supports an allocation of synergies to the seller. Cineworld argues that in light of the substantial premium over the unaffected market price, the drop in Cineworld's stock price upon news of the deal, and the extensive evidence that Cineworld contemplated synergies, Regal's stockholders necessarily received some allocation. To quantify the allocation, Cineworld's expert relied on a 2018 version of a study by the Boston Consulting Group (the "2018 BCG Study") that sought to estimate how synergies are allocated across deals. *See* Jens Kengelbach et al., *The 2018 M&A Report: Synergies Take Center Stage* (2018) [hereinafter *2018 M&A Report*].

Each side has precedents that support its position. Decisions pre-dating *DFC* and *Dell* favor the petitioners. Decisions post-dating *DFC* and *Dell* favor Cineworld.

### i. Synergy Allocations Before *DFC* and *Dell*

Although the appraisal statute dates back to 1899,[56] the deal-price-less-synergies metric is a recent innovation. In 2003, then-Vice Chancellor Strine introduced the

---

adversarial presentation blending facts, opinions, and argument, the Court's conclusions in one appraisal proceeding may not squarely inform its conclusions in another.").

[56] *See* 21 *Del. Laws* 445, 462–63, ch. 273 § 56 (1899).

methodology in his *Union Illinois* decision, using it as the exclusive metric for valuing a privately held company.[57] He started with the deal consideration of $10.20 per share, then

[57] *See Union Ill.*, 847 A.2d at 364. As precedent for the deal-price-less-synergies metric, the *Union Illinois* decision cited three cases: *Gilbert*, *Cooper v. Pabst Brewing Co.*, 1993 WL 208763 (Del. Ch. June 8, 1993), and *Van de Walle v. Unimation, Inc*., 1991 WL 29303 (Del. Ch. Mar. 7, 1991). *See Union Illinois*, 847 A.2d at 357 & nn.36–37 (citing the three cases and stating that "our case law recognizes that when there is an open opportunity to buy a company, the resulting market price is reliable evidence of fair value").

The *Pabst* decision appears to be the first Delaware case to reference the pricing of the deal that gave rise to the appraisal proceeding, but the *Pabst* decision approached the question differently than *Union Illinois*. After a public auction involving competitive bidding by multiple suitors, G. Heileman Brewing Company acquired Pabst Brewing Company through a structurally coercive, two-tiered tender offer, in which Heileman paid $32 per share in the first step and squeezed out the remaining stockholders in the back-end merger for a package of subordinated debentures with a face value of $24 per share. *Pabst*, 1993 WL 208763, at *2, *8. The court rejected all of the parties' valuation methods, forcing the court to "make a determination based upon its own analysis." *Id.* at *8. The court reached a fair value conclusion of $27 per share by blending the front-end and back-end consideration to reach a value of $29.50, and then deducting a control premium, which the court estimated "did not exceed $2.50 per share." *Id.* at *8–9. The court did not equate the control premium with a synergies-based deduction.

After *Pabst*, the concept of a deal price metric next surfaced in *Gilbert*. The petitioners were minority stockholders in privately held company that was sold to a third-party buyer. The trial court valued the company using a DCF analysis. The respondent appealed, asserting that the trial court erred by failing to give weight to the transaction price and relying heavily on *Van de Walle*, a breach of fiduciary duty action in which a controlled company was sold to a third party and all stockholders received consideration having the same value. As one of several reasons for entering judgment in favor of the defendants, the *Van de Walle* court cited the arm's-length negotiations between the seller and the buyer. Coining a phrase that has figured prominently in twenty-first century appraisal decisions, the *Van de Walle* court observed that "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair." 1991 WL 29303, at *17. In *Gilbert*, however, the Delaware Supreme Court distinguished *Van de Walle* as a breach of fiduciary duty case and observed that "[a] fair merger price in the context of a breach of fiduciary duty claim will not always be a fair value in the context

discounted that figure by 13% to reflect the synergies he found to have been captured by the seller, basing that figure on the opinion of the respondent's valuation expert. *Id.* at 353–54. Although the opinion does not describe the expert's method for allocating synergies, Vice Chancellor Strine characterized the figure as reasonable "given the nature of the purchasers who were interested in buying UFG. All of them were other, larger banks who expected synergistic gains." *Id.* at 353 n.26. He also cited the fairness opinion of the seller's financial advisor, which "had mid-range synergy assumptions of 15%–20% for the synergy value that would be shared" with the seller. *Id.* The *Union Illinois* decision thus relied on deal-specific evidence to support the synergy adjustment.

This court next deployed the deal-price-less-synergies metric in 2007, when Vice Chancellor Lamb gave 75% weight to that valuation methodology. *Highfields*, 939 A.2d at 61. The transaction price was $31 per share, and the respondent's expert opined that the price incorporated shared synergies equal to 25% of the deal price, or $7.75 per share. In

---

of determining going concern value." 731 A.2d at 797. The high court did express agreement with "the general statement made by the Court in *Van de Walle*" to the effect that "[a] merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value." *Id.* But the high court again cautioned that "in an appraisal action, that merger price must be accompanied by evidence tending to show that it represents the going concern value of the company rather than just the value of the company to one specific buyer." *Id.* Citing the trial court's broad discretion when assessing fair value, the high court in *Gilbert* affirmed the trial court.

The decisions in *Pabst*, *Van de Walle*, and *Gilbert* do not provide direct support for the deal-price-less-synergies metric. The decision in *Union Illinois* stands as the wellspring of the approach.

reaching this estimate, the expert considered estimates from industry analysts, the seller's financial advisor, and the buyer's management team. *Id.* at 60. Vice Chancellor Lamb noted that in his other analyses, the expert had not relied on the work of the seller's financial advisor, and he rejected the expert's selective reliance on that source for a synergy deduction. *Id.* at 61. Vice Chancellor Lamb found more credible the expert's reliance on the synergy estimates of the acquirer's management team, which he noted were informed by a detailed actuarial analysis. After adjusting the acquirer's estimates for an updated actuarial study, Vice Chancellor Lamb concluded that the deal price incorporated synergies of $4.12 per share. *Id.* at 60–61. That figure coincidentally worked out to a deduction of 13%, the same number used in *Union Illinois*. In reaching this figure, however, the *Highfields* decision relied on record evidence specific to the deal in question.

After *Union Illinois* and *Highfields*, the deal-price-less-synergies metric lay dormant, only to re-emerge and rise to prominence during 2015 and 2016, when this court considered the deal price as evidence of fair value in seven appraisal decisions.[58] The

---

[58] *See In re Appraisal of DFC Glob. Corp.* (*DFC Trial*), 2016 WL 3753123, at *20–21 (Del. Ch. July 8, 2016), *rev'd sub nom. DFC Glob. Cor. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346 (Del. 2017); *Dell Trial*, 2016 WL 3186538, at *29–44; *Lender Processing*, 2016 WL 7324170, at *16–26; *BMC Software*, 2015 WL 6164771, at *14–17; *Ramtron*, 2015 WL 4540443, at *20–24; *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *11–17 (Del. Ch. Apr. 30, 2015); *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726 (Del. Ch. Jan. 30, 2015).

Two earlier decisions highlighted the deal price as evidence of fair value. In a 2010 opinion, then-Vice Chancellor Strine stated that "an arms-length merger price resulting from an effective market check is entitled to great weight in an appraisal." *Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010).

following year, the Delaware Supreme Court elevated the deal-price-less-synergies metric to its current position as first among equals.

In the decisions that preceded the Delaware Supreme Court's powerful endorsement of the methodology, this court exhibited reluctance to apportion synergies to the seller without persuasive, deal-specific evidence. Of the seven decisions issued during this period, only one made a deduction for synergies, and that decision rejected the respondent's position and adopted the petitioner's much lower adjustment.[59] In three decisions, the court did not reach the issue.[60] In three other decisions, the court found that the respondent had

He declined to apply the deal-price-less-synergies metric on the facts of the case because two large stockholders under common ownership stood on both sides of the transaction and a special committee treated the deal as if the company had a controlling stockholder. *Id.* at 503, 508–09.

Subsequently, in 2013, Vice Chancellor Glasscock relied exclusively on a deal price metric to value a privately held company, and the Delaware Supreme Court summarily affirmed the decision. *See Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807 (Del. Ch. Nov. 1, 2013), *aff'd*, 2015 WL 631568 (Del. Feb. 12, 2015) (ORDER). It seems likely that *Huff* provided the catalyst for the emphasis on the deal price in 2015 and 2016.

[59] *See Ramtron*, 2015 WL 4540443, at *1, *25–26 (rejecting respondent's estimate of $0.34 per share and adopting petitioner's estimate of $0.03 per share).

[60] In *Lender Processing*, the record contained extensive factual evidence about the existence of synergies, but the respondent waived its ability to seek a synergy adjustment by not raising the issue until post-trial briefing and its valuation expert had "declined to offer any opinion on the quantum of synergies or to propose an adjustment to the merger price" and "affirmed that he did not have any basis to opine regarding a specific quantum of synergies." 2016 WL 7324170, at *33. In *Dell*, the trial court found that the deal price was a sufficiently reliable metric to exclude the petitioner's significantly higher valuation, but that it did not provide reliable evidence of fair value due to flaws in the sale process. *See Dell Trial*, 2016 WL 3186538, at *44. Because the court did not use the deal price metric to derive fair value, it did not have to confront the synergy deduction. In *DFC*, the court found that the deal price was sufficiently reliable to use as one of three valuation

102

not provided deal-specific evidence to support an allocation of synergies to the seller.[61]

The *AutoInfo*, *Ramtron*, and *BMC Software* decisions illustrate the deal-specific approach that prevailed during this period. In *AutoInfo*, the appraisal proceeding followed a sale to a financial buyer. The buyer introduced evidence that it anticipated cost savings from taking the company private, and its expert argued that the seller's stockholders likely captured 100% of that value. 2015 WL 2069417, at *17. To support his opinion, the expert cited "academic literature that concludes that target firms capture virtually all of the value created by corporate combinations through the price paid by the acquirer." *Id.* This court refused to make a deduction for synergies, explaining that the evidence needed to be merger-specific. *Id.* The expert's method, by contrast, would call for "a near automatic reduction in price," which "would reverse the burden that is on the party arguing that

---

metrics but did not make a synergy adjustment because the acquirer "was a financial buyer rather than a strategic acquirer." 2016 WL 3753123, at *20–21 & n.230. In the earlier *Huff* decision from 2013, the synergy issue also arose too late. In its post-trial decision determining fair value to be $5.50 per share based on deal price, the court noted that the record contained limited evidence on synergy value and authorized the parties to supplement the record on this issue. *Huff*, 2013 WL 5878807, at *15. After a motion for reargument, the trial court found that the respondent had not provided an adequate evidentiary record to make a downward adjustment to the merger price. *See Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 2042797, at *3 (Del. Ch. May 19, 2014), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (ORDER).

[61] *See BMC Software*, 2015 WL 6164771 at *17 (finding that respondent failed to prove a synergy deduction); *AutoInfo*, 2015 WL 2069417, at *17 (same); *Ancestry*, 2015 WL 399726 at *16–17, 23 (declining to make a deduction for synergies where the buyer was a financial acquirer and the respondent's expert agreed that synergies were unlikely in a non-strategic acquisition).

adjustments are warranted." *Id*.

The court reasoned similarly in *Ramtron*, but ultimately adopted the petitioner's proposed synergy deduction. After a sale to a strategic buyer, the buyer's expert opined that synergies contributed to more than 10% of the transaction price, warranting a deduction of $0.34 per share. 2015 WL 4540443, at *25. To support that deduction, the buyer's expert prepared "a market-wide analysis of the premia paid by financial versus strategic buyers and . . . concluded that average synergies could be removed from the purchase price by applying the ratio of the average financial buyers' premium to the average strategic buyers' premium, *i.e.,* effectively multiplying the Merger price by [$]0.73." *Id.* The court rejected the expert's reliance on "general data," explaining that it did not provide insight into "*this specific* transaction, which must be the focus in a Section 262 action." *Id.* As an alternative measure, the buyer's expert quantified the anticipated synergies, "then assumed that Ramtron's stockholders captured between 25% and 75% of these synergies and took the midpoint of those calculations." *Id.* The court rejected this calculation as insufficiently reliable, noting that it had a "back-of-the-envelope feel." *Id.* Perhaps anticipating that some reduction was warranted, the petitioner's expert advocated for a far lower deduction of $0.03 per share. The court adopted the petitioner's figure, stating simply that "it better conforms to the evidence adduced at trial." *Id.* at *26.

In both *AutoInfo* and *Ramtron,* the buyer's expert testified about the appropriate synergy deduction. In *BMC Software*, a financial buyer claimed that it had anticipated financial savings from operating the target as a private company. 2015 WL 6164771, at

*17. But the buyer's expert "did not opine on the fair value of the Company using a deal-price-less-synergies approach." *Id*. Instead,

> [d]uring trial and in post-trial briefing, [the buyer] offered the testimony of a Bain principal to show that the Buyer Group would have been unwilling to pay the Merger price had they not intended to receive the tax benefits and cost reductions associated with taking the Company private. In fact, had these savings not existed, the Buyer Group would have been willing to pay only $36 per share, an amount that resembles the going-concern value posited by [the buyer's] expert.

*Id.* The court rejected this evidence, explaining that "demonstrating the acquirer's internal valuation is insufficient to demonstrate that such savings formed a part of the purchase price." *Id.* The court also noted that the buyer "required a 23% internal rate of return in their business model to justify the acquisition," suggesting that the buyer needed to retain the synergies to achieve the "rate of return that was required to justify the leverage presumably used to generate those savings." *Id.* The court ultimately found that

> [n]either party has pointed to evidence, nor can I locate any in the record, sufficient to show what quantum of value should be ascribed to the acquisition, in addition to going-concern value; and if such value was available to the Buyer Group, what portion, if any, was shared with the stockholders.

*Id.* The court therefore held "that the Merger price does not require reduction for synergies to represent fair value." *Id.*

Taken together, these cases suggest that a buyer during this period faced a relatively heavy burden when seeking to establish a synergy deduction. The buyer needed to identify case-specific factual evidence that supported not only the existence of potential synergies, but also the allocation of a portion of the synergies to the seller. Expert testimony based on broad market studies was not sufficient.

105

### ii. Synergy Allocations After *DFC* and *Dell*

After the Delaware Supreme Court's decisions in *DFC* and *Dell*, this court's appraisal decisions took a different approach. In three cases, this court allocated synergies based on a 2013 study prepared by the Boston Consulting Group ("2013 BCG Study"), which is a predecessor to the 2018 BCG Study on which Cineworld relies in this case.[62] The 2013 BCG Study used stock price reactions to conclude that on average, sellers collect 31% of the capitalized value of synergies (the median allocation in the sample). Across deals, however, the study showed wide variation, with stock price reactions suggesting a range of synergy allocations from 6% to 51%. *See* Kengelbach et al., *2013 M&A Report*, *supra*, at 12.

In *Aruba Trial*, the respondent's expert opined that the standalone value of the target company was $19.85 per share, the result of his DCF valuation. *See Aruba Trial*, 2018 WL 922139, at *49. To support the reasonableness of his valuation, the respondent's expert noted that it fell within the same range as the DCF valuations prepared by the buyer and its

---

[62] *See Panera*, 2020 WL 506684, at *38; *Solera*, 2018 WL 3625644, at *28 n.364; *Aruba Trial*, 2018 WL 922139, at *45. A fourth decision declined to allocate synergies to the seller based on a failure of proof. *See Columbia Pipeline*, 2019 WL 3778370, at *44. A fact witness for the acquirer testified that the acquirer had allocated all of the synergies to the target, but the contemporaneous evidence did not support that claim. The acquirer's valuation materials identified synergies, but they also showed the deal price falling comfortably within the indicative range of fair value without any allocation of synergies. *Id.* The court held that the buyer had not carried its burden of proof on the synergy deduction it claimed, and that although the buyer "likely could have justified a smaller synergy deduction," the buyer "claimed a larger and unpersuasive one." *Id.* at *45.

financial advisor, and he placed particular emphasis on the buyer's internal DCF valuation of $19.10 per share. *See id.* at \*53. As further support for his valuation opinion, the expert looked to the allocation of synergies implied by the difference between the deal price and the buyer's internal DCF valuation of $19.10 per share. Assuming that the delta reflected synergies allocated to the seller, then the allocations fell within the range described in the 2013 BCG Study. *See id.* at \*45. The respondent's expert argued that his DCF-based valuation conclusion therefore was reasonable.

Attempting to follow the teachings of *DFC* and *Dell*, the trial court did not rely on a DCF methodology. *Id.* at \*52. Instead, the trial court looked to the unaffected trading price and the deal price as market-based indicators of value. *Id.* at \*51–55.

Using the deal price as a valuation indicator meant that the trial court needed to deduct the value of the synergies allocated to the seller as part of the purchase price. There was no direct evidence regarding the allocation, and the parties agreed that it was not possible to determine with precision what portion of the final deal price reflected synergy value. *Id.* at \*44. "The respondent's expert conceded that '[t]he percentage of synergies actually paid by HP to Aruba cannot be accurately measured.'" *Id.* (alteration in original).

The trial court nevertheless attempted to determine an appropriate synergy deduction. To quantify the amount of synergies, the trial court relied on a synergies estimate prepared by the buyer's outside consulting firm. *Id.* at \*45. Noting that the respondent's expert had relied on the 2013 BCG Study, the trial court estimated a valuation range for the deal-price-less-synergies metric using the range of percentage allocations in the study. *Id.* The mid-point of the range was $18.20 per share. Based on the trial court's

107

review of the negotiation process, the trial court was "inclined to think that [the seller's] representatives bargained less effectively than they might have," which would have suggested that "they obtained a relatively low share of the synergies" and would have supported a valuation below the midpoint. *Id.* But "[h]aving no way to gauge the marginal impact of their ineffectiveness," the trial court used $18.20 per share as the valuation indication for the deal-price-less-synergies methodology. *Id.*

Despite having reached this conclusion regarding synergies, the trial court regarded the deal-price-less-synergies indicator as resting on series of uncertain judgments.

> My deal-price-less-synergies figure could have errors at multiple levels. To cite just a few, I may have erred when making my case-specific allocation of synergies to the sell-side. I might have misinterpreted the information that Aruba's expert cited, or that data itself could contain sampling and measurement errors. The size of the original synergy estimates might also be off, as could any number of individual estimates that added up to the overarching estimates. After all, they were necessarily predictions about complex matters. Perhaps errors at one level might counterbalance errors at another, but there is no way to know, and the smaller number of judgments involved (compared to the number of trades generating the market price) makes it more likely that the errors could skew the figure, just like a small and undiversified portfolio can produce extreme results. The Delaware Supreme Court's expressed preference in *Dell* and *DFC* for market indicators over discounted cash flow valuations counsels in favor of preferring market indicators over the output of a similarly judgment-laden exercise of backing out synergies.

*Id.* at *53. Believing that the unaffected trading price was a more reliable indication of standalone value, the trial court used the unaffected trading price to determine fair value and did not rely on the deal-price-less-synergies metric. *Id.* at *54–55.

In a *per curiam* decision, the Delaware Supreme Court reversed the trial court's fair value finding and remanded with instructions to enter judgment determining fair value to

108

be $19.10 per share. *Aruba*, 210 A.3d at 142. In its opinion, the high court noted at several points that the respondent described the figure of $19.10 per share as a deal-price-less-synergies metric. *See id.* at 130, 131, 134, 141. The respondent described its figure in those terms, but it had not developed that valuation indicator by starting with the deal price and deducting a synergy allocation. The respondent had proceeded in the opposite direction by starting with the buyer's internal DCF valuation of $19.10 per share, then arguing that by paying $24.67 per share, the buyer necessarily gave the seller over half of the synergies. *See* C.A. No. 11448, Dkt. 163 at 1, 3, 30, 41. The respondent's deal-price-less-synergies indicator of $19.10 per share thus was a plain vanilla DCF valuation, which the buyer used to argue that the court should adopt its expert's marginally higher DCF-based valuation indicator. *See id.* at 63.

The Delaware Supreme Court treated the figure of $19.10 per share as a true deal-price-less-synergies metric, remarking that the trial court "failed to explain why [its] estimate of $18.20 per share was more reliable than [the buyer's] own estimate of $19.10 per share." *Aruba*, 210 A.3d at 132. The Delaware Supreme Court noted that the trial court had relied on the 2013 BCG Study in reaching its conclusion, but did not comment one way or the other on the propriety of its use. Instead, by adopting the buyer's internal DCF valuation, the high court implicitly endorsed a synergy allocation in which the seller's stockholders captured 49.12% of the buyer's synergies estimate.[63]

---

[63] Internally, the buyer estimated total merger synergies of $11.34 per share. C.A. No. 11448, Dkt. 163 at 30. The difference between the merger price of $24.67 per share

The *Aruba* decision sent at least two strong messages. First, the Delaware Supreme Court directed the trial court to enter what the high court understood to be a deal-price-less-synergies valuation indicator, providing its most powerful endorsement yet of that methodology. Second, the high court discounted the trial court's concern about the difficulties involved in making a reliable synergy deduction. The Delaware Supreme Court instead admonished that "estimating synergies and allocating a reasonable portion to the seller certainly involves imprecision, but no more than other valuation methods, like a DCF analysis that involves estimating (i) future free cash flows; (ii) the weighted average cost of capital (including the stock's beta); and (iii) the perpetuity growth rate." *Aruba*, 210 A.3d at 141. One might debate the comparisons,[64] but the Delaware Supreme Court's

---

and the DCF valuation of $19.10 per share was $5.57. *See id.* Dividing $5.57 per share by $11.34 per share results in 49.12%, meaning the seller's stockholders captured 49.12% of the total merger synergies. The respondent had argued that this implied synergy allocation was reasonable because it fell within the range of outcomes in the 2013 BCG Study, albeit at the higher end of the range. *See Aruba Trial*, 2018 WL 922139, at *49.

[64] The financial literature has established methods for projecting free cash flows, deriving the weighted average cost of capital, and estimating the perpetuity growth rate. By contrast, the finance literature "does not contain a reliable method for estimating the portion of a merger premium that results from expected synergy value." *Union Illinois*, 847 A.2d at 356 n.35. Like Kennedy in this case, experts in other cases have acknowledged that difficulty. *See, e.g., Aruba Trial*, 2018 WL 922139, at *44 (respondent's expert conceding that "[t]he percentage of synergies actually paid by HP to Aruba cannot be accurately measured"); *Lender Processing*, 2016 WL 7324170, at *33 ("At trial, Fischel affirmed that he did not have any basis to opine regarding a specific quantum of synergies."); *Ramtron*, 2015 WL 4540443, at *25 (expert "assumed that Ramtron's stockholders captured between 25% and 75% of these synergies and took the midpoint of those calculations," which the court rejected in part due to its "back-of-the-envelope feel"); *Andaloro*, 2005 WL 2045640, at *18 n.74 ("Puglisi candidly admitted that he cannot find reliable data supporting the inference that higher premiums are paid in deals that are expected to yield synergies for the

statement provided forceful encouragement for trial judges to make synergy deductions using their best judgment.

And the judges of this court have made the attempt. In *Solera*, decided while *Aruba* was on appeal, the respondent's expert reviewed three studies that examined the percentage of synergies generally allocated to the seller. 2018 WL 3625644, at \*28. The respondent's expert elected to allocate 31% of the synergy value to the seller, using the median percentage in the 2013 BCG Study. The court noted that the 31% deduction was the lowest supported by the three studies that the expert reviewed. *Id.* The *Solera* court recognized that "the appraisal statute mandates excision of synergies specific to the merger at issue," but noted that "this court has used general estimates of the percentage of synergies shared, as provided by experts, to derive appraisal value from deal price." *Id.* at \*28 n.364 (citing *Union Ill.*, 847 A.2d at 353 & n.26). The court adopted the resulting deal-price-less-synergies metric as "the best evidence of the fair value of petitioners' shares of Solera at the time of the Merger." *Id.* at \*28.

In *Panera*, decided after the *Aruba* decision, the same expert who testified for the respondent in *Solera* allocated 31% of the synergy value to the seller based on the median percentage in the 2013 BCG Study. *Panera*, 2020 WL 506684, at \*38. In response to the petitioners' objection that the 2013 BCG Study did not constitute deal-specific evidence,

_____

buyer than in deals that are not of this nature."). Scholars have described the "relatively sparse literature" on quantifying and allocating synergies as "inconsistent." Hamermesh & Wachter, *Finding the Right Balance*, supra, at 1003.

the respondent relied on *Solera*. The court agreed that "the adoption of a methodology, expert opinion, or metric in one appraisal action does not mandate its adoption in a different appraisal action" and confirmed that the court's "previous acceptance of [the expert's] proffered study is not conclusive in this case." *Id.* The court instead noted that "Petitioners have not cast doubt on the reliability of this study, or put forward a more appropriate percentage" and concluded that the respondent therefore had proven its synergy allocation by a preponderance of the evidence. *Id.*

### iii.    The Synergy Allocation In This Case

With this jurisprudential history in mind, the court must determine whether to adjust the deal price for synergies in this case. The strongest evidence that Regal extracted a portion of the anticipated synergies comes from the fact that the deal price of $23 per share reflected a premium of 46.1% over Regal's unaffected market price.[65] In addition, Cineworld's stock price declined after the merger talks leaked and Cineworld disclosed the anticipated transaction price,[66] suggesting that market participants initially perceived that Cineworld was paying a price greater than Regal's fair value. *See* Kennedy Report ¶ 108;

---

[65] *See DFC,* 172 A.3d at 371 ("[I]t is widely assumed that the sales price in many M & A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control."). *But see Agranoff v. Miller*, 791 A.2d 880, 897 (Del. Ch. 2001) (discussing possible grounds for paying a control premium and observing that "[a]s a practical matter, however, it is impossible to make precise determinations about what motivated an acquiror to pay a control premium.").

[66] Kim Tr. 823; JX 1190; Kennedy Report ¶ 108.

112

JX 1645 ("Kennedy Rebuttal Report") ¶¶ 8, 40. Cineworld's share price recovered somewhat after Cineworld disclosed its synergy estimates. *See* JX 1400 at 3. This pattern suggests that once market participants understood the value of the combined company, they inferred that Cineworld had not overpaid but merely allocated some of the anticipated synergies to Regal.

By contrast, other case-specific evidence indicates that Regal did not extract any synergies in the transaction. When negotiating the Merger, the Board did not consider synergies. *See, e.g.*, Bell Dep. (JX 1591) 83–84. Bell, Miles, and Ownby testified that the parties never discussed them.[67] Ownby thought Cineworld's synergies estimates were unreliable. When he learned on December 4, 2017, that Cineworld planned to announce $100 million in annual cost and revenue synergies, he derided the number as "bullshit." Ownby Tr. 256; JX 1258 at 1. The absence of any explicit attempt to bargain for synergies weighs against a case-specific finding that Regal extracted them. The contemporaneous valuations that Cineworld's financial advisors prepared also suggest that Regal did not extract any synergies. In the Banker Presentation, Cineworld's financial advisors commented that the $23 per share offer price was "in line with [Regal's] standalone valuation." JX 1115 at '788; *accord* JX 1203 at '012 (lender presentation).

---

[67] *See* Ownby Tr. 256–61; Bell Tr. 502–03; Miles Dep. (JX 1589) 210–13; Bell Dep. (JX 1591) 83.

Cineworld's expert, Kennedy, conceded that he could not ascertain with any certainty how the synergies were split without "being in the smoke-filled room where negotiations were taking place." Kennedy Tr. 1059–60. He instead relied on the 2018 BCG Study, which found that "since 2007, the shareholders of target companies have captured, on average, 54% of the value of synergies, thanks to share price increases near the announcement date." Kengelbach et al., *2018 M&A Report*, *supra*, at 18 (using "average" to refer to median in sample); *accord id.* Fig. 12. The 2018 BCG Study thus estimates that sell-side stockholders generally capture significantly more synergies than in the 2013 BCG Study (54% versus 31%).

The petitioners object to the court using the 2018 BCG Study. They argue that it uses stock price reactions following the announcement of mergers to estimate the synergy allocation, which has not been shown to provide persuasive evidence of the allocation of synergies. Although it is true that stock price reactions do not measure the allocation of synergies directly, that is not a sufficient reason to discard the study. As Cineworld points out, the academic literature contains support for the use of stock price reactions to measure synergies.[68] The 2018 BCG Study relied on short-window event studies. *See* Kengelbach

---

[68] *See* Gregor Andrade et al., *supra*, at 109 ("The most statistically reliable evidence on whether mergers create value for shareholders comes from traditional short-window event studies, where the average abnormal stock market reaction at merger announcement is used as a gauge of value creation or destruction."); *see also* Tim Koller et al., *Valuation: Measuring and Managing the Value of Companies* 569–72 (6th ed. 2015) (summarizing research and noting that "[t]hese studies typically examine the stock market reaction to an acquisition within a few days of its announcement").

114

et al., *2018 M&A Report*, *supra*, App'x A. The 2018 BCG Study examined "all reported M&A transactions from 1990 through the first half of 2018," and the median synergy allocation of 54% resulted from analyzing "1,000 public-to-public M&A transactions between 2008 and 2017." *Id.* Ex. 12, App'x A. The 2018 BCG Study therefore is a useful tool for assessing how synergies are allocated generally.

The petitioners also object to the study because it does not account for deal-specific or industry-specific factors. Dkt. 255 at 58–59. And they point out that Kennedy did not attempt to replicate the study's methodology and that Kennedy agreed that he could not have done so. Kennedy Tr. 1063–64. It is true that the 2018 BCG Study's synergy sharing estimates do not incorporate deal-specific or industry-specific factors, but by using the predecessor version of the study to allocate synergies, the *Solera* and *Panera* decisions showed that this was not a fatal defect. The fact that Kennedy did not and could not replicate the study's methodology also does not defeat its usefulness for making a "reasonable estimate" of the allocation of synergies. *Aruba*, 210 A.3d at 133.

In addition, as a case-specific argument against using the 2018 BCG Study, the petitioners maintain that Regal did not receive any synergies, because "Cineworld needed to keep all the 'synergies' to raise the debt needed to finance the transaction." Dkt. 255 at 57. The petitioners' case-specific argument does not obviate the potential need for a synergy deduction. This decision already has concluded that Cineworld likely increased its synergy estimates to satisfy its lenders and would have been unlikely to share the value represented by the increased estimates with Regal. To reflect Cineworld's retention of

115

those synergies, this decision already has discounted the total value of operational synergies by thirty percent. It does not follow that Cineworld kept *all* of the synergies.

The court's task under the appraisal statute is to value Regal, and the question remains how much of the synergies to allocate to Regal's stockholders. The court faces a less than optimal record and unsettled precedent as to what is necessary to prove a synergy allocation. In deciding how to proceed, the court heeds the Delaware Supreme Court's admonition in *Aruba*, which called on the trial court to use its best judgment in apportioning synergies despite the imprecision inherent in that exercise.

Nor is it unprecedented for the trial courts to deploy rough estimates in appraisal cases. During an earlier jurisprudential era, this court was unable to quantify the amount of synergies required to adjust a valuation metric derived using a comparable transactions methodology. The Delaware Supreme Court observed with approval that this court "account[ed] for the synergies in a different way, namely, by reducing the total weight accorded to the comparable transactions component of the overall valuation, from 80% to 65%." *Montgomery Cellular*, 880 A.2d at 221. The high court affirmed this approach, noting that "[a]lthough in a perfect world that may not have been the ideal solution, in this world it was the only one permitted by the record evidence." *Id.*[69] Likewise, during a period

---

[69] It is unclear whether the Delaware Supreme Court would endorse a similar method today. In *DFC,* the Delaware Supreme Court reversed a decision by this court that weighted three valuation techniques, admonishing that when confronted with multiple valuation indications the Court of Chancery "may well feel tempted to turn its valuation decisions into a more improvisational variation of the old Delaware Block Method, but one in which the court takes every valuation method put in the record, gives each equal weight,

when this court added a control premium to an appraisal valuation derived from a comparable company methodology to correct for the implicit minority discount that was understood to infect that method, this court relied on cross-deal studies and similar expert analyses to derive a rough estimate of the amount of the control premium.[70] Estimating a

and then divides by the number of them." 172 A.3d at 388. The high court mandated that if the Court of Chancery relies on multiple valuation methods, it "must exercise its considerable discretion while also explaining, with reference to the economic facts before it and corporate finance principles, why it is according a certain weight to a certain indicator of value." *Id.* Heeding this instruction, the trial court rejected a request by the petitioners in the *Dunmire* case to adjust for synergies in a manner resembling the *Montgomery Cellular* decision. The petitioners argued that the court should address synergies by either adjusting the weight given to their expert's comparable transactions valuation or, alternatively, asked the court to deduct 5% or 10% of the value to reflect synergies. The court "decline[d] to go down that road for lack of any principled basis by which to determine the amount of weight to give [the expert's] analysis or to determine the appropriate level of an adjustment for potential synergies." *Dunmire*, 2016 WL 6651411, at *9 n.109.

[70] On the implicit minority discount generally, see Hamermesh & Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, *supra*. Because the comparable company method was understood to contain an implicit minority discount, decisions sought to correct for what was understood to be an impermissible stockholder-level discount when that valuation methodology was used in appraisal cases. To correct for the implicit minority discount, Delaware decisions added an estimate of a control premium derived from studies of acquisition premiums or the prices at which large blocks traded. The decisions recognized that the premium incorporated several factors, including synergies available to an acquirer and the value of control. The upward adjustment in the valuation to add control value thus was conceptually similar to, albeit the directional opposite of, the deduction from the deal price to exclude synergy value. The cases that sought to account for the implicit discount with an upward adjustment did not rely on company-specific or transaction-specific evidence. *See, e.g.*, *Agranoff*, 719 A.2d at 900 (applying a premium of 30% to correct for an implicit minority discount; basing adjustment on testimony by expert regarding aggregate control premiums paid in acquisitions of public companies during the valuation year); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1186 (Del. Ch. 1999) (adding control premium of 30% to correct for implicit minority discount), *aff'd*, 766 A.2d 437 (Del. 2000) (per curiam);

synergy deduction based on the evidence available in this case is comparable to the exercises of judgment reflected in those precedents.

The record evidence establishes that the combination of Regal and Cineworld would create synergies. The premium reflected in the merger consideration and the associated stock price reactions are sufficient to establish by a preponderance of the evidence that Regal's stockholders received at least some of the synergistic value. The 2018 BCG Study is the best tool available for an imprecise task. It also results in an outcome close to the nearly equal synergy allocation implied by the Delaware Supreme Court's decision in *Aruba*, another case in which the trial record did not clearly demonstrate how synergies were allocated.

This decision has found that the amount of synergies available for sharing was $6.99 per share; 54% of that figure equals $3.77 per share. The deal price thus included $3.77 of synergies.

---

*Borruso v. Commc'ns Telesystems Int'l,* 753 A.2d 451, 459 (Del. Ch. 1999) (electing to apply 40% premium to compensate for implicit minority discount in comparable company analysis, but reducing 40% premium to 30% to reflect potential synergistic value from merger); *Hintmann v. Fred Weber, Inc.*, 1998 WL 83052, at *8 (Del. Ch. Feb. 17, 1998) (adopting expert's comparable company valuation in which expert corrected for the implicit minority discount by "analyz[ing] the control premia paid for publicly-held companies between July 1, 1991 and June 30, 1992," finding that "the mean premium was approximately 45% and that the median premium was approximately 55%," and then applying an adjusted premium of 20% "[b]ecause a portion of those premia reflected post-merger values expected from synergies").

### d. Deal Price As Reliable Indicator Of Fair Value At Signing

Because the sale process bore multiple objective indicia of reliability and compared favorably to the facts of other appraisal cases in which the Delaware Supreme Court has endorsed the deal price as a reliable valuation indicator, the deal price provides reliable evidence of Regal's fair value as of signing. This decision has evaluated the parties' competing arguments about synergies and ultimately made its own estimate of the portion of synergies that must be excluded from the deal price. The Merger produced $6.99 of excludable synergies, and a reasonable estimate of the amount of synergies that Regal's stockholders captured is $3.77 per share. Subtracting $3.77 from the deal price of $23 per share yields a deal-price-less-synergies value of $19.23 per share.

### 3. Step Three: The Change In Value Between Signing And Closing

After the court has concluded that the deal price is a reliable valuation indicator, and after the court has deducted an appropriate synergy allocation, then the analysis proceeds to the third step: determining whether the value of the corporation changed between signing and closing. In an appraisal proceeding, the court must determine the fair value of the dissenter's shares as of the date on which the merger closes. *Stillwater*, 240 A.3d at 17. The valuation date is "not the date the merger agreement is executed." *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1135 (Del. 2020). "Thus, if the value of the corporation changes between the signing of the merger agreement and the closing, then the fair value determination must be measured by the 'operative reality' of the corporation at the time of the merger." *Stillwater*, 240 A.3d at 17.

Ordinarily, "the party seeking an adjustment to the deal price reflecting a valuation change between signing and closing bears the burden to identify that change and prove the amount to be adjusted." *Id.* In this case, both sides agree that Regal's operative reality changed between signing and closing when the Tax Act became law on December 22, 2017. Both sides agree that this event necessitates an upward adjustment to the deal-price-less-synergies metric. The only question is the amount.

### a. The Implications Of The Go-Shop Phase

Despite agreeing that an adjustment to the deal-price-less-synergies metric is warranted to reflect a post-signing, pre-closing change in value, Cineworld contends that the adjustment should be minimal because no one bid for Regal during the go-shop phase. Dkt. 259 at 6, 25–26. At a superficial level, this argument makes sense: If parties have agreed on a price for an asset, and if the value of that asset has increased such that the asset is now underpriced, then other bidders should compete for the asset. *See Dell*, 177 A.3d at 32–33. But depending on the facts of a specific case, the intuition may not hold.

One reason why the absence of a higher bid might not convincingly negate the existence of a change in value is if the parties to the deal created meaningful barriers to an overbid. At trial, the petitioners sought to show that Regal was generally hostile to a competing bid by pointing to contemporaneous documents that described a topping bidder as an "interloper." *See* JX 1215 at 1; JX 1085 at 7. That term has a pejorative connotation and suggests someone who is not wanted. *See* Kim Tr. 854–56. But in an M&A deal, the term generally has a pejorative connotation only from the perspective of an incumbent

bidder, if at all.[71] The term commonly is used to refer to a topping bidder without any negative connotations from the perspective of the target company,[72] so it does not signal anything exceptional about Regal's sale process. The more important factor was whether the Merger Agreement established meaningful barriers to a competing bidder's participation. As this decision has explained, it did not. *See* Part II.D.1, *supra*.

Another reason why the absence of a higher bid might not convincingly negate the existence of a change in value is if there were a limited number of potential bidders who realistically could challenge the incumbent, yet those bidders were unable to engage for

---

[71] *See, e.g.*, *Ramtron*, 2015 WL 4540443, at *21 ("Cypress began preparing for its hostile bid well in advance. Part of that diligence involved predicting potential interlopers."); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 582 (Del. Ch. 2010) ("JP Morgan viewed Goldman Sachs as an interloper trying to angle into JP Morgan's deal."); Arthur Fleischer, Jr. et al., *Takeover Defense: Mergers and Acquisitions* § 16.04 (8th ed. 2018) ("[I]f the confidentiality agreement has a standstill, the initial bidder will generally insist that any interloper be subject to the same restrictions."); Steven J. Brams & Joshua R. Mitts, *Mechanism Design in M&A Auctions*, 38 Del. J. Corp. L. 873, 878 (2014) ("[E]ven if the board announces an agreement with a winning bidder at the highest price among participants in the auction, the transaction is always vulnerable to subsequent interlopers who might make a topping bid.").

[72] *See, e.g.*, *Panera*, 2020 WL 506684, at *13 ("Morgan Stanley also identified and ranked 'Potential Interlopers' by their strategic rationale and ability to pay."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1037 (Del. Ch. 2012) ("[T]he deal protections were, by traditional standards, not of a size that would have prevented a serious topping bid by a genuine, motivated interloper."); Scott M. Freeman et al., *"Don't Ask, Don't Waive": Standstill Provisions in Light of Recent Delaware Cases*, 17 M & A Law. 14 (2013) ("The stalking horse has the benefit of reasonable deal protections, such as matching rights and a break-up fee, but otherwise recognizes that the deal is open to being topped by an interloper."); Stephen I. Glover, *Designing Termination Fee Payment Triggers*, 6 M & A Law. 14 (2002) ("[T]he target stockholders will choose not to approve a transaction only if an interloper has made a better offer.").

121

reasons unrelated to price. The Merger was a synergistic transaction, making it likely that only trade bidders with access to synergies could compete with Cineworld. In this case, the two logical trade bidders were AMC and Cinemark. The petitioners assert that Regal drove away AMC, but this decision already has rejected that argument. *See* Part II.D.1.a.i, *supra*. Nevertheless, the evidence indicates that AMC and Cinemark elected not to engage for reasons other than price. AMC faced likely insuperable antitrust issues and was struggling financially at the time, and Cinemark was focused on its standalone business rather than on M&A. *See* Kim Tr. 825–26.

Yet another reason why the absence of a higher bid might not convincingly negate the existence of a change in value is if the valuation increase would be available to the incumbent and the competitors alike. Under those circumstances, the competition for the incremental value would operate as a common value auction, "defined as an auction in which 'every bidder has the same value for the auctioned object.'" *Stillwater Trial*, 2019 WL 3943851, at *49 (quoting Peter Cramton & Alan Schwartz, *Using Auction Theory to Inform Takeover Speculation*, 75 L. Econ. & Org. 27, 28–29 (1991)).

> In a competition for that incremental value, the incumbent bidder's matching right would loom large. To make it worthwhile to bid, a potential deal jumper would not only have to perceive that the value of the target had increased above the level set by the deal price plus the termination fee and fee reimbursement plus the deal jumper's likely transaction costs, but also perceive a pathway to success that was sufficiently realistic to warrant becoming involved, taking into account the potential reputational damage that could result from being unsuccessful.

*Id*; *see* Brian JM Quinn, *Normalizing Matching Rights*, 1 Harv. Bus. L. Rev. Online 7, 9 (2010) ("Matching rights work to deter subsequent bids when held by an initial bidder. In

the context of common value auctions . . . , the effect of a matching right is to deter subsequent bidders and appropriate rents to the initial bidder."). The Tax Act increased the value of Regal's future free cash flows by reducing Regal's future tax payments. That value likely would have been available to any competing bidder, including Cineworld, eliminating any pathway for a competitor to capture the common value created by the Tax Act.

The fact that no one bid during the go-shop period does not provide persuasive evidence that the Tax Act had a minimal effect on Regal's value. It is possible that the Tax Act could have caused Regal's value to increase materially, despite the absence of any bids.

### b. The Implications Of Anschutz's Approval Of The Deal

Cineworld next contends that because Anschutz approved the Merger, any incremental value from the Tax Act must have been minimal. Anschutz's approval of the Merger lacks probative value because Anschutz executed a voting agreement that bound Anschutz to vote for the Merger without any meaningful outs. *See* JX 1289 § 3(b); *accord* JX 1346 at '875. As it was obligated to do, Anschutz approved the Merger by written consent. JX 1290 at 78–80; JX 1346 at '107–09. Anschutz's approval reflected its compliance with a contractual obligation, not its view regarding the incremental value created by the Tax Act.

Assuming for the sake of argument that Anschutz had a choice, then the evidence would not support Cineworld's position. In *Stillwater*, the court rejected a similar argument, noting that stockholders only would vote down the deal if they preferred to

123

return to the Company's operative reality as a standalone firm. *Stillwater Trial*, 2019 WL 3943851, at \*50. Stockholders might well prefer "the surer option of the deal price, even if they believed that the Company's value had increased between signing and closing such that the deal price no longer reflected fair value." *Id.* Anschutz's large holdings and its status as Regal's controlling stockholder constrained its ability to sell. If Anschutz wanted liquidity, then it likely would have had to engage in further block sales at a discount to the market price, and its sales could have created a further overhang on the stock. In fact, the evidence suggests that Anschutz was sufficiently happy with the deal price that it never evaluated the implications of the Tax Act for Regal's value. *See* Anschutz Dep. 86–87.

The fact that Anschutz approved the Merger does not provide persuasive evidence that the Tax Act had a minimal effect on Regal's value. It is possible that the Tax Act could have caused Regal's value to increase materially, despite approval from Anschutz.

### c. The Double-Counting Issue

In addition to arguing that the go-shop phase and Anschutz's vote meant that any post-signing change in value was minimal, Cineworld maintains that the deal price at signing already included a measure of value resulting from the expectation that the corporate tax rate would fall. Cineworld failed to prove that the deal price included a quantifiable amount of value from this source.

Kennedy sought to establish that the deal price included value from an anticipated lowering of tax rates by citing market commentary which claimed that traders were considering this issue. *See* Kennedy Tr. 994–99; Kennedy Report ¶¶ 151–56. To quantify the impact, Kenney relied on a J.P. Morgan report, issued in November 22, 2017, in which

the bank predicted that the Tax Act "would translate to ~8% of S&P 500 price appreciation" and estimated that "about ~3% is priced in." JX 1148 at 2. In a later report issued on December 4, 2017, J.P. Morgan estimated that the effect of reducing the corporate tax rate was "currently ~50% priced-in." JX 1252 at 1. Kennedy also determined that market multiples did not react materially when the Tax Act became law. *See* Kennedy Report ¶ 21; Kennedy Rebuttal Report ¶ 56.

Kennedy's market evidence was not persuasive. Analysts had been writing about the possibility of lower tax rates since the 2016 election, so the existence of market commentary on the issue was trivial. The J.P. Morgan reports sought to quantify the effect, but the firm's conclusions were speculative and unsupported. The fact that market multiples did not react significantly upon the passage of the Tax Act indicates that by that point, the effects of a lower corporate tax rate were priced in, but it does not provide evidence of when the changes were priced in—an occurrence that likely took place over time and to different degrees for different companies.

More importantly, Cineworld failed to translate its generic evidence about market prices into specific evidence about Regal. Cineworld failed to provide any persuasive evidence regarding the degree to which Regal's stock price incorporated value from a lowered tax rate. Cineworld also did not point to any channel by which value theoretically imbued in the stock price would have percolated into the deal price. Cineworld did not prove that the parties anchored the deal price off of the market price or any metric based on the market price.

125

There also was a timing disconnect. The Tax Act became law on December 22, 2017. The negotiations that led to the deal price began in October 2017, and the parties reached agreement on price on November 3, 2017, seven weeks before the Tax Act passed and almost three weeks before J.P. Morgan estimated that 3% of the value of the Tax Act was priced in to the S&P 500. The Board ultimately approved the Merger Agreement on December 4, three weeks before the Tax Act became law, but the parties had reached agreement on pricing weeks before that.

Notably, Cineworld did *not* argue that a double-counting problem arises because Cineworld had expected to generate cost savings by moving income from the United States into lower jurisdictions, only to have a significant portion of that value become part of Regal's operative reality as a standalone entity as a result of the Tax Act. Kennedy accepted that Cineworld could not claim a portion of that value as synergies, warranting a lower synergy deduction from the deal price, and he agreed that an adjustment was necessary to account for the change in Regal's value between signing and closing. This decision has made different findings regarding the amount of the synergy deduction and the subsequent increase in value between signing and closing, but it otherwise agrees with Kennedy's approach and does not treat the passage of the Tax Act as creating a double-counting problem. The former step in the analysis is necessary to derive the standalone value of the Company at signing as implied by the deal price; the latter step is necessary to adjust the standalone value of the Company to reflect the change in value between signing and closing.

126

Cineworld thus did not carry its burden of proving that a double-counting problem existed.

### d. The Estimates Of The Change In Value

The record contains various estimates of the change in Regal's value between signing and closing. This decision ultimately adopts a value of $4.37 per share, which is the value implied by Cineworld's disclosures about the amount of financial savings it could achieve before and after the passage of the Tax Act. That figure is the same value that this decision deducted from Cineworld's expectation of financial savings to account for the passage of the Tax Act. The two are not necessarily equivalent: Cineworld's estimate of the financial savings it no longer could achieve might be higher or lower than the actual value of a lower corporate tax rate to Regal as a standalone entity. For purposes of this case, however, Cineworld's estimate is the most reliable indicator. First, unlike the experts in this case, Cineworld had actual dollars at risk. Second, when making its disclosures regarding financial savings, Cineworld was attempting to portray the deal in a positive light to the markets, its investors, and its lenders, meaning that Cineworld had an incentive to identify any financial savings that its management team believed the Merger could generate. A valuation based on the reduced amount of benefits that Cineworld thought it could generate therefore is likely to be conservative.

Notwithstanding Cineworld's arguments that sought to minimize the change in value between signing and closing, Kennedy opined that Regal's value increased by $0.92 due to the passage of the Tax Act. As noted, Kennedy derived this figure using the two J.P. Morgan reports. *See* Kennedy Tr. 1074; Kennedy Report ¶¶ 116, 154. He relied blindly on

127

J.P. Morgan's estimates, and he did not test or attempt to replicate J.P. Morgan's methodology. Kennedy Tr. 1075. His valuation therefore is unpersuasive.

Yilmaz opined that Regal's value increased by $7.32 between signing and closing. To derive this figure, Yilmaz prepared a DCF valuation of Regal using its effective tax rate before the passage of the Tax Act, then conducted a DCF valuation of Regal using its effective tax rate after the Tax Act passed. *See* Yilmaz Rebuttal Report ¶ 46. Both valuations used the 2017 Projections. This decision has explained that there are sufficient questions surrounding the 2017 Projections to eschew using them for valuation purposes. This decision therefore will not use Yilmaz's methodology to determine the change in value between signing and closing.

The record contains two contemporaneous estimates of the value of a lower tax rate to Regal. One estimate was prepared on December 2, 2017, by Christopher Frye, Regal's Vice President of Tax, who used the 2017 Projections to estimate Regal's tax savings in 2017, 2018, and 2019. *See* JX 1235. Using Frye's calculations, the court estimates that the reduction in tax rates had a value of $4.66 per share.[73] That result, however, depends ultimately on the reliability of the 2017 Projections and other debatable inputs.

---

[73] To derive this figure, the court first adjusted Frye's estimates to reflect the tax rate of 21% in the Tax Act, rather than the 20% rate that Frye anticipated. Making this change causes Frye's model to predict savings of $33.65 million in 2017, $42.26 million in 2018, and $47.25 million in 2019. To calculate the present value of the these cash flows, the court used the formula $PV = C / (1 + r)^n$, where $PV$ is the present value of the future cash flow, $C$ is the amount of the future cash flow, $r$ is the discount rate, and $n$ is the number of years in the future. To value the tax savings into perpetuity, the court derived a terminal value by treating the 2019 savings as the final year of the projection period in a DCF

A second contemporaneous estimate of the value of the tax rate reduction appears in the January Stockholder Letter and the January Lender Presentation, in which Cineworld estimated that it would receive $50 million in tax savings as a result of the Tax Act. JX 1416 at 10; JX 1420 at 5. Using Kennedy's method for calculating the value of financial savings, $50 million of annual tax benefits would equal $4.97 per share.[74] That estimate is not sufficiently supported by the record evidence. It appears to have been derived by adding the $17.5 million of savings from transfer pricing to the $31 million of projected savings from financial structuring under the "base case" scenario in a draft of an E&Y tax synergies report, and rounding up. *See* JX 1163 at '290, '292. In any event, because this decision already has excluded the value of $44 million of expected financial savings from the calculation of synergies, using a higher number risks double-counting.

This decision uses $4.37 per share as its estimate of the change in value between signing and closing due to the Tax Act. This decision has found that the deal price included $2.73 per share that was attributable to Cineworld's expectations of financial savings.

---

valuation and using the formula $TV = C_{Steady\ State} / (r - g)$, where $TV$ is the steady-state expected free cash flow for the year after the final year of the cash flow forecast, $r$ is the discount rate, and $g$ is the perpetuity growth rate. Using a perpetuity growth rate of 1.5% (drawn from Yilmaz's DCF) and a discount rate of 7.66% (drawn from Kennedy's critique of Yilmaz's DCF), this calculation yields a present value of $734.65 million. Dividing this number by the 157.7 million outstanding shares of Regal stock results in tax savings valued at $4.66 per share.

[74] If $71.5 million of financial savings translates to $7.10 per share, then $50 million divided $71.5 million (69.93%) times $7.10 per share equals $4.97 per share.

Cineworld originally had anticipated financial savings of $7.10 per share, but the remaining $4.37 per share represented value that became part of Regal's operative reality at the time of the Merger after the enactment of the Tax Act.

The $4.37 per share represents the value of Cineworld's original estimate of $71.5 million in 2019 run rate tax savings, reduced to account for (i) the $17.5 million of savings from transfer pricing that Cineworld expected to achieve before the passage of the Tax Act and (ii) the $10 million of group structuring benefits that Cineworld continued to believe it could achieve after the passage of the Tax Act. The resulting $44 million of annual tax savings is more conservative than Morgan Stanley's estimate of $85 million to $100 million in annual tax savings that would result from the Tax Act.[75] The per-share value of $4.37 implied by the $44 million in annual tax savings also is lower than Yilmaz's estimate of $7.32 per share.

The court's calculation based on Frye's estimates, the values disclosed by Cineworld in the January Stockholder Letter and the January Lender Presentation, and the value implied by Cineworld's expectation of financial savings before and after the passage of the Tax Act cluster in a range between $4.37 and $4.97 per share. The congruence among

---

[75] *See* JX 1232. That said, valuing the tax savings at $4.37 per share admittedly is higher than a Morgan Stanley sensitivity analysis, prepared in early December 2017, which implied that Regal's value using a DCF methodology would increase by $1.52 to $1.62 if the federal tax rate was reduced. *See* JX 1256 at 15.

these estimates suggests that the resulting calculation is a reasonable one.[76] Ultimately, the court adopts the most conservative of the three—the $4.37 implied by Cineworld's expectation of financial savings.

### e. Adjusted Deal Price As Reliable Indicator Of Fair Value At Closing

This decision has concluded that the deal price provided a reliable indicator of the fair value of Regal at signing. This decision has determined that the Merger price included $4.26 per share of operational synergies and $2.73 per share of financial savings, for total synergies value of $6.99 per share. This decision has concluded that Cineworld shared 54% of the synergies with Regal's stockholders, necessitating a synergy deduction of $3.77 per share. After the deduction, the adjusted deal price points to a fair value at signing of $19.23

---

[76] *See, e.g., Aruba*, 210 A.3d at 142 (adopting deal-price-minus-synergies estimate that "was corroborated by HP's and Aruba's real-time considerations and Aruba's DCF, comparable companies, and comparable transactions analyses" (footnotes omitted)); *Jarden Trial*, 2019 WL 3244085, at \*50 (adopting unaffected market price and noting that the valuation conclusion was corroborated by the results of a DCF methodology); *S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, 2011 WL 863007, at \*20 (Del. Ch. Mar. 9, 2011) ("[I]t is preferable to take a more robust approach involving multiple techniques . . . to triangulate a value range . . . ."); *In re Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at \*3 (Del. Ch. Sept. 24, 2010) (citing use of "multiple valuation techniques that support one another's conclusions" as supporting adoption of respondent's expert valuation); James M. Wahlen et al., *Financial Reporting, Financial Statement Analysis, and Valuation* 995 (8th ed. 2015) ("Our experience with valuation suggests that using several valuation approaches yields more useful insights than using just one approach in all circumstances."); Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions* 138 (2009) ("[O]nce a . . . valuation range is determined, it should be compared to the valuation ranges derived from other methodologies."); *cf. DFC,* 172 A.3d at 388 (admonishing Court of Chancery against using a weighted average of multiple valuation indicators).

131

per share. Between signing and closing, Regal's value increased by $4.37 per share. Adding the valuation increase to the adjusted deal price results in a fair value indicator as of closing of $23.60 per share.

## III.  CONCLUSION

The most reliable metric for determining the fair value of the petitioners' shares is the deal price minus synergies plus the change in value between signing and closing. Accordingly, the fair value of Regal as of the date of the Merger was $23.60 per share. The petitioners are entitled to this amount, plus pre- and post-judgment interest.